Matthew J. Faust, State Bar No. 254145
*faust@shariffaust.com*
Khodadad D. Sharif, State Bar No. 187992
*sharif@shariffaust.com*
Yasaman Sharif, State Bar No. 298318
*ysharif@shariffaust.com*
SHARIF | FAUST LAWYERS, LTD.
600 B Street, Suite 2490
San Diego, CA 92101
Telephone: (619) 233-6600
Facsimile: (619) 233-6602

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BULLION STANDARD, INC., a California corporation<br><br>Plaintiff,<br>vs.<br><br>BANK OF AMERICA, N.A.; and DOES 1 through 25,<br><br>Defendants. | Case No.: 25-CV-1299 W (SBC)<br><br>FIRST AMENDED COMPLAINT:<br><br>1. DECLARATORY RELIEF;<br>2. RECEIPT OF STOLEN PROPERTY;<br>3. INDEBITATUS ASSUMPSIT;<br>4. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;<br>5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;<br>6. NEGLIGENT INTEREFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;<br>7. VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200. |

**COMES NOW**, PLAINTIFF BULLION STANDARD, INC. who brings this action against DEFENDANTS BANK OF AMERICA, N.A., and DOES 1 through 25 and allege as follows:

## GENERAL ALLEGATIONS

1) PLAINTIFF, BULLION STANDARD, INC. ("Bullion Standard") is a California corporation doing business in this judicial district.

2) DEFENDANT, BANK OF AMERICA, N.A. ("B.O.A."), is a national association, qualified to do business in the state of California and actually doing business in this judicial district. B.O.A. maintains a branch at 655 W. Broadway, Ste 101, San Diego California, 92101. This location is a four minute walk from this Courthouse.

3) PLAINTIFF is ignorant of the true names and capacities of the DEFENDANTS sued herein under the fictitious names DOES 1 through 25, inclusive. PLAINTIFF is informed and believes that each of the DEFENDANTS was responsible in some manner for the current damages alleged in this Complaint.

4) At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each DEFENDANT, was the agent/employee of each and every other DEFENDANT. In doing the things alleged in the causes of action to which this paragraph is incorporated by reference, each and every DEFENDANT was acting within the course and scope of this agency and employment and was acting with the consent, permission, and authorization of each of the other DEFENDANTS. All actions of each DEFENDANTS alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other DEFENDANTS.

## FACTUAL BACKGROUND

5) Bullion Standard is an online precious metals retailer that stands out as the trusted choice for discerning precious metals investors. It maintains a commitment to competitive pricing, superior products, and exceptional customer service.

6) In operating its business, Bullion Standard opened a bank account at B.O.A. to receive wire transfers from its customers.

7) In a matter of days, B.O.A. has destroyed Bullion Standard's 15 years of goodwill and business development. As will be explained below, B.O.A. acted unlawfully and in violation of their own duties to their customers generally, and Bullion Standard specifically.

8) B.O.A. has falsely accused Bullion Standard of committing fraud after committing a bad faith "investigation" and intentionally overlooked overwhelming evidence which demonstrates Bullion Standard committed no fraudulent acts. Based upon its bad faith "investigation" of Bullion Standard, B.O.A. stole $ 50,000 from Bullion Standard's account which was to be utilized to purchase precious metals for one of Bullion Standard's customers. B.O.A. then closed the account, without providing immediate and actual notice and in bad faith, closed Bullion Standard's account, rendering it unable to facilitate any wire transfers. This has irreversibly and permanently damaged Bullion Standard's business.

9) Bullion Standard has been shut down until it can open new bank accounts. Due to anti-money laundering protocols imposed on precious metal retailers, this process can take several weeks. By the time that Bullion Standard is able to re-establish banking relationships

with institutions that do not breach their duties to their customers, Bullion Standard will have lost millions of dollars of sales.

10) Accordingly, Bullion Standard brings this action against B.O.A. to recover the money it stole from Bullion Standard as well as remuneration for the bad faith actions of the defendants.

## I. **Bullion Standard**

11) Bullion Standard started business in 2010 as a local precious metals dealer in America's finest city of San Diego, CA, and has evolved into one of the industry's premier online bullion retailers, trusted by investors nationwide. Bullion Standard is driven by a shared vision of revolutionizing the retail bullion industry.

12) Traditional bullion retailers often fall short when it comes to fair pricing, customer service, and education, so Bullion Standard decided to take action. Harnessing a collective experience of more than 24 years in the precious metals industry, Bullion Standard embarked on reshaping those standards.

13) Bullion Standard prides itself on being a BBB accredited business with an A+ rating, member dealers of the National Coin and Bullion Association (NCBA), the American Numismatic Association (ANA), and authorized dealers for PCGS and NGC, ensuring that its customers can trust in its reliability and reputation. At Bullion Standard, transparency and

integrity are at the core of everything it does, embodying the principle that "you only get one chance to make it right in this business."

14) Competition in the bullion retail space is fierce, which means retailers, like Bullion Standard, rely upon an excellent reputation amongst its customer base. Bullion Standard's customers expect excellence. Winning their business is hard and requires time and money. Building its customers' trust is paramount to Bullion Standard's success. To build good faith in the marketplace, Bullion Standard has enacted several anti-fraud policies to ensure that its customers are who they say they are (e.g., not identity thieves) and that they receive their goods when they purchase them. The steps that Bullion Standard takes includes IPQS Enterprise grade fraud software, telephonic order verification, email verification, tracked shipping, and signature delivery confirmation.

15) By taking the above-steps to protect its customers, Bullion Standard has been able to build its business over the past 15 years to the point where it was able to expand its operations. Bullion Standard recently began offering a membership program, which allowed its customers to purchase an unlimited amount of product for a low monthly charge (the "Membership Program"). Bullion Standard's sales under this program were especially dependent upon having reliable banking relationships.

///

///

///

## II. B.O.A.'s Shameful and Deceitful History of Defrauding its Customers

16) B.O.A. is one of the largest financial institutions in the world. As of March 31, 2023, B.O.A. had approximately $ 2,400,000,000,000.00 ($ 2.4 trillion) in combined assets and $ 1,900,000.000,000.00 ($ 1.9 trillion) in domestic deposits.

17) Unbeknownst to Bullion Standard, Bank of America has a history of defrauding its customers. In fact, in the last ten years, the United States Consumer Financial Protection Bureau ("C.F.P.B.") has ordered B.O.A. to pay over $ 1,000,000,000.00 ($ 1 billion) in penalties, fines, and disgorgements.

### A. The Credit Card Scam

18) In 2014, the C.F.P.B. ordered B.O.A. to pay $ 727,000,000.00 ($ 727 million) in redress to its victims—a.k.a. customers—for illegal credit card practices and was entered in C.F.P.B. Case No. 2014-CFPB-0004. This will be referred to in this complaint as the **Credit Card Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.A.

(a) The C.F.P.B. described B.O.A. fraudulent and illegal conduct in the **Credit Card Scam** as follows:

(i) Roughly 1.4 million consumers were affected by Bank of America's deceptive marketing of their add-on products. B.O.A. also illegally charged approximately 1.9 million consumer accounts for credit monitoring and credit reporting services that they were not receiving.

B.O.A was ordered to pay a $20 million civil money penalty to the C.F.P.B.

(ii) B.O.A. led some consumers to believe that the first 30 days of coverage were free of charge when, in fact, by enrolling, consumers were "agreeing" to purchase the credit protection products. Consumers would begin incurring charges unless they cancelled within an initial 30-day review period, in which case any fees previously paid would be reimbursed.

(iii) B.O.A. misled some consumers about the enrollment process for these products, telling them that there were additional steps to enroll in or purchase the products after the telemarketing call or that, on the call, they were merely agreeing to receive additional information. In reality, B.O.A. was enrolling these consumers in the products during these calls and then charging consumers for the products.

(iv) B.O.A. misrepresented the benefits consumers could receive from the products, telling consumers they could receive benefits for a longer period of time than was allowed under the terms and conditions of the credit protection products. B.O.A. also led some consumers to believe they would be entitled to a "$25,000 death benefit" by enrolling in Credit Protection Plus when that was not the case. Telemarketers misled

consumers by implying the benefits of these products were automatic upon notice of a qualifying event when, in fact, benefits were contingent on the successful completion of a benefit request submission and approval process.

(v) B.O.A. illegally charged customers for these products as soon as they enrolled even if they were not actually receiving the services yet.

(vi) The unfair monthly fees that customers were charged sometimes resulted in customers exceeding their credit card account limits, which lead to additional fees for the customers. Some consumers also paid interest charges on the fees for services that were never received.

(vii) B.O.A. engaged in these unfair billing practices from at least October 2000 through September 2011. About 1.9 million consumer accounts were improperly billed product fees while not receiving the full product services, affecting roughly 1.5 million consumers. The unfair billing practices resulted in about $459 million in harm to consumers.

(viii) Consumers may have been under the impression that their credit was being monitored for fraud and identity theft, when, in fact, these services were either not being performed at all, or were only partially performed.

(b) As a result of its illegal, unfair, deceptive, and abusive actions in the **Credit Card Scam**, B.O.A. was ordered to undertake the following corrective actions:

(i) B.O.A. was prohibited from marketing any credit protection or credit monitoring add-on products until it submits a compliance plan to the C.F.P.B.

(ii) Consumers were no longer be billed for these products if they are not receiving the promised benefits. B.O.A. was ordered to review and, if necessary, improve its policies to ensure that it does not commit unlawful acts in the future.

(iii) B.O.A. was ordered to provide approximately $ 268,000,000.00 ( $268 million) in refunds and additional relief to more than 1.4 million customers subjected to deceptive marketing practices. B.O.A. was also ordered to pay approximately $ 459,000,000.00 ($ 459 million) to roughly 1.9 million customer accounts, representing approximately 1.5 million consumers who enrolled in the credit monitoring products and were charged while B.O.A. did not perform all of the promised services.

(iv) B.O.A. reimbursed consumers for the unfair billing practices relating to the identity protection products. For the credit protection products, if the consumers were B.O.A. customers, they were to receive

a credit to their accounts. If they were no longer a B.O.A. credit card holder, they were to receive a check in the mail or have charged-off balances reduced by the amount they were charged in fees. Consumers were not required to take any action to receive their credit or check.

(v) B.OA. was ordered to make a $20 million penalty payment to the CFPB's Civil Penalty Fund.

**B. The Garnishment Scam**

19) In 2022, the C.F.P.B. ordered B.O.A. to pay a $ 10,000,000.00 ($ 10 million) civil penalty for illegally garnishing its victims'—customers'—moneys in C.F.P.B. Case No. 2022-CFPB-0002. This will be referred to in this complaint as the **Garnishment Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.B.

(a) The C.F.P.G. described B.O.A.'s misconduct in the **Garnishment Scam** as follows:

(i) B.O.A. falsely represented to customers that their rights to have certain funds exempted from garnishment were governed by the law of the issuing court's state. By stating to its customers that it applied the exemption law of the garnishment issuing state, B.O.A. misrepresented to customers that their rights to have certain funds exempted from

garnishment orders were governed by the laws of the issuing states when, actually, in most states, customers' own state laws apply.

(ii) B.O.A. required customers to "direct" it not to contest garnishment orders and to waive the company's liability for its actions regarding the out-of-state garnishment orders. This prevented customers from pursuing legal claims against B.O.A. for improperly handling garnishments. B.O.A. also represented to its customers that they waived their right to hold the company liable for improperly responding to garnishment notices; however, account holders have the right to challenge garnishments despite any language in their account agreements to the contrary.

(iii) B.O.A. acted on garnishment orders without disclosing that the accounts were located out-of-state and protected from the issuing courts' garnishment orders. B.O.A. applied the consumer protections and exemption rights of the state that issued the garnishment order and not those of the state where the individual lived. As a result, it improperly held, froze, and eventually turned over its customers' funds to judgment creditors.

(b) As a result of B.O.A.'s unfair, deceptive and abusive acts in the **Garnishment Scam**, the C.F.P.B. ordered it to:

(i) Refund at least $ 592,000.00 in garnishment-related fees to harmed customers.

(ii) Review and reform its system for processing garnishments, and notify courts or other garnishment issuers when accounts were located out-of-state.

(iii) B.O.A. was ordered to cease including language in customer contracts that purports to limit customer rights to challenge garnishments.

(iv) B.O.A. was ordered to pay a $10,000,000.00 ($ 10 million) dollar penalty to the CFPB, which will be deposited into the CFPB's Civil Penalty Fund.

### C. The Fraud Reporting Scam

20) In 2022, the C.F.P.B. and the United States Office of the Comptroller of the Currency ("O.C.C.") fined B.O.A. $ 225,000,000.00 ($ 225 million) and required it to pay hundreds of millions of dollars in redress to consumers for botched disbursement of state unemployment benefits at the height of the COVID-19 pandemic. This occurred in C.F.P.B. Case No. 2022-CFPB-0004. This scam will be referred to in this complaint as the **Fraud Reporting Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.C.

(a) The C.F.P.B. described B.O.A.'s misconduct in the **Fraud Reporting Scam** as follows:

(i) In the fall of 2020, and continuing through mid-2021, B.O.A. changed its practices for investigating prepaid debit card fraud on the unemployment insurance benefit accounts. Instead of conducting reasonable investigations, it implemented a fraud filter with a simple set of flags that automatically triggered an account freeze. This set a low bar to freeze the unemployment insurance benefits of many people, harming thousands of legitimate cardholders needing the money. The bank also retroactively applied its fraud filter to deny some notices of error submitted by prepaid debit cardholders that the bank had previously investigated and paid.

(ii) B.O.A. made it very difficult for people to unfreeze their prepaid debit cards or for people to report fraudulent use of their cards. People with unemployment insurance benefit prepaid debit cards could not make reports online, or in person at bank branches. People were on hold for hours every day for weeks trying to talk to someone at the bank. Furthermore, the bank told customers they had agents available 24 hours a day, seven days a week, when, in fact, it operated a more limited schedule for its claim call center. Because Bank of America was the

strongly preferred provider for California unemployment benefits, consumers were caught without any choice to switch providers.

(iii) When consumers sought assistance, the bank often sent them back to the California state unemployment department for verification in order to regain access to their benefits. But the bank knew the department was stretched and unable to provide services; the bank met with the department dozens of times in the summer of 2020 and should have known it was essentially redirecting people into a black hole.

(b) As a result of the illegal, unfair, deceptive, and abusive actions in the **Fraud Reporting Scam**, B.O.A. was ordered to undertake the following corrective actions:

(i) B.O.A. was ordered to pay back the money that they wrongly denied to consumers across the country because of the faulty fraud filter. The bank was also ordered to provide each affected consumer with a lump sum consequential harm payment, which was determined through a methodology of financial harm consumers suffered due to the time their accounts remained frozen or blocked. Finally, affected consumers had the opportunity to receive additional redress through an individualized review process.

(ii) B.O.A. was ordered to pay a $100 million dollar penalty to the CFPB, which will be deposited into the victims relief fund. The penalty reflects the severity and scope of the consumer harm caused by the bank's practices. The OCC is separately fining the bank $125 million to be remitted to the Treasury.

21) In 2023, B.O.A. was caught tricking its customers and stealing in excess of $ 100,000,000.00 ($ 100 million) from its poorest customers in C.F.P.B. Case No. 2023-CFPB-0006. In addition to being ordered to return what it stole, B.O.A. also paid penalties of $ 90,000,000 to the C.F.P.G. and $ 60,000,000 to the O.C.C. This will be referred to in the complaint as the **Theft Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.D.

(a) The C.F.P.B. described B.O.A.'s **Theft Scam** as follows:

(i) B.O.A. had a policy of charging customers $35 after the bank declined a transaction because the customer did not have enough funds in their account. The C.F.P.B.'s investigation found that B.O.A. double-dipped by allowing fees to be repeatedly charged for the same transaction. Over a period of multiple years, B.O.A. generated substantial additional revenue by illegally charging multiple $35 fees.

(ii) To compete with other credit card companies, B.O.A. targeted individuals with special offers of cash and points when signing up for a

credit card. B.O.A. illegally withheld promised credit card account bonuses, such as cash rewards or bonus points, to tens of thousands of consumers. B.O.A. failed to honor rewards promises for consumers who submitted in-person or over-the-phone applications. B.O.A. also denied sign-up bonuses to consumers due to the failure of B.O.A.'s business processes and systems.

(iii) From at least 2012, in order to reach now disbanded sales-based incentive goals and evaluation criteria, B.O.A. employees illegally applied for and enrolled consumers in credit card accounts without consumers' knowledge or authorization. In those cases, B.O.A. illegally used or obtained consumers' credit reports, without their permission, to complete applications. Because of B.O.A.'s actions, consumers were charged unjustified fees, suffered negative effects to their credit profiles, and had to spend time correcting errors.

(iv) B.O.A. also violated the Fair Credit Reporting Act by using or obtaining consumer reports without a permissible purpose in connection with unauthorized credit cards, as well as the Truth in Lending Act and its implementing Regulation Z, by issuing credit cards to consumers without their knowledge or consent.

(b) As a result of the foregoing deceptive, unfair, and illegal acts in the **Theft Scam**, B.O.A. was ordered to do the following:

(i) B.O.A. was ordered to stop opening unauthorized accounts and disclose material limitations on any rewards cards bonuses and provide bonuses as advertised. Additionally, B.O.A. was also strictly prohibited from charging repeat non-sufficient funds fees in the future.

(ii) B.O.A. was ordered to compensate consumers charged unlawful non-sufficient funds fees and who have not already been made whole by the bank, totaling approximately $ 80,400,000.00 ($ 80.4 million) in consumer redress. The bank was also ordered to compensate consumers who incurred costs stemming from the unauthorized opening of new credit card accounts, and any customers improperly denied bonuses whom the bank had not already made whole. The bank previously paid around $ 23,000,000/00 ($23 million) to consumers who were denied rewards bonuses.

(iii) B.O.A. was ordered to pay a $ 60,000,000.00 ($60 million) penalty to the CFPB for charging repeat non-sufficient funds fees, and a $ 30,000,000.00 ($30 million) penalty to the C.F.P.B. for its credit card rewards practices and for opening unauthorized accounts. The penalties were deposited into the C.F.P.B.'s victims relief fund. Separately,

B.O.A. was also ordered to pay a $ 60,000,000 ($60 million) penalty to the O.C.C. for its double-dipping fee practices.

## III. B.O.A.'s First Wrongful Freeze of Bullion Standard's Account

22) On or about 17 January 2024, Bullion Standard opened a direct deposit account with B.O.A. (the "Account"). Without knowledge of B.O.A.'s fraudulent past, Bullion Standard rather believed that B.O.A. was an world class bank which was more than capable of handling its business. Bullion Standard's personnel contacted the bank and discussed its business model to ascertain whether B.O.A. was a good bank for it to work with. Because of the nature of the precious metals industry, banks commonly require retailers like Bullion Standard to satisfy criteria additional to a typical business. For instance, Bullion Standard was required to comply with anti-money laundering certifications and present additional evidence of its business's valid, lawful operations. In anticipation of opening the account, Bullion Standard submitted an online application and specified that the account would be utilized as a "precious metals dealer account" in accordance with the bank's pre-populated data form. B.O.A.'s representative explained that they would be more than able to handle Bullion Standard's business. As a further inducement to obtain Bullion Stanard's business, and knowing that Bullion Standard intended on utilizing wire transfers as a core component of its business model, B.O.A. offered an account that would have no fees associated with receiving wire transfers. Based on these representations, Bullion Standard agreed to open an

Account with B.O.A. After all of this, Bullion Standard's Account was finally opened on or about 17 January 2024.

23) For the next year, until the occurrence of the facts at issue in this complaint, Bullion Standard conducted its business, instructing its customers to deposit funds into the Account. In approximately one year's time, B.O.A. received approximately $ 4 million n transfers from Bullion Standard's customers, without incident.

24) That was soon about to change. B.O.A. mishandled the Account, failed to exercise reasonable care, made false statements, and generally breached the implied covenant of good faith and fair dealing. As a result of these bad acts, B.O.A. has destroyed Bullion Standard's business.

### A. Customer 1

25) Between 8 January 2025 and 13 February 2025, Bullion Standard entered into a series of sales transaction with a customer who, to protect the customer's identity, will be identified under the fictitious name "**Customer 1**". Customer 1 purchased approximately $ 380,000.00 of product from Bullion Standard over a series of transactions and sent numerous wire transfers to Bullion Standard's B.O.A. Account to consummate the purchases. For each transaction, after verifying the sales and the availability of the funds, Bullion Standard transferred the funds to its wholesaler so as to fulfill Customer 1's order(s). Thereafter, Bullion Standard monitored the transactions and confirmed that the product was delivered to

Customer 1 for each order. Customer 1 verified their receipt of the product that they ordered on or about 2/17/2025. As far as Bullion Standard knew, this transaction was completed.

26) However, unbeknownst to Bullion Standard, Customer 1, acting on their own and without any instructions from Bullion Standard, gave their product to a third party, whose identity is unknown . For the purposes of this pleading, the third party shall be known as Potential Thief 1. Upon information and belief, that third party utilized false pretenses to wrongfully obtain the product from Customer 1. Upon information and belief, Customer 1 determined that they had been a victim of fraud perpetrated by Potential Thief 1.

27) Customer 1 then went to their local B.O.A. branch to report that their product had been stolen by Potential Thief 1. Customer 1 did not accuse Bullion Standard of committing, participating, or otherwise being aware of the actions of Potential Thief 1.

28) Without conducting any investigation into the matter, exercising reasonable care, or acting in accordance with its duties of good faith and fair dealing, on or about 11 March 2025, without providing any notice to Bullion Standard, B.O.A. debited Bullion Standard's account in the amount of approximately $ 381,000.00.

**B. Customer 2**

29) On or about 2/27/2025 Bullion Standard entered into a sales transaction with a customer who, to protect the customer's identity, will be identified under the fictitious name "**Customer 2**". Customer 2 purchased approximately $ 75,000 of product from Bullion

Standard and sent a wire transfer to Bullion Standard's B.O.A. Account to consummate the purchase. After verifying the sale and the availability of the funds, Bullion Standard transferred the funds to its wholesaler so as to fulfill Customer 2's order. Thereafter, Bullion Standard monitored the transaction and confirmed that the product was delivered to Customer 2. Customer 2 verified their receipt of the product that they ordered on or about 3/6/2025 As far as Bullion Standard knew, this transaction was completed.

30) However, unbeknownst to Bullion Standard, Customer 2, acting on their own and without any instructions from Bullion Standard, gave their product to a third party, whose identity is unknown . For the purposes of this pleading, the third party shall be known as Potential Thief 2. Upon information and belief, that third party utilized false pretenses to wrongfully obtain the product from Customer 2. Upon information and belief, Customer 2 determined that they had been a victim of fraud perpetrated by Potential Thief 2.

31) Customer 2 then went to their local bank to report that their product had been stolen by Potential Thief 2. Customer 2 did not accuse Bullion Standard of committing, participating, or otherwise being aware of the actions of Potential Thief 2.

32) Without conducting any investigation into the matter, exercising reasonable care, or acting in accordance with its duties of good faith and fair dealing, on or about 12 March 2025, without providing any notice to Bullion Standard, B.O.A. debited Bullion Standard's account in the amount of approximately $ 75,000.00.

### C. Bullion Standard Obtains the Return of Its Funds

33) After the wrongful debits identified above, B.O.A. showed Bullion Standard's Account had a balance of approximately – $ 430,000.00. B.O.A. failed to provide contemporaneous notice or explanation of its actions to Bullion Standard. Bullion Standard was completely unaware of B.O.A.'s actions until B.O.A. logged into its account to verify it had received funds for another customer's purchase.

34) At that point Bullion Standard discovered that its account was negative and that it was without any ability to collect payments or conduct transactions for its customers. Bullion Standard's business was entirely shut down as a result of B.O.A.'s wrongful conduct.

35) Accordingly, Bullion Standard undertook a furious effort to understand what happened to its money. Bullion Standard's personnel spent countless hours every day on B.O.A.'s "customer support" phone number, but it quickly became apparent that B.O.A.'s call center was unable to answer any meaningful questions about the account. Its representatives were unable to provide details about the nature of the bank's debits. Bullion Standard received contradictory and inconsistent information.

36) Bullion Standard provided documentary evidence demonstrating the validity of the transactions and confirming that Customer 1 and Customer 2 actually did purchase and receive the product from Bullion Standard.

37) During this time, Customer 1 and Customer 2 both notified Bullion Standard that they believe their product had been stolen by Potential Thief 1 and Potential Thief 2, respectively.

38) Concurrent with its efforts to deal with B.O.A., Bullion Standard also worked to understand what Customer 1 and Customer 2 had said to the banks. Both Customer 1 and Customer 2 confirmed again that they had received the product that they ordered and that they knew that Bullion Standard did not do anything wrong. Customer 1 and Customer 2 each confirmed to Bullion Standard that they never told the bank that they believed their purchase from Bullion Standard was fraudulent or made any comments indicating that Bullion Standard was engaged in fraud of any kind.

39) Thereafter, Customer 1 agreed to contact their local B.O.A. and reiterate to them that Bullion Standard had not engaged in fraud. They requested that they did not want Bullion Standard's funds frozen or withheld any further. B.O.A. noted the request, but did not immediately return Bullion Standard's money.

40) On or about 13 March 2025, Bullion Standard visited the B.O.A. branch located at 655 W. Broadway, Ste 101, San Diego California, 92101. At this meeting, Bullion Standard met with a manager (the "Manager") who was also unable to provide any additional information or introduce Bullion Standard to B.O.A.'s legal department to resolve the matter. The Manager was advised that they were not given any contact information for the legal department and could not connect Bullion Standard with a regional manager to discuss the

problems. Notwithstanding this, the Manager did call B.O.A.'s customer service line and ultimately was able to use their credentials to dial into B.O.A.'s fraud prevention department. This was the first time any B.O.A. personnel had offered to provide this level of assistance to Bullion Standard.

41) The fraud prevention employee on the phone call further confirmed that Customer 1 had requested that the funds be released to Bullion Standard and that the investigation into the matter was being closed.

42) However, B.O.A. still did not release Bullion Standard's funds associated with Customer 1's purchase for several days.

43) Thereafter, Customer 2 also contacted their bank to reiterate to them that Bullion Standard had not engaged in fraud. They requested that they did not want Bullion Standard's funds frozen or withheld any further. B.O.A. noted the file, but did not immediately return Bullion Standard's money.

44) Several days later, on or about 19 March 2025, B.O.A. finally credited Bullion Standard's funds to it and unfroze the account. Of course, the funds never should have been withdrawn and the Account never should have been frozen. It was only a result of B.O.A.'s failure to adequately investigate the matter or act in accordance with its duty of good faith and fair dealing that the debits were made and the Account was frozen. In sum, B.O.A. had wrongfully debited Bullion Standard's account for a period in excess of one week, causing Bullion Standard to suffer actual damages in an amount to be proven at trial.

45) Also on 19 March 2025, over a week after taking Bullion Standard's funds, B.O.A. mailed written notice to Bullion Standard of the "disputes" relating to Customer 1 and Customer 2's funds. These notices included materially false statements indicating that the transactions related to Customer 1 and Customer 2 were "unauthorized," when in fact both Customer 1 and Customer 2 advised Bullion Standard and B.O.A. that purchases from Bullion Standard were legitimate.

46) Notwithstanding B.O.A.'s false and wrongful actions related to Customer 1 and Customer 2, B.O.A. advised Bullion Standard that both "investigations" were closed and that Bullion Standard's account would be unfrozen so that it could continue its business. This statement was made by a customer service representative on a telephone call. This statement was materially false.

47) Bullion Standard did not know it at the time, but B.O.A. had actually determined that Bullion Standard committed fraud on its customers, notwithstanding the undisputed evidence to the contrary. Additionally, Bullion Standard is informed and believes, and thereon alleges that B.O.A. had flagged Bullion Standard's account for fraud. None of these facts were known to Bullion Standard until much later, but should have been disclosed by B.O.A. on the phone call of.

48) At this time, Bullion Standard understood it would need to establish a new banking relationship to continue its business. As outlined above, banks require several weeks of compliance and due diligence before opening a bank account for a bullion retailer.

At the filing of this Complaint, Bullion Standard is undergoing the compliance process, but has not yet completed it.

49) Left without an account, Bullion Standard is seeing its business damaged daily. It has lost its goodwill and future business with its customers. It's inactivity in the precious metals business has caused it be delisted amongst various indexes that identify bullion retailers to the general public. On top of these harms, Bullion Standard has lost profits, including, as explained below, the most lucrative day in the history of precious metals sales.

### IV. B.O.A. Wrongfully "Determined" That Bullion Standard Committed Fraud and Withheld Customer 3's Funds

50) On or about 3/27/2025 Bullion Standard entered into a sales transaction with a customer who, to protect the customer's identity, will be identified under the fictitious name "**Customer 3**". Customer 3 purchased approximately $ 50,000 of product from Bullion Standard and sent a wire transfer to Bullion Standard's B.O.A. Account to consummate the purchase. Bullion Standard attempted to verify the sale and the availability of the funds so that it could pay the wholesaler to fulfill Customer 3's order.

51) Instead, Bullion Standard logged into its account online and learned that B.O.A. had frozen the Account, making the funds and all access from the account impossible. .

52) Bullion Standard contacted B.O.A.'s fraud prevention line to enquire as to the freeze. The representative advised Bullion Standard that the transaction was marked as

"potentially fraudulent," although the representative confirmed that there was not a complaint from Customer 3 indicating the amount was fraudulent.

53) Bullion Standard contacted Customer 3 to explain the situation to them. Bullion Standard requested that they contact B.O.A. to explain the situation was not fraudulent and request that the funds be cleared so that the transaction could complete.

54) Customer 3 was irate and did not believe that a bank would act in a manner that B.O.A. had acted. Nonetheless, Customer 3 attempted to contact the bank as requested, but B.O.A. refused to speak with Customer 3 regarding the transaction.

55) Throughout this time period, Bullion Standard contacted B.O.A.'s fraud prevention line daily to obtain updates on the matter. Ultimately, the representatives changed their story about the nature of the account. It was at this point that B.O.A.'s representatives revealed that Bullion Standard was "determined" by B.O.A. to have committed fraud in connection with the transactions with Customer 1 and Customer 2, despite the overwhelming and undisputed evidence that Bullion Standard did not commit fraud. Because of this false determination, B.O.A. made the decision to close Bullion Standard's Account. Rather than notify Bullion Standard of its intent to close the Account, B.O.A. had reopened the Account and allowed Bullion Standard to receive funds for a sale. At that point, B.O.A. closed the account and froze Customer 3's funds from Bullion Standard's account.

56) Bullion Standard requested that the bank return the funds directly to Customer 3, but B.O.A. denied this request. Its representatives stated that the funds would be returned to Bullion Standard, but the representatives each had different dates for the return. One representative stated that the funds would be returned when the account was closed in the "next few weeks" (which would have been mid-April 2025). Another representative stated that the funds would be returned on or about 5/13/2025. A third representative said the funds would not be returned until it was determined that Bullion Standard had not engaged in fraud, and that investigation would take up to 90 days.

57) Bullion filed its original claim on or about 4/11/2025 and B.O.A. was served shortly thereafter. Upon information and belief, B.O.A. had not conducted any investigation as to whether or not any fraudulent activity actually occurred on B.O.A.'s account at that point.

58) On or about 7/3/2025, Bullion's counsel sent B.O.A. a written demand for the return of its funds. That letter is attached hereto as Exhibit 1 (with Personally Identifying Information redacted). Notably, in that demand, Bullion provided indisputable proof of the origin of Customer 3's funds. The letter further put B.O.A. on notice that because it had failed to act in good faith that the funds would be treated as stolen from this point forward.

59) On or about 7/16/2025, B.O.A. responded, falsely claiming that it was permitted to keep Bullion's money so long as it determined that it—in its unilateral discretion—determined that the funds were the subject of fraud or other illegal activity. B.O.A.'s letter is

attached hereto as Exhibit 2. Notably, B.O.A. conceded by silence that, contrary to its customer service representatives' statements to the contrary, there was no investigation. B.O.A. had misrepresented the status of the investigations into Bullion's Account. Even worse, B.O.A.'s letter implied that it was somehow authorized to keep Bullion's money forever pursuant to the terms of a so-called deposit agreement. These statements validated Bullion's concerns that B.O.A. had failed to conduct any investigation into the claimed fraudulent activity prior to 4/11/2025. Had such an investigation occurred, then B.O.A.'s letter of 7/16/2025 would have included more substantive discussion of such an investigation, instead of ignoring any mention of an investigation.

60) On or about 8/14/2025, Bullion responded to B.O.A.'s letter. In its letter, attached hereto as Exhibit 3, Bullion debunked B.O.A.'s false statements and put it on notice of the stolen character of the moneys it is now evidently withholding in perpetuity.

61) To date, B.O.A. has wrongfully retained and kept the funds Customer 3 wired to Plaintiff for the purchase of precious metals products. Those funds are now stolen property because B.O.A. has misappropriated them to its own use either in violation of California Penal Code §§ 484, 503, and 506 or through the making material false misrepresentations as outlined herein.

///

///

///

## V. Bullion Standard is Left Without Accounts for the Biggest Trading Day in History

62) On 4/4/2025, President Trump unveiled a series of new tariffs to be imposed by the United States.

63) Precious metals investors (including Bullion Standard's customers and potential customers) had been eying this date as an important event in the purchase and sales of precious metals.

64) As a result of B.O.A.'s bad acts, however, Bullion Standard's Account was shuttered.

65) On 4/4/2025, President Trump announced the new tariff regime and the precious metals industry exploded. Prices of gold and silver crashed significantly, where the volatility fueled mania brought enormous buying pressure into the precious metals sector, and all Bullion Standard could do was watch. Its personnel fielded dozens of calls and emails from potential customers who were unable to purchase through Bullion Standard. The customers that joined Bullion Standard's Membership Program were livid that their membership would not permit them to participate in this historic event.

66) Defendant knew, at all times, that Plaintiff is a precious metal retailer, as evidenced by Plaintiff's numerous communications to Defendant, from the opening of the Account through Defendant's mishandling of the debits/freezes associated with Customer 1 and Customer 2.

67) To date, Bullion Standard is still working to reestablish its banking relationships, but the damage has been done. Through its bad acts, B.O.A. has caused Bullion Standard's business to shutter and lose profits. Further, upon information and belief, B.O.A. has reported to other banking institutions utilizing systems akin to a credit report that it has closed B.O.A.'s account for fraud related to transactions involving Customer 1 and Customer 2. This reporting is not publicly available but is in B.O.A.'s possession. Discovery and verification of these comments can only be obtained through compulsory discovery procedures. B.O.A. made these statements in gross disregard of the truth, namely that Bullion Standard did not defraud Customer 1 or Customer 2, that B.O.A. was provided with incontrovertible evidence of Bullion Standard's innocence, and that Customer 1 and Customer 2 both advised B.O.A. that Bullion Standard did not defraud them. Bullion Standard's merchant account, not administered by B.O.A. but rather by another institution, was closed and has had a chargeback in excess of $ 193,000 applied against it. Upon information and belief, Bullion Standard alleges that B.O.A.'s false statements through inter-bank communications and/or databases are the cause for the losses associated with Bullion Standard's merchant services account.

68) Until B.O.A.'s negligent and bad faith conduct, Bullion Standard had steadily increased its good will in the marketplace, resulting in Bullion Standard collecting profits and setting an expectation for future profits. As a result of B.O.A.'s bad acts, Bullion Standard has lost out on:

(a) Moneys frozen and being held by BOA for an unknown amount of time from its account, in an amount to be proven at trial;

(b) Actual sales, in an amount to be proven at trial;

(c) Financial inability to meet its obligations as funds owed to primary wholesaler cannot be repaid;

(d) Reputational harm due to Bullion Standards inability to fulfill customer order;

(e) Future profits and lost good will, in an amount to be proven at trial.

69) For these reasons, Bullion Standard brings this complaint.

## FIRST CAUSE OF ACTION
## (DECLARATORY RELIEF)
## (AGAINST ALL DEFENDANTS)

70) PLAINTIFF hereby incorporates by reference paragraphs 1-65 of this Complaint as if fully set forth herein.

71) An actual controversy has arisen and now exists between Plaintiff and Defendant concerning their respective rights and duties in that Plaintiff contends that Defendant has wrongfully determined that Plaintiff's business was fraudulent based upon Defendant's "investigation" into the transactions involving Customer 1 and Customer 2. Based upon this wrongful determination, Defendant closed Plaintiff's Account and made

false statements about Plaintiff to other banking institutions that Plaintiff engaged in fraudulent conduct.

72) Plaintiff desires a judicial determination of its rights and duties, and a declaration that it did not commit fraud against Customer 1 and Customer 2.

73) A judicial declaration is necessary and appropriate at this time under the circumstances that Plaintiff did not commit fraud against Customer 1 and Customer 2.

## SECOND CAUSE OF ACTION
## (RECEIPT OF STOLEN PROPERTY)
## (CAL. PENAL CODE § 496)
## (AGAINST ALL DEFENDANTS)

74) PLAINTIFF hereby incorporates by reference paragraphs 1-73 of this Complaint as if fully set forth herein.

75) On or about 3/27/2025, B.O.A. falsely and wrongfully stole approximately $ 49,526.90 of Bullion's money related to Customer 3's deposit which was to be utilized to purchase five bars of Platinum (the "Platinum Money"), as well as an additional $ 741.01 which was already in the account.

76) B.O.A. stole Bullion's money utilizing either or both of two separate theft-based schemes: an Embezzlement Scheme, or a Theft Through False Pretenses Scheme.

77) Under the Theft Through False Pretenses Scheme, B.O.A. lured Bullion into making additional deposits which B.O.A. would then "Freeze"—aka steal—without

performing an adequate investigation. Upon the facts known to Bullion now, this is how B.O.A. perpetrated the Theft Through False Pretenses Scheme:

(a) On or about 3/13/2025, B.O.A.'s fraud prevention employees confirmed to Bullion's personnel that they had confirmed that complaints filed by Customers 1 and 2 were being withdrawn, that there was no fraud on Bullion's account, that the freezes on Bullion's account were being lifted, and that there was no further fraud investigations pending against Bullion's account.

(b) These statements were misleading. Although Customer 1 and Customer 2 had withdrawn their complaints and acknowledged that Bullion had not stolen any moneys from them, B.O.A. had apparently already begun plans to close Bullion's account and "freeze" Bullion's funds indefinitely.

(c) B.O.A. never told Bullion of its secret plans to close the account and to "freeze" Bullion's moneys.

(d) Had Bullion known of B.O.A.'s plans to indefinitely freeze Bullion's funds, Bullion would have opened a bank account elsewhere so that B.O.A. would be unable to embezzle any money from Bullion.

(e) Bullion would not have utilized the Account for those funds had B.O.A. not made the misrepresentations to Bullion.

(f) B.O.A. made these misrepresentations to Bullion with the intent of taking Bullion's money and misappropriating said money to its own purpose. B.O.A.'s fraudulent intent can be further inferred through its parallel bad conduct in the Fraud Scam and the Theft Scam when B.O.A. pleaded guilty to stealing in excess of $ 100,000,000.00 from customers across the nation.

78) Alternatively, or additionally, B.O.A. also engaged in the Embezzlement Scheme, outlined below:

(a) Independent of any misrepresentations B.O.A. made to Bullion, at some point in the process of closing Bullion's Account, B.O.A. has made the determination that it never needs to return the moneys it has taken from Bullion's Account.

(b) Bullion has never consented to this taking and has instead demanded the return of its moneys.

(c) Despite this, B.O.A. has falsely and fraudulently claimed that it is entitled to take Bullion's money so long as it believes that Bullion's account was subject to fraud or other improper conduct.

(d) However, B.O.A. has never had a legitimate basis to believe that Bullion's Account was subject to fraud or other improper conduct because B.O.A. has never conducted an investigation into whether such conduct has ever occurred.

(e) In fact, Bullion has provided in numerous instances evidence demonstrating that it is not subject to fraud. Bullion's own customers, such as Customer 1, Customer 2, and Customer 3, have all called B.O.A. to explain that Bullion did not commit fraud against them. Based upon these statements, B.O.A.'s fraud prevention department closed the fraud investigations.

(f) B.O.A. has no good faith basis to withhold Bullion's funds, and thus, the taking of Bullion's funds are an illegal and unauthorized embezzlement in violation of California Penal Code §§ 484, 503, and 506.

(g) B.O.A.'s illegal and criminal intent is consistent with that demonstrated when it stole in excess of $ 727,000,000.00 from its customers in the Credit Card Scam and the Garnishment Scam as outlined above.

79) As of 7/3/2025, the value of five platinum bars had appreciated to $ 68,188.85.

80) Bullion has placed B.O.A. on notice of the stolen nature of the funds and requested their return, as outlined in Exhibits 1 and 3; however, B.O.A. has withheld said funds in violation of § 496 of the California Penal Code. Accordingly, Bullion is entitled to treble damages and attorneys fees pursuant to subdivision (c) of § 496 of the California Penal Code.

81) B.O.A.'s actions as outlined above have been authorized, ratified, and consented to by B.O.A.'s highest levels as demonstrated by the statements made by its counsel in Exhibit 2, which countenanced such acts.

## THIRD CAUSE OF ACTION

## (INDEBITATUS ASSUMPSIT)

## (AGAINST ALL DEFENDANTS)

82) PLAINTIFF hereby incorporates by reference paragraphs 1-75 of this Complaint as if fully set forth herein.

83) On or about March 27, 2025, B.O.A. has become indebted to Plaintiff in the sum of $ 50,927.91 for money had and received by Defendant for the use and benefit of Plaintiff

84) Plaintiff has repeatedly demanded payment from Defendant. The last demand was made on 8/14/2025.

85) No payment has been made by Defendant to Plaintiff, and there is no owing the sum of $ 50,927.91, with interest on that amount at the legal rate from 3/27/2025.

## FOURTH CAUSE OF ACTION

## (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS)

## (AGAINST ALL DEFENDANTS)

86) PLAINTIFF hereby incorporates by reference paragraphs 1-85 of this Complaint as if fully set forth herein.

87) On or about March 27, 2025, Plaintiff and Customer 3 entered into a valid contract for the purchase of precious metals for approximately $ 50,000.

88) Defendant knew of Plaintiff's contract with Customer 3 by virtue of the facts alleged above.

Defendant converted and misappropriated to its own use the funds that Customer 3 deposited into Plaintiff's Account.

89) Defendant knew of the wrongful nature of its conduct because it had already been punished and fined an amount in excess of $ 1,000,000,000.00 ($ 1 billion) by the C.F.P.B. and the O.C.C. for engaging in similar conduct in the Credit Card Scam, Garnishment Scam, and Fraud Reporting Scam outlined above.

90) Because of Defendant's wrongful conduct, Plaintiff is unable to deliver $ 50,000 of precious metals to Customer 3 as Customer 3 had ordered because of the volatility of the precious metals market, and, accordingly, it will cost more than $ 50,000 to obtain for Customer 3 the product that Customer 3 ordered.

91) Additionally, Plaintiff will lose out on continued business from Customer 3 because Customer 3 has lost all faith and trust in Plaintiff's ability to fulfill orders. This will result in damages to Plaintiff in the form of loss or reputation, lost future profits, and other damages in a sum to be proven at trial.

92) The aforementioned acts of Defendant were willful, malicious, oppressive, and/or fraudulent. Plaintiff is therefore entitled to an award of punitive damages. Defendants' actions were instructed, approved, ratified, or consented to by the supervisors

and other managing agents that supervised Defendant's fraud prevention unit and customer service hotlines.

## FIFTH CAUSE OF ACTION
## (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)
## (AGAINST ALL DEFENDANTS)

93) PLAINTIFF hereby incorporates by reference paragraphs 1-92 of this Complaint as if fully set forth herein.

94) As outlined above, Plaintiff had built goodwill and a customer base generating approximately $ 4 million in sales which were handled through Plaintiff's Account over the last year.

95) Defendant knew of these sales by virtue of the facts outlined above.

96) As a result of its considerable track record of success, Plaintiff anticipated that it would generate at least another $ 4 million in sales per year for the next several years of its business.

97) In addition to above, as a result of historic events, Plaintiff expected to have an additional $ 1 million – $ 2 million in sales on the day of March 27, 2025.

98) Plaintiff had repeatedly advised Defendant of the nature of its business, and Defendant monitored all the wire transfers that Plaintiff's customers made into the Account.

Defendant further knew that each of these transfers in was accompanied by a transfer out to Plaintiff's wholesaler.

99) Further, during the "investigations" into the transactions related to Customer 1 and Customer 2, Plaintiff's personnel, Defendant knew (because Plaintiff told it) of the devastating effects Defendant's conduct would have on Plaintiff's business.

100) Notwithstanding the foregoing, Defendant intentionally, wrongfully, and without justification, closed Plaintiff's Account and shut down its business. Defendant further knows of the extended amount of time it would take for Plaintiff to open new bank accounts because Defendant itself took time to open the Account for Plaintiff.

101) Defendant knew of the wrongful nature of its conduct because it had already been punished and fined an amount in excess of $ 1,000,000,000.00 ($ 1 billion) by the C.F.P.B. and the O.C.C. for engaging in similar conduct in the Credit Card Scam, Garnishment Scam, and Fraud Reporting Scam outlined above.

102) Because of Defendant's wrongful conduct, Plaintiff is unable to conduct any business, and has lost out on approximately $ 1 million -- $ 2million of sales from March 27, 2025.

103) Additionally, Plaintiff will lose out on continued business because Plaintiff's extended shutdown in business has destroyed its goodwill amongst its customer base, caused it to be delisted from various industry listings, and generally diminished Plaintiff's good will

in the precious metals market. This will result in damages to Plaintiff in the form of loss or reputation, lost future profits, and other damages in a sum to be proven at trial.

104) The aforementioned acts of Defendant were willful, malicious, oppressive, and/or fraudulent. Plaintiff is therefore entitled to an award of punitive damages. Defendants' actions were instructed, approved, ratified, or consented to by the supervisors and other managing agents that supervised Defendant's fraud prevention unit and customer service hotlines.

## SIXTH CAUSE OF ACTION

## (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

## (AGAINST ALL DEFENDANTS)

105) PLAINTIFF hereby incorporates by reference paragraphs 1-95 of this Complaint as if fully set forth herein.

106) As outlined above, Plaintiff had built goodwill and a customer base generating approximately $ 4 million in sales which were handled through Plaintiff's Account over the last year.

107) Defendant knew of these sales by virtue of the facts outlined above.

108) As a result of its considerable track record of success, Plaintiff anticipated that it would generate at least another $ 4 million in sales per year for the next several years of its business.

109) In addition to above, as a result of historic events, Plaintiff expected to have an additional  $ 1 million – $ 2 million in sales on the day of March 27, 2025.

110) Plaintiff had repeatedly advised Defendant of the nature of its business, and Defendant monitored all the wire transfers that Plaintiff's customers made into the Account. Defendant further knew that each of these transfers in was accompanied by a transfer out to Plaintiff's wholesaler.

111) Further, during the "investigations" into the transactions related to Customer 1 and Customer 2, Plaintiff's personnel, Defendant knew (because Plaintiff told it) of the devastating effects Defendant's conduct would have on Plaintiff's business.

112) Notwithstanding the foregoing, Defendant negligently closed Plaintiff's Account and shut down its business.  Defendant further knows of the extended amount of time it would take for Plaintiff to open new bank accounts because Defendant itself took time to open the Account for Plaintiff.

113) Defendant knew of the wrongful nature of its conduct because it had already been punished and fined an amount in excess of $ 1,000,000,000.00 ($ 1 billion) by the C.F.P.B. and the O.C.C. for engaging in similar conduct in the Credit Card Scam, Garnishment Scam, and Fraud Reporting Scam outlined above.

114) Because of Defendant's wrongful conduct, Plaintiff is unable to conduct any business, and has lost out on approximately $ 1 million -- $ 2million of sales from March 27, 2025.

115) Additionally, Plaintiff will lose out on continued business because Plaintiff's extended shutdown in business has destroyed its goodwill amongst its customer base, caused it to be delisted from various industry listings, and generally diminished Plaintiff's good will in the precious metals market. This will result in damages to Plaintiff in the form of loss or reputation, lost future profits, and other damages in a sum to be proven at trial.

116) The aforementioned acts of Defendant were willful, malicious, oppressive, and/or fraudulent. Plaintiff is therefore entitled to an award of punitive damages. Defendants' actions were instructed, approved, ratified, or consented to by the supervisors and other managing agents that supervised Defendant's fraud prevention unit and customer service hotlines.

## SEVENTH CAUSE OF ACTION

## (VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200)

## (AGAINST ALL DEFENDANTS)

117) PLAINTIFF hereby incorporates by reference paragraphs 1-116 of this Complaint as if fully set forth herein.

118) As alleged above, B.O.A. has a troubling and disturbing history of lying to and stealing from its customers, including Bullion. *See also,*

119) As a direct result of B.O.A.'s bad conduct, B.O.A. has wrongfully obtained in excess of $ 50,000 of funds from Bullion's Account, not to mention fees and other charges it has collected in an amount to be proven at trial.

120) By reason of the above-alleged fraudulent, deceptive, and unfair conduct, Bullion seeks disgorgement of B.O.A.'s ill-gotten gains. Bullion further seeks an order from this Court enjoining B.O.A. from continuing to conduct business through the fraudulent, deceptive, and unfair acts herein described.

**WHEREFORE** PLAINTIFF prays judgment against DEFENDANTS, and each of them, as follows:

121) On the **First Cause of Action**:

(a) For a declaration that Plaintiff did not commit fraud against Customer 1 and Customer 2;

(b) For an order requiring Defendant to correct any statements made to third parties stating, implying, or otherwise insinuating that Plaintiff committed fraud against Customer 1 and Customer 2;

122) On the **Second Cause of Action**:

(a) For actual damages, trebled pursuant to § 496 of the California Penal Code;

(b) For attorneys fees pursuant to § 496 of the California Penal Code;

123) On the **Second Cause of Action**:

(a) For actual damages;

(b) For prejudgment interest at the legal rate from 3/27/2025;

124) On the **Fourth through Sixth Causes of Action**:

(a) For damages in a sum to be proven at trial;

(b) For exemplary and punitive damages;

125) On the **Seventh Cause of Action**:

(a) For disgorgement of all sums wrongfully retained by Defendant;

(b) For declaratory and injunctive relief restraining Defendant from engaging in the misconduct described herein, including but not limited to ordering that Defendant take each of the following corrective actions:

(i) Timely respond to merchant customers' claims that their transactions are legitimate and to validate the source of disputed funds;

(ii) Establish a timeline by which Defendant's fraud prevention unit must respond to its merchant customers' claims that their accounts are not the subject of irregular, unauthorized, fraudulent, or illegal activity;

(iii) Establish a customer service website, email address, and telephone hotline which will be staffed by bank personnel that

will be empowered to answer questions in a timely fashion that allows merchants to timely and accurately dispute the Bank's claims that their accounts are the subject of irregular, unauthorized, fraudulent, or illegal activity;

(iv) Return all disputed funds to the merchant customers within 15 days of the imposition of any "freeze" if the Bank is unable to comply with the above.

(c) For an award of attorney fees pursuant to § 1021.5 of the California Code of Civil Procedure;

126) On **All Causes of Action**:

(a) For cost of suit incurred herein; and

(b) For such other relief as the Court may deem proper.

SHARIF | FAUST LAWYERS, LTD.

Dated: 8/20/2025 BY: /S/ Matthew J. Faust

MATTHEW J. FAUST
Attorneys for Plaintiff
BULLION STANDARD, INC.

# EXHIBIT 1

From the desk of:
Matthew J. Faust, Esq.
Faust@shariffaust.com

3 July 2025

*Via Email*

Piper A. McCormick
McGuireWoods LLP
pmccormick@mcguirewoods.com

**Case: *Bullion Standard v. Bank of America*, CASD Case No. 3:25-CV-01299-W-SBC**
**Re: Demand for Return of Withheld Funds**

Dear Ms. McCormick:

I write to you to seek the immediate return of the funds that were frozen in Bullion's BOA Account ending in (7931) (the "Account") on or about 27 March 2025, along with the damages that have accrued from the improper hold placed on these funds by BOA. Please advise BOA to either immediately wire the total sum of $ 68,188.85 to Bullion or to the person identified in the Complaint as "Customer 3" (aka "Mr. De Jesus"), the owner of the account which was the source of the account that wired the funds to Bullion in the first place. Additionally, demand is hereby made that BOA return the sum of $ 741.01 that was swept from the Account when it was closed as well.

As BOA is aware, Mr. De Jesus wired $ 49,526.90 to Bullion's Account on or about 27 March 2024 to purchase five 10 oz. platinum bars. I have attached to this letter as Exhibit A the relevant portion of the Account statement for March 2025, which reflects the wire being made by Mr. De Jesus into the Account. A copy of the order is attached hereto as Exhibit B. Mr. De Jesus contacted BOA's fraud prevention department to personally verify the transaction; however, BOA nonetheless determined the transaction to be "suspicious" and withheld the money from both Bullion and Mr. De Jesus. You will also see on the attached Exhibit A that the sum of $ 741.01 was in the Account at the time of its closure as well.

For reasons known only to BOA, it deemed this transaction "suspicious" and, in bad faith, converted the funds for its own use. BOA's "fraud prevention" department apparently called the funds "frozen." A more accurate name for what has transpired is theft, and it has been apparently perpetrated by the fraud prevention department. In a movie, this would be ironic, but this is not a movie. BOA has stolen from Bullion and its customer. Now, Bullion is fully prepared to prosecute this claim for fraud against BOA.

Since BOA's blatant theft, the price of platinum has risen. As you will see from the attached Exhibit C, five platinum bars now cost $ 68,188.85. Mr. De Jesus expects his platinum bars and

the only reason he does not have them is because BOA and its Orwellian-named "fraud prevention" department has stolen the money he wired to Bullion. Because BOA has remained tight-lipped about its intentions with the stolen moneys, Bullion has no way of knowing whether it will ever return the stolen moneys to Bullion or to Mr. De Jesus, or whether it simply intends to keep the stolen funds forever. There is only one proper resolution to this dilemma that BOA has created: release the stolen funds (along with the appreciation). Accordingly, demand is hereby made that BOA immediately pay Mr. De Jesus or Bullion the sum of $ 68,188.85 so that one of them may purchase the five platinum bars for Mr. De Jesus. The stolen $ 741.01 should also be returned to Bullion as well.

As outlined above, BOA has been repeatedly advised and put on notice of the legitimate nature of Mr. De Jesus's purchase of the five platinum bars. If you have any doubts about this matter, please consult with your client to investigate this matter fully. Indeed, your office has been in possession of the complaint in this case for no less than 60 days; thus, there has been ample opportunity for your client to apprise you fully of the matter. We are at your disposal to facilitate the conclusion of the transaction.

Alternatively, should BOA continue its illegal and unlawful receipt of these funds it will face additional liability now that it has been put on notice of its felonious acts (to the extent that it was somehow previously unaware that it wrongfully stolen from Bullion—a claim that seems dubious at best). Indeed, now that the bank has filed a motion to dismiss, Bullion is inclined to include a claim for receipt of stolen property in violation of California Penal Code § 496, which, as you are likely aware, includes the recovery of attorney fees and treble damages. Of course, this claim will be unnecessary if BOA immediately repays those it has harmed. We look forward to the prompt return of the stolen funds (plus appreciation damages). Of course, the return of the stolen funds will not resolve the other claims Bullion has, and all rights are hereby reserved. Please do not hesitate to contact us to discuss the return of the stolen funds and the appreciation damages.

Sincerely yours,

SHARIF | FAUST LAWYERS, Ltd.

Matthew J. Faust, Esq.

CC: Client

<u>EXHIBIT A</u>

BANK OF AMERICA

P.O. Box 15284
Wilmington, DE 19850

# Business Advantage

**Customer service information**

1.888.BUSINESS (1.888.287.4637)

bankofamerica.com

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

BULLION STANDARD
[redacted]

Please see the **Important Messages - Please Read** section of your statement for important details that could impact you.

# Your Business Advantage Relationship Banking

for March 1, 2025 to March 31, 2025

Account number: [redacted]

**BULLION STANDARD**

## Account summary

| | | |
|---|---|---|
| Beginning balance on March 1, 2025 | [redacted] | # of deposits/credits: 10 |
| Deposits and other credits | | # of withdrawals/debits: 12 |
| Withdrawals and other debits | | # of items-previous cycle[1]: 0 |
| Checks | | # of days in cycle: 31 |
| Service fees | -0.00 | Average ledger balance: $45,976.30 |
| **Ending balance on March 31, 2025** | **$50,048.84** | *[1]Includes checks paid, deposited items and other debits* |




## Account security you can see

Check your security meter level and watch it rise as you take action to help protect against fraud. See it in the Mobile Banking app and Online Banking.

**To learn more, visit bofa.com/SecurityCenter or scan this code.**

When you use the QRC feature, certain information is collected from your mobile device for business purposes. Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.

SSM-11-23-0458.C | 6115469

**BANK OF AMERICA**

## Your checking account



## Deposits and other credits

| Date | Description | Amount |
| --- | --- | --- |
| 03/03/25 | [redacted] | |
| 03/04/25 | | |
| 03/04/25 | | |
| 03/04/25 | | |
| 03/07/25 | | |
| 03/10/25 | | |
| 03/12/25 | | |
| 03/14/25 | | |
| 03/24/25 | | |
| 03/27/25 | WIRE TYPE:WIRE IN DATE: 250327 TIME:1456 ET TRN:2025032700521174 SEQ:03271356000003/000162 ORIG:JAVIER DE JESUS ID:20458 SND BK:CORPORATE AME RICA CREDIT UNIO ID:262090120 | 49,526.90 |
| **Total deposits and other credits** | | [redacted] |

BANK OF AMERICA

SPECIAL OLYMPICS USA

**Good luck to all Special Olympics USA athletes!**

Join us as we cheer for the inspirational athletes competing on a global stage at the Special Olympics World Winter Games Turin 2025.

**bankofamerica.com/SupportingInclusion**

SSM-12-24-0035.C | 7534883

<u>EXHIBIT B</u>

UPSTATE
COIN & GOLD

[redacted]

| | |
|---|---|
| **Order Date:** | 3/27/2025 |
| **Terms** | COC - Wire |
| **Customer PO:** | [redacted] |
| **Platinum Spot:** | $979.77 |
| **Shipping Instructions:** | Confidential Drop Ship to Customer |
| **Entered By:** | API Contact [redacted] |

12353 E Easter Ave, Ste 150
Centennial, CO 80112
(315) 637-1300
https://platform.gold

Bill To:
Kyle Horn
Bullion Standard
[redacted]

Ship To:
Javier De Jesus
[redacted]

| Qty | Filled | Item | Rate | Amount |
|---|---|---|---|---|
| 4 | 4 | 10 oz Platinum Bar - Brand Varies .999+ (No Card) | $9,807.50 | $39,230.00 |
| 1 | 1 | 10 oz Platinum Bar - Brand Varies .999+ (No Card) | $9,807.50 | $9,807.50 |

**Order Total:** **$49,037.50**

# EXHIBIT C



MGOLD
DASHBOARD
TRADE
ORDERS
CHARTS
RESOURCES
SETTINGS
BULLION STANDARD, INC.
TRADE TICKET
Platinum
Platinum Bullion Bar
10 oz Platinum Bar - Brand Varies .999+ (No Card)
Add to Favorites
Bid:
SELL $13,017.03
-2.25%
Ask:
BUY $13,637.77
+0.75%
Markups
Bid
Ask
Specifications
Metal Type
Metal Content
10 oz
Purity
0.9990
Mint/Brand
Various
10 oz Platinum Bar - Brand Varies .999+ (No Card)
Qty
Premium
Unit Price
Total
5
+0.75%
$13,637.77
$68,188.85
ADD & VIEW TRADE TICKET
ADD & CONTINUE TRADING

# EXHIBIT 2

McGuireWoods

**McGuireWoods LLP**
1800 Century Park East
8th Floor
Los Angeles, CA 90067
Phone: 310.315.8200.
Fax: 310.315.8210.
www.mcguirewoods.com

**Piper A. McCormick**
Direct: 310.315.8250.
pmccormick@mcguirewoods.com
Fax: 310.956.3150.

July 16, 2025

*Via Email*

Matthew J. Faust, Esq.
SHARIF | FAUST LAWYERS, Ltd.
Faust@shariffaust.com

**Re: *Bullion Standard v. Bank of America,* CASD Case No. 3:25-cv-01299-W-SBC**

Mr. Faust:

I write in response to your letter dated July 3, 2025, regarding the above matter. As you are aware and as is reflected in your letter, your client's accounts with Bank of America, N.A. ("BANA") were closed. As BANA explained to your client in its letters dated April 9, 2025, copies of which are attached, "[a]s permitted under our Deposit Agreement, [BANA has] frozen the funds while [it] review[s] the transactions and validate[s] the source of funds."

When your client opened an account with BANA in January 2024, its CEO, Kyle Horn, acknowledged on its behalf that your client agreed that its account would be "maintained in the name of the Business with the Bank in accordance with the terms of the applicable Deposit Agreement." A copy of that acknowledgement is attached. The Deposit Agreement provides that "[i]f [BANA] decide[s] to close your account, [it] may freeze it" and that "[i]f at any time [BANA] believes that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze some or all of the funds in the account and in other accounts you maintain with us, and/or delay transactions, without any liability to you, until such time as we are able to complete our investigation of the account and transactions. . . . The Bank will not be liable for any costs or fees incurred by a delay for these reasons." That agreement is attached.

Accordingly, BANA acted and continues to act within the bounds of the parties' agreement when BANA froze your client's accounts to review the transactions and validate the source of the funds. As a result, your claims that BANA has stolen from your client are entirely baseless. Additionally, the terms of the Deposit Agreement make clear that BANA is not liable for any costs your client may have incurred that are incidental to the freeze, including the appreciation of platinum referenced in your letter. Indeed, it is telling that the complaint you filed on behalf of your client in this matter, as well as your July 3 letter, completely ignore the existence of the Deposit

Agreement. Indeed, these very terms to which your client agreed to be bound defeat its pending and proposed claims.

Sincerely,

Piper A. McCormick

Enclosures

# EXHIBIT 3

From the desk of:
Matthew J. Faust, Esq.
Faust@shariffaust.com

14 August 2025

*Via Email*

Piper A. McCormick
McGuireWoods LLP
pmccormick@mcguirewoods.com

**Case: *Bullion Standard v. Bank of America*, CASD Case No. 3:25-CV-01299-W-SBC**
**Re: Response to 16 July Letter and Renewed Demand for Return of Stolen Funds**

Dear Ms. McCormick:

I write to your letter of 16 July 2025 and renew my request of 3 July 2025 seeking the immediate return of the funds that were stolen by BOA from Bullion's Account ending in (7931) (the "Account") on or about 27 March 2025, along with the damages that have accrued from the improper hold placed on these funds by BOA. Again, please advise BOA to either immediately wire the total sum of $ 68,188.85 to Bullion or to the person identified in the Complaint as "Customer 3" (aka "Mr. De Jesus"), the owner of the account which was the source of the account that wired the funds to Bullion in the first place. Again, demand is hereby made that BOA return the sum of $ 741.01 that was swept from the Account when it was closed as well. Should BOA continue to refuse to return Bullion's money, this letter will be made an exhibit to Bullion's complaint in the above-entitled case and presented to the jury at the trial in this matter as evidence that BOA is knowingly and intentionally withholding funds that it has stolen from Bullion. It is our genuine hope that it does not come to this.

## I. Summary of Demands from 3 July 2025

In my correspondence of 3 July, I advised you that BOA wrongfully misappropriated funds from Bullion's Account. I provided indisputable evidence documenting the legitimate nature of a deposit made by Bullion's customer, Mr. De Jesus, into Bullion's account to purchase five 10 oz. platinum bars. That letter included exhibits demonstrating the wire made by Mr. De Jesus as well as Bullion's bank statements showing the incoming wired funds. I further provided evidence of the increase of the value of platinum—easily verifiable through reference to any online resource—and demanded the return of the stolen funds, increased to account for the value of platinum.

My letter further made clear that BOA has made no investigation of the facts regarding the wrongfully withheld funds and established that any funds that were further wrongfully withheld would be deemed stolen and pursued as such under § 496 of the California Penal Code.

## II. BOA's Response

BOA responded on 16 July in a letter that lacked merit. In its correspondence, BOA claimed that it is contractually entitled to "freeze" its customer's funds—ostensibly indefinitely—if BOA, determines, at any time, that BOA "believes that [the] account may be subject to irregular, unauthorized, fraudulent, or illegal activity . . . ." Of course, BOA's letter identified no such "irregular, unauthorized, fraudulent, or illegal activity." What's worse, the letter never represented that any investigation occurred into whether such "activity" had taken place or would ever take place. Indeed, my letter of 3 July identified the pristine nature of the funds that BOA has stolen, and the letter of 16 July made no effort to dispute the propriety of these funds. Instead, BOA attempted to hide behind its "Deposit Agreement" to justify what is plainly theft at this point.

This premise is deeply flawed.

Of course, Bullion does not agree that the so-called "Deposit Agreement" referenced in the letter of 16 July is accurate, binding, or enforceable. We have no way of evaluating whether or not the Deposit Agreement attached to the letter is true and accurate, because the letter itself admits the document was made after the account was opened, and there was likewise no evidence indicating anyone at Bullion agreed to those terms. And, for reasons explained below, any purported provision in the so-called Deposit Agreement that claims to permit theft is obviously not enforceable under California law. *See, e.g.*, Cal. Civ. Code § 1668; *see also*, Cal. Pen. Code § 506. The Deposit Agreement attached to the letter also appears to contain numerous provisions which appear to be substantively unenforceable under California law, and, given the adhesion nature of the contract, it appears that BOA's attempt to rely upon this Deposit Agreement will be limited. The letter likewise appeared to cast aspersions that Bullion did not solely seek remedies for breach of a deposit agreement in this case. No case law requires Bullion to do so, especially when BOA has committed so many tort-based wrongs. Further, as will be outlined below, given BOA's own well-documented past of using abusive and overbearing deposit agreements to steal from and lie tod its customers, one would expect BOA to be more circumspect about attempting to bring its unconscionable and overbearing deposit agreement before a judge or jury in this case.

## III. BOA's Bad Faith History of Stealing From Its Customers

As you are likely aware, BOA has a long and sordid history of lying to stealing from its customers. Just in the past few years, BOA has been penalized and forced to disgorge more than one billion dollars by the Consumer Financial Protection Bureau ("C.F.P.B.") for schemes that bear a striking similarity to what has happened in this case. In all these cases, BOA has demonstrated a shocking disregard for its customers, just as it has in this case. In the end, these matters will not only repudiate BOA's claims that it is acting appropriately, but will also merit the imposition of punitive damages on Bullion's other punitive damages claims (which are not discussed in this letter). These cases further demonstrate BOA's admitted abuse and misuse of deposit agreements in its campaigns to lie to and steal from its customers.

First, in 2014, the C.F.P.B. ordered BOA to pay $ 727,000,000.00 in redress to its victims—aka "customers"—after BOA engaged in widespread scheme of deception, fraud, and theft to steal unauthorized credit card charges from them. I have attached a copy of the consent order documenting this "Deception Scheme" as Exhibit A for your consideration.

Second, in 2022, the C.F.P.B ordered BOA to pay a $ 10,000,000.00 penalty for illegally garnishing its victims' (also customers') moneys by creating improper and illegal deposit agreements that misled customers into misunderstanding their rights under state law when garnishment proceedings occurred. This prevented customers from pursuing legal claims against B.O.A. for improperly handling garnishments. B.O.A. also misrepresented to its customers that they waived their right to hold the company liable for improperly responding to garnishment notices; however, account holders have the right to challenge garnishments despite any language in their account agreements to the contrary. I have attached a copy of the consent order documenting this "Garnishment Scheme" as Exhibit B for your consideration.

Third, also in 2022, the C.F.P.B., ordered BOA to pay $ 225,000,000.00 and required it to pay hundreds of dollars of millions of more dollars in redress to consumers related to BOA's grossly inadequate practices for investigating fraud associated on prepaid debit cards issued for unemployment insurance benefits during the COVID pandemic. Rather than conduct reasonable or meaningful fraud investigations, BOA set overly simplistic "flags" that automatically froze the cards and then BOA set up inadequate customer support to help the customers regain access to their frozen funds. Of course, this says nothing about the fact that the customers never asked to have their unemployment paid on BOA accounts in the first place, but were simply issued these cards by the states they resided in. To compound this, BOA then abused the trust placed in it by the issuing states to harm the poorest of Americans during the COVID pandemic by withholding their money from them and making it nearly impossible for them to retrieve it through an impenetrable bureaucracy of malevolent incompetence. I have attached a copy of the consent order documenting this "Fraud Scheme" as Exhibit C.

Fourth, in 2023, BOA was caught tricking its customers and stealing in excess of $ 100,000,000.00 from its most vulnerable accountholders. In addition to being ordered to repay what it stole, BOA also paid penalties of $ 90,000,000 to the C.F.P.B. and an additional $ 60,000,000 to the United States Office of the Comptroller of the Currency ("O.C.C.") BOA was caught charging customers multiple times for the same declined transactions. Additionally, BOA was caught fraudulently inducing customers to sign up for credit with false "special offers" of "cash and points" which BOA never ultimately offered. BOA personnel also enrolled customers for cards without their knowledge or consent. I have attached a copy of the consent order documenting this "Theft Scheme" as Exhibit D.

These schemes demonstrates a continuing pattern of theft and deception perpetrated by BOA against its customers. This pattern unfortunately includes Bullion, as will be outlined below.

## IV. BOA Will Be Liable to Bullion Under California Penal Code § 496

In light of the foregoing, it is unfathomable that BOA is intentionally choosing to retain Bullion's moneys. In April of 2025 BOA had no evidence, complaints, claims, allegations, or basis for believing that Bullion's Account or the funds held in it were the subject of fraud. Despite this, BOA closed Bullion's Account and misappropriated the funds contained therein. Although your letter of 16 July charitably called this taking a "freeze", this terminology implies many facts which are simply untrue. When will the "freeze" end? Will it be after an investigation concludes? Has an investigation even begun? Since no investigation has begun, will an investigation ever occur? Why would BOA take someone's money without conducting an investigation in the first place? Why would BOA accuse someone of fraud without conducting an investigation in the first place? These serious questions were never seriously addressed by BOA. If BOA were seriously to argue to a jury (or a judge) in this case that it had "frozen" the account, then why have the past four months been inadequate for BOA to evaluate the propriety of the deposit made by Mr. De Jesus in March? Why didn't BOA take Mr. De Jesus's phone call in March?

The answer to all these questions is obvious: BOA is not now, nor has it ever been, acting in good faith. As will be explained below, the only possible inference is that BOA has stolen from its customer, Bullion, just as it has from all of the other customers it was caught stealing from by the C.F.P.B. To wit: Over one month ago, my letter of 3 July put BOA's attorneys on notice of the nature of those funds and BOA apparently had not yet conducted any investigation of the funds at that time. BOA had two weeks to review the documentation that was provided in my letter and share its investigation with its attorneys. Obviously this did not happen because your letter of 16 July contained no such references to it. Rather, that letter contained general, unverified, and unsubstantiated allegations of "fraud." For BOA to claim that those funds were frozen under the terms of a deposit agreement in April was specious at best. For BOA to continue these meritless assertions in July is inexcusable. Any continuing assertion of the funds being subject to a "freeze" are now not only made in bad faith but will subject the bank to liability.

Indeed, the bank's response letter of 16 July 2025 insinuated, without providing any legal authority, that it would be permitted hold the funds subject to its supposed deposit agreement. The letter provided no outer limit for how long such a freeze would endure or under what conditions the bank could impose such a freeze. Of course, such a notion is a preposterous one. And it is not countenanced under the law. Fortunately for Bullion, sections 503 and 506 of the California Penal Code, are directly on point. Second 503 provides that "Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted." Further, section 506 states:

> Every trustee, banker, . . . or person otherwise intrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose. . . is guilty of embezzlement . . . .

Of course, an "embezzlement" under California law is a type of theft. Cal. Pen. Code § 484. Thus, even though BOA's relationship with Bullion originally arose out of a lawful business setting, it is still liable to Bullion under section California Penal Code § 496:

> The language of section 496(c) is clear and unambiguous. A criminal conviction is not a prerequisite to recovery of treble damages. All that is required for civil liability to attach under section 496(c), including entitlement to treble damages, is that a "violation" of subdivision (a) or (b) of section 496 is found to have occurred. A violation may be found to have occurred if the person engaged in the conduct described in the statute. [a "violation" occurs "when the subject engages in" the conduct described in the statute].) While section 496(a) covers a spectrum of impermissible activity relating to stolen property, the elements required to show a violation of section 496(a) are simply that (i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property.
>
> A violation of section 496(a) may, by its own terms, relate to property that has been "stolen" *or* "that has been obtained *in any manner constituting theft* or extortion." (§ 496(a), italics added.) As reflected in *Bell v. Feibush, supra*, 212 Cal.App.4th at page 1048, the issue of whether a wrongdoer's conduct in any manner constituted a "theft" is elucidated by other provisions of the Penal Code defining theft, such as section 484. In 1927, the Legislature consolidated the crimes of larceny, embezzlement, and theft by false pretense in Penal Code section 484, subdivision (a), under the single term "theft."

*Switzter v. Wood*, 35 Cal. App. 5th 116, 126-27 (2019). The California Supreme Court has followed this rationale and expressly rejected a losing defendants' request to decline "the statutory treble damage remedy into the context of an ordinary business dispute where traditional remedies for breach of contract, fraud and conversion were available." *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 354 (2022). The Ninth Circuit has similarly permitted § 496 claims against corporate entities in business disputes. *See generally*, *Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 Fed. Appx. 238 (9th Cir. 2021).

BOA is expected to claim that it originally came into possession of the funds under ostensibly lawful means. Of course, this is the general crux of an embezzlement claim, Cal. Pen. Code § 503, specifically that against a "banker," Cal. Pen. Code § 506. As outlined above, BOA has a history of defrauding and stealing from its customers. That means that BOA committed one of two theft-based acts here. Under the first alternative, BOA defrauded Bullion, as it has millions of its other customers, by misrepresenting the terms of its anti-fraud systems. In this alternative, it has falsely declared a fraud to have occurred without conducting an investigation, refused to make its customer service available to assist Bullion, frozen Bullion's money, and kept Bullion's money

for itself. This is identical to the Fraud Scheme for which BOA pleaded guilty to in Exhibit C which resulted in $ 225,000,000.00 of penalties and disgorgement.

Under the second alternative, BOA never intended to declare that Bullion's Account had fraudulent or suspicious account activity on it, but simply lured Bullion into opening an account with the intent of stealing Bullion's money outright. This conduct would be more akin to the Deception Scheme, Garnishment Scheme, or Theft Scheme, outlined above, which BOA pleaded guilty to in Exhibits A, B, and D, respectively.

In either event, BOA has a well-documented history of abusing and stealing from its customers. Here, there is no basis for BOA to consider that Bullion's account has fraudulent activity, and thus there is no reason for BOA to withhold Bullion's money. BOA's funds should be immediately returned, along with the damages caused by the loss of the opportunity to purchase the five platinum bars for Mr. De Jesus. Accordingly, BOA must immediately return $ 68,929.86. BOA's continued retention of any of these funds will be easily shown to be the "withholding" of stolen property in violation of California Penal Code § 496, and Bullion will seek treble damages and attorney fees at trial.

## CONCLUSION

In sum, BOA has admitted through its silence and inaction that several facts are true:

1. BOA does not have a good faith belief that Bullion's Account may be subject to irregular, unauthorized, fraudulent, or illegal activity;
2. BOA has engaged in no investigation to determine that Bullion's Account has ever been subject to irregular, unauthorized, fraudulent, or illegal activity;
3. BOA has no timeline for ever investigating whether Bullion's Account has ever been subject to irregular, unauthorized, fraudulent, or illegal activity;
4. BOA has no basis to believe that the money deposited by Mr. De Jesus into Bullion's account was for anything other than the purchase of five (5) platinum bars;
5. Despite this, BOA has taken all of the funds out of Bullion's Account under false pretenses;
6. In so doing, BOA is actively interfering with and preventing Bullion from purchasing the five (5) platinum bars for Mr. De Jesus;
7. BOA's act of theft has harmed Bullion in the amount of $ 68,929.86.

Despite this, BOA's correspondence to date has relied on generic, boilerplate assertions which evade the merits of the matter and make unsupported arguments. These unsupported arguments did not support BOA's positions then and do nothing now to demonstrate anything other than the fact that BOA has violated § 496 of the California Penal Code. It is doubtful that BOA was unaware of its violations before, but this letter is sent to remove all doubt. Accordingly, should BOA do anything other than to fully rectify the situation, Bullion will amend its complaint to

include a § 496 claim, which will include a unilateral attorney fees provision and a claim for treble damages. BOA has been warned of the precarious nature of its position. Accordingly, we look forward to the prompt return of the $ 68,929.86. Please contact my office for wiring information.

Sincerely yours,

SHARIF | FAUST LAWYERS, Ltd.

Matthew J. Faust, Esq.

CC: Client

# EXHIBIT 3A

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

**ADMINISTRATIVE PROCEEDING**
**File No. 2014-CFPB- 0004**

| **In the Matter of:**<br><br>**Bank of America, N.A.; and**<br>**FIA Card Services, N.A.** | **CONSENT ORDER** |
|---|---|

The Consumer Financial Protection Bureau ("CFPB") has reviewed the practices of Respondents Bank of America, N.A. and FIA Card Services, N.A. ("the Bank," as defined below) relating to add-on products and has identified violations of law. The CFPB hereby issues, pursuant to Sections 1053 and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5563 and 5565, this Consent Order ("Order").

## ARTICLE I
## OVERVIEW

1. The CFPB finds that the Bank and its Service Providers (as defined below) have engaged in violations of Sections 1031 and 1036 of the CFPA (collectively, "Section 1036"), 12 U.S.C. §§ 5531, 5536 in connection with the marketing, sales, delivery, servicing, and/or fulfillment of the Bank's Credit Protection Covered Products (as defined below) and the billing of Identity Protection Covered Products (as defined below).

## ARTICLE II
## JURISDICTION

2. The CFPB has jurisdiction over this matter pursuant to Sections 1053 and 1055 of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5563, 5565.

## ARTICLE III
## STIPULATION

3. The Bank has executed a Stipulation and Consent to the Issuance of Consent Order ("Stipulation"), which is incorporated by reference and is accepted by the CFPB. By this Stipulation, the Bank has consented to the issuance of this Order by the CFPB pursuant to Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any findings of fact or violations of law or wrongdoing, except that the Bank admits to the CFPB's jurisdiction over the Bank and the subject matter of this action.

## ARTICLE IV
## DEFINITIONS

4. For purposes of this Order, the following definitions shall apply:

(a) "Add-On Product" shall mean any Bank-branded or co-branded consumer financial product or service, as defined by Section 1002(5) of the CFPA, 12 U.S.C. § 5481(5), which is sold by the Bank or its Service Providers as an optional add-on product to Bank credit cards and/or as an optional add-on product to consumer financial products of the Bank.

(b) "Bank of America" or the "Bank" shall mean Bank of America, N.A., Charlotte, North Carolina, and FIA Card Services, N.A., and their successors and assigns, and excludes Service Providers, as defined in Paragraph 4(t), below.

(c) "Board" shall mean the Boards of Directors of Bank of America, N.A. and FIA Card Services, N.A.

(d) "Class Action Settlement" shall mean the settlement agreement FIA Card Services, N.A. and Bank of America Corporation entered into to resolve seven putative class actions related to its credit protection products that

had been consolidated into a multidistrict litigation in the Northern District of California, *In re Bank of America Credit Protection Marketing and Sales Practices Litigation,* No. 3:11-md-02269.

(e) "Covered Products" shall mean, collectively, "Credit Protection Covered Products" and "Identity Protection Covered Products."

(f) "Customer" means any person who was enrolled in a Covered Product.

(g) "Credit Protection Covered Products" shall mean the Bank's Credit Protection Plus and Credit Protection Deluxe products.

(h) "Credit Protection Product" shall mean any Add-On Product that purports to allow a Customer enrolled in the Credit Protection Product to request (i) cancellation of some or all of the credit card balance in certain circumstances, such as death, or (ii) cancellation of minimum credit card payments in certain circumstances such as unemployment, disability, or other enumerated events. "Credit Protection Product" includes the Credit Protection Covered Products.

(i) "Credit Protection Product Fees" shall mean the fees charged by the Bank or a Credit Protection Service Provider to a Credit Protection Eligible Customer's Account for any Credit Protection Product or Products. Credit Protection Product Fees shall not include finance charges, over-limit fees, or interest associated with Credit Protection Products.

(j) "Credit Protection Relevant Time Period" shall mean October 1, 2010 through March 31, 2013.

(k) "Credit Protection Service Provider" refers to any direct customer-facing Service Provider that provided marketing, sales, delivery, servicing, and/or fulfillment of Credit Protection Products to Bank Customers.

(l) "Effective Date" shall mean the date on which the Order is issued.

(m) "Identity Protection Covered Products" refers to the identity theft protection products, "Privacy Guard," "PrivacySource" and "Privacy Assist," which included but were not limited to credit monitoring and credit report retrieval services and were marketed and sold to Bank Customers or other consumers by the Bank or its Identity Protection Service Providers pursuant to a contract between the Bank and an Identity Protection Service Provider.

(n) "Identity Protection Products" shall mean any Add-On Product that purported to provide credit monitoring and credit report retrieval services. "Identity Protection Product" includes the Identity Protection Covered Products.

(o) "Identity Protection Service Provider" refers to the Bank's Service Providers, including, but not limited to, Trilegiant Corporation and Intersections, Inc., that provided marketing, sales, delivery, servicing, and/or fulfillment of Identity Protection Covered Products to Bank Customers and/or other consumers.

(p) "Identity Protection Product Fees" are the fees charged by the Bank or Identity Protection Service Provider for an Identity Protection Covered Product.

(q) "Products" shall mean, collectively, "Credit Protection Products" and "Identity Protection Products."

(r) "Regional Director" shall mean the Regional Director for the Office of Supervision for the Southeast Region for the Consumer Financial Protection Bureau.

(s) "Related Consumer Action" shall mean a private damages action by or on behalf of one or more consumers brought against the Bank based on substantially the same facts as set forth in Article V of this Order, including, but not limited to, *In re Bank of America Credit Protection Marketing and Sales Practices Litigation*, No. 3:11-md-02269.

(t) "Service Provider" shall mean any service provider, as defined in Section 1002(26) of the CFPA, 12 U.S.C. § 5481, that provides services for Add-On Products pursuant to a contractual obligation to the Bank.

## ARTICLE V
## FINDINGS AND CONCLUSIONS

The CFPB finds the following:

5. Bank of America, N.A. is a "covered person" as that term is defined by 12 U.S.C. § 5481(6) and is an insured depository institution with assets greater than $10 billion within the meaning of 12 U.S.C. § 5515(a).

6. FIA Card Services, N.A. is a "covered person" as that term is defined by 12 U.S.C. § 5481(6) and is an insured depository institution with assets greater than $10 billion within the meaning of 12 U.S.C. § 5515(a).

**Credit Protection Products**

7. Credit Protection Plus was an optional debt cancellation product offered to Bank of America credit card customers. The last version of Credit Protection Plus that the Bank marketed to customers was marketed as being able to cancel up to twice the customer's minimum monthly payment for up to 18 months for Involuntary Unemployment, Disability, Hospitalization, and Leave of Absence (each as defined in the product's terms and conditions); up to three minimum monthly payments for certain defined Life Events, including Marriage, Divorce, Birth/Adoption, New Residence, Graduation, Entering College, and Retirement; and up to $25,000 of the customer's balance upon the customer's death. When last marketed to customers, the monthly fee for this product was 0.85 percent of the customer's monthly balance.

8. Credit Protection Deluxe was an optional, flat-fee debt cancellation product offered to Bank of America credit card customers. The last version of Credit Protection Deluxe that the Bank marketed to customers was marketed as being able to cancel up to $500 per month (up to $2000) for Involuntary Unemployment, Disability, Hospitalization, and Leave of Absence (each as defined in the product's terms and conditions), and up to $200 for the same Life Events covered by Credit Protection Plus. When last marketed to customers, the fee for this product was $15.99 per month.

9. To obtain Credit Protection Plus or Credit Protection Deluxe benefits for either hardship or life events, the Bank required customers to request benefits through the Bank's benefit approval process. To continue receiving Credit Protection Plus or Credit Protection Deluxe benefits for certain hardship events, customers had to resubmit forms and documentation throughout their benefit period.

10. During the Credit Protection Relevant Time Period, Bank of America Call Center Representatives (CSRs) solicited cardholders who called the Bank to activate their cards, or to obtain other customer service, to enroll in the Credit Protection Covered Products.

11. During the Credit Protection Relevant Time Period, the Bank also engaged Credit Protection Service Providers to conduct inbound and outbound telemarketing of the Credit Protection Covered Products to customers.

12. During the Credit Protection Relevant Time Period, the Bank and its Service Providers failed to adequately inform some customers that they were purchasing the Credit Protection Covered Products, or misrepresented to some customers the costs, terms, benefits, and benefits process of the Credit Protection Covered Products. During the relevant time period improper telemarketing practices included:

(a) representing that the first 30 days of coverage were free of charge when, in fact, by enrolling, Customers were agreeing to purchase the Credit Protection Covered Products and to begin incurring charges unless they cancelled within the 30-day review period, in which case any fees previously paid would be reimbursed;

(b) representing that additional steps were required to enroll in or purchase the Credit Protection Covered Products after the telemarketing call;

(c) representing that customers were consenting to receive additional information about the Credit Protection Covered Products, when, in fact, the Bank was enrolling Customers in the Credit Protection Covered Products;

(d) representing that Customers could receive benefits for a duration longer than permitted under the terms and conditions of the Credit Protection Covered Products; and

(e) representing that Customers would be entitled to an "up to $25,000 death benefit" by enrolling in Credit Protection Plus when, in fact, enrollment in Credit Protection Plus did not entitle Customers or their survivors to $25,000 upon the Customer's death; Credit Protection Plus could only cancel the amount owed on the decedent Customer's credit card account up to $25,000.

(f) representing that the benefits covered by the Credit Protection Covered Products were automatic upon notice of the qualifying event when, in fact, the programs required a benefit request submission and approval process.

13. The Bank's compliance monitoring, Service Provider management, and quality assurance yielded ineffective oversight and did not, in certain instances, prevent, identify, or correct the improper sales practices in marketing the Credit Protection Covered Products.

14. The Bank voluntarily ceased marketing and selling Credit Protection Products. The Bank stopped marketing and selling Credit Protection Products in August 2012 and canceled all existing accounts as of September 1, 2013.

15. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

16. Statements and omissions by the Bank or its Service Providers, as set forth in the preceding Paragraphs, are material because they are likely to affect a consumer's choice or

conduct regarding the Credit Protection Covered Products and are likely to mislead consumers acting reasonably under the circumstances.

17. The representations of the Bank, through its CSRs and Credit Protection Service Providers with respect to Credit Protection Covered Products during the Credit Protection Relevant Time Period, constitute deceptive practices in violation of Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). These violations affected approximately 1.4 million Customers.

**Identity Protection Products**

18. From at least October 2000 to approximately December 2011, the Bank and its Service Providers marketed and sold the Identity Protection Covered Products, which included credit monitoring and credit report retrieval, to Bank Customers and other consumers.

19. To provide the credit monitoring and credit report retrieval services, the Bank, through its Service Providers, was required by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681b to have a "permissible purpose" to obtain Customers' credit information from the credit reporting agencies. Among other reasons, a credit reporting agency may release a credit report in accordance with a consumer's "written instructions." 15 U.S.C. § 1681b(a)(2).

20. Accordingly, Customers and other consumers who enrolled in the Identity Protection Covered Products were required to provide sufficient authorization before their credit bureau reports could be accessed. Customers of the Identity Protection Covered Products were provided the materials necessary to submit this authorization, but until the authorization was submitted, the Bank and its Service Providers could not provide Customers the full credit monitoring and/or credit report retrieval services of the Identity Protection Covered Product in which they were enrolled.

21. In many cases, however, some period of time passed before the Bank or its Service Providers obtained the Customers' authorizations, or the Bank or its Service Providers never obtained the Customers' authorizations. From at least October 2000 to approximately September 2011, the Bank, through its Service Providers, billed the full fee of the Identity Protection Covered Product to customers who were not receiving all of the credit monitoring and/or credit report retrieval benefits of the product.

22. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

23. The Bank's and Service Providers' acceptance of monthly payments while failing to provide credit monitoring and/or credit report retrieval services has resulted in substantial injury to approximately 1.5 million consumers in the amount of at least $459 million for Identity Protection Covered Products. This injury was not reasonably avoidable by consumers and is not outweighed by any countervailing benefit to the consumers or to competition.

24. By reason of the foregoing billing practices for its Identity Protection Covered Products, the Bank and its Service Providers engaged in unfair practices in violation of Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## ARTICLE VI
## ORDER TO CEASE AND DESIST AND TO TAKE AFFIRMATIVE ACTIONS

**IT IS HEREBY ORDERED**, pursuant to Sections 1053 and 1055 of the CFPA, that:

25. The Bank and its officers, agents, servants, employees, and attorneys, whether acting directly or indirectly, shall cease and desist and shall take reasonable measures to ensure that its Service Providers and other agents cease and desist from engaging in violations of law or

regulation in connection with the marketing and administration of Credit Protection Products and in the billing and administration of Identity Protection Products.

26. The Bank shall correct all violations of law, as described herein, and shall implement procedures to prevent their recurrence. The Bank's actions as required by this Article shall be satisfactory to the Regional Director as determined at subsequent examinations and/or visitations.

27. The Bank shall not make, or allow to be made, any material deceptive representation, statement, or omission, expressly or by implication, in the marketing materials, telemarketing scripts, and/or sales presentation used to solicit any customer or prospective customer in connection with any Credit Protection Product, including but not limited to misrepresentations or omissions as to the following:

(a) any and all fees, costs, expenses and charges associated with the Credit Protection Product;

(b) that a product is optional and not required for the customer to activate or use his or her credit card;

(c) that accessing the Credit Protection Product's benefits requires minimal action by the consumer;

(d) the benefits of any Credit Protection Product;

(e) any material conditions and restrictions related to the Credit Protection Product;

(f) the purpose of sales calls and/or sales portions of servicing or other calls; or

(g) payment terms for a Credit Protection Product, including the actual date a Customer will be charged for a Credit Protection Product or incur charges for a Credit Protection Product.

28. The Bank represents that it stopped substantially all marketing, soliciting, offering for sale, and selling the Identity Protection Products to new enrollees by December 2011 and stopped marketing, soliciting, offering for sale, and selling Credit Protection Products on or before August 2012.

29. The Bank and its officers, agents, servants, employees, and attorneys, whether acting directly or indirectly, shall be prohibited from marketing, soliciting, offering for sale and selling Credit Protection Products and Identity Protection Products, unless it submits to the CFPB a compliance plan (the "Compliance Plan") specifically designed to prevent all violations of applicable Federal consumer financial laws in the sale and administration of Identity Protection Products and/or Credit Protection Products, as applicable.

(a) Any Compliance Plan concerning Credit Protection Products shall:

(i) Address the manner in which marketing and soliciting of Credit Protection Products may occur, including, but not limited to, prohibiting the Bank or its representatives or Service Providers from marketing or soliciting the Products until after activation is completed and the consumer is informed that listening to the solicitation is optional;

(ii) Address the manner in which the Bank informs Customers and prospective customers of any and all fees, costs, expenses and charges associated with the Credit Protection Product; the payment

terms for a Credit Protection Product, including the actual date a Customer will be charged for a Product or incur charges for the Product; the benefits of any Credit Protection Product; the process of accessing the benefits of any Credit Protection Product; and any material conditions, benefits, and restrictions related to the Credit Protection Products;

(iii) Describe how the Bank will disclose that a product is optional and not required for the Customer to activate or use his or her credit card.

(b) Any Compliance Plan concerning Identity Protection Products shall:

(i) Address the manner in which the Bank informs Customers and prospective customers that any credit monitoring services will not be activated until receipt of customer authorization for the Bank to access their credit information at credit reporting agencies;

(ii) Describe how the Bank will avoid billing Customers during a period before the Bank or Service Provider receives authorization to access credit information from each credit reporting agency and during a period when the credit reporting agency has not yet processed authorizations submitted by Customers.

30. The Bank shall submit any Compliance Plan to the Regional Director at least ninety (90) days prior to marketing, soliciting, offering for sale, or selling Credit Protection Products and/or Identity Protection Products to new enrollees, as applicable, for prior determination of supervisory non-objection. The Bank shall adhere to the Compliance Plan.

31. Within one-hundred twenty (120) days of the Effective Date, the Bank shall submit to the Regional Director, for review and written determination of supervisory non-objection, an acceptable plan containing a description of the actions that are necessary and appropriate to achieve compliance with this Order (the "Action Plan"). The Board or a Committee thereof shall ensure the Action Plan is submitted to the Regional Director for prior determination of supervisory non-objection.

32. The Action Plan shall specify timelines for completion of each of the requirements of this Order. The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order, unless modified in writing by the Regional Director.

33. The Action Plan shall include a review, and if necessary, the revision of the Add-On Products related portions of its written Service Provider Management Program to ensure that all Add-On Products which are marketed and sold by the Bank comply with applicable Federal consumer financial law. At a minimum, the Service Provider Management Program shall require:

(a) An analysis to be conducted by the Bank, prior to the Bank entering into a contract with the Service Provider, of the ability of the Service Provider to perform the marketing, sales, delivery, servicing, and fulfillment of services for the Add-On Product(s) in compliance with all applicable Federal consumer financial laws and the Bank's related policies and procedures;

(b) For new and renewed contracts, a written contract between the Bank and the Service Provider, which sets forth the responsibilities of each party, especially:

(i) the Service Provider's specific performance responsibilities and duty to maintain adequate internal controls over the marketing, sales, delivery, servicing, and fulfillment of services for the Add-On Products;

(ii) the Service Provider's responsibilities and duty to provide adequate training on compliance with all applicable Federal consumer financial laws and the Bank's related policies and procedures to all Service Provider employees or agents engaged in the marketing, sales, delivery, servicing, and fulfillment of services for the Add-On Product(s);

(iii) granting the Bank the authority to conduct periodic onsite reviews of the Service Provider's controls, performance, and information systems as they relate to the marketing, sales, delivery, servicing, and fulfillment of services for the Add-On Product(s); and

(iv) the Bank's right to terminate the contract if the Service Provider materially fails to comply with the terms specified in the contract, including the terms required by this Paragraph.

(c) Periodic review by the Bank of the Service Provider's controls, performance, and information systems related to Add-On Products.

34. In addition, within one-hundred twenty (120) days of this Order, an appropriate independent qualified group within the Bank shall review and, if necessary, revise the written Unfair, Deceptive, or Abusive Acts or Practices Policy statement ("UDAAP Policy") to ensure the UDAAP Policy requires, at minimum:

(a) A written comprehensive assessment, to be conducted on an annual basis, of the unfair, deceptive, and abusive practices ("UDAAP") risk for existing or new Add-On Products and for any changes to existing Add-On Products, including, but not limited to the UDAAP risk of the governance, control, marketing, sales, delivery, servicing, and fulfillment of services for new Add-On Products and existing Add-On Products, including the UDAAP risk of marketing and sales practices;

(b) The development and implementation of written policies and procedures to effectively manage, prevent, detect, and mitigate, on an on-going basis, the risks identified in the written assessment required by the preceding Paragraph;

(c) The recording of all telephone calls in which Add-On Products are marketed or sold following the Effective Date by the Bank or through a Service Provider to Bank customers, which recordings shall be retained for a period of at least 25 months from the date of the call;

(d) The recording of all telephone calls in which a customer enrolled in an Add-On Product marketed or sold following the Effective Date by the Bank or through a Service Provider indicates that he or she did not authorize, does not want, does not need, or wishes to cancel the Add-On Product, which recordings shall be retained for a period of at least 25 months from the date of the call;

(e) Comprehensive written procedures for providing appropriate training on applicable Federal consumer financial laws and the Bank's related policies

and procedures, including, but not limited to, unfair, deceptive, and abusive acts and practices, to appropriate Bank employees and Service Provider call agents who market or sell Add-On Products during in-bound or out-bound telephone calls or who engage in retention efforts during telephone calls in which a Bank customer indicates that he or she did not authorize, does not want, does not need, or wishes to cancel the Add-On Product;

(f) Comprehensive written procedures for providing appropriate training on applicable Federal consumer financial laws and the Bank's related policies and procedures as related to Add-On Products to appropriate Bank employees and Service Provider's employees or agents who monitor telephone calls as required by Paragraph 34(i);

(g) Comprehensive written policies and procedures for identifying and reporting any violation of applicable Federal consumer financial laws and the Bank's related policies and procedures as related to Add-On Products by the Bank's employees and Service Provider's employees or agents, in a timely manner, to a specified executive risk or compliance manager at the Bank. The manager to whom such reports are made shall be independent of the unit overseeing the sale and marketing of Add-On Products;

(h) Development of training materials relating to identifying and responding to violations of applicable Federal consumer financial laws as related to Add-On Products that will be incorporated into the existing annual compliance training for appropriate employees;

(i) Independent telephone call monitoring of Bank employees and Service Provider's employees or agents who are engaged in the marketing or sale of Add-On Products by qualified personnel who have training in identifying and reporting violations of applicable Federal consumer financial laws and the Bank's related policies and procedures;

(j) Reporting, on at least a monthly basis by the independent unit responsible for conducting the monitoring required by Paragraph 34(i), of its findings from the telephone call monitoring described in Paragraph 34(i) to a specified executive risk or compliance manager at the Bank who is independent of the unit overseeing the sales and marketing of these Add-On Products; and

(k) Written policies and procedures to ensure that the risk management, internal audit, Service Provider administration, and corporate compliance programs have the requisite authority and status within the Bank so that appropriate reviews of Add-On Products marketed or sold by the Bank or through Service Providers may occur and deficiencies are identified and properly remedied.

35. Within one-hundred twenty (120) days of the Effective Date, the Bank shall submit its Action Plan, the Add-On Products related portions of the Service Provider Management Program, and the Add-On Products related portions of the UDAAP Policy to the Regional Director for prior determination of supervisory non-objection.

36. Upon receipt by the Bank of a determination of supervisory non-objection from the CFPB to the Action Plan, the Add-On Products related portions of the Service Provider

Management Program, and the Add-On Products related portions of the UDAAP Policy, the Board, or a Committee thereof, shall ensure the Bank's adoption, implementation, and adherence to the Action Plan, the Add-On Products related elements of the Service Provider Management Program, and the Add-On Products related portions of the UDAAP Policy.

37. Any material proposed changes to or deviations from the approved Service Provider Management Program and UDAAP Policy, where such proposed changes or deviations relate to Add-On Products, shall be submitted in writing to the CFPB for determination of supervisory non-objection.

38. The Bank's Internal Audit department shall periodically conduct an assessment of the Bank's compliance with the Service Provider Management Program and its UDAAP Policy in connection with the marketing, sales, delivery, servicing, and fulfillment of services for Add-On Products. Such assessments shall occur within one-hundred twenty (120) days after the Bank's receipt of a determination of supervisory non-objection to the Service Provider Management Policy and the UDAAP Policy, and periodically thereafter, and the findings shall be memorialized in writing. Within thirty (30) days of completing each assessment, Internal Audit shall provide its written findings to the Audit Committee and the Regional Director.

## ARTICLE VII
## THE AUDIT COMMITTEE

39. The Bank's existing Audit Committee, which is composed of a majority of independent directors of the Bank or its holding company, shall be responsible for monitoring and coordinating the Bank's compliance with the provisions of this Order, and approving measures necessary to ensure compliance with the remaining Articles of this Order (unless other specific approvals are required).

40. Within one-hundred twenty (120) days of the Effective Date, and thereafter within thirty (30) days after the end of each calendar quarter, the Audit Committee shall submit a written progress report to the Board setting forth in detail the actions taken to comply with this Order, and the results and status of those actions.

41. The Board shall forward a copy of the Audit Committee's report, with any additional comments by the Board, to the Regional Director within ten (10) days of the first Board meeting following receipt of such report, unless additional time is granted by the Regional Director through a written determination of supervisory non-objection.

## ARTICLE VIII
## ROLE OF THE BOARD

42. The Board shall ensure that all submissions (including plans, reports, programs, policies, and procedures) required by this Order are submitted to the Regional Director.

43. Although this Order requires the Bank to submit certain documents for the determination of non-objection by the Regional Director, the Board shall have the ultimate responsibility for proper and sound management of the Bank and for ensuring that the Bank complies with Federal consumer financial laws and this Order. With the prior non-objection of the Regional Director, the Board may delegate certain of the approval or reporting obligations included herein to the Audit Committee.

44. In each instance in this Order in which the Board is required to ensure adherence to, or undertake to perform certain obligations of the Bank, the Board, directly or through the Audit Committee, shall:

(a) Authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b) Require the timely reporting by the Bank management of such actions directed by the Board to be taken under this Order;

(c) Follow up on any material non-compliance with such actions in a timely and appropriate manner; and

(d) Require corrective action be taken in a timely manner of any material non-compliance with such actions.

**ARTICLE IX**
**ORDER FOR REDRESS**

45. The Bank shall make redress, as set forth in Paragraphs 47 through 52 of this Article, in accordance with the Redress Plan required by Paragraph 53 of this Article, to all Credit Protection Eligible Customers and Identity Protection Eligible Customers as defined in Paragraphs 47(a) and 50(a) of this Article.

46. If the Bank claims to have made any restitution prior to the Effective Date of this Order that complies with the requirements of this Order, the Bank shall provide appropriate proof of such restitution to the Regional Director concurrent with the Redress Plan required by Paragraph 53 of this Article. Any redress paid to an Identity Protection Eligible Customer pursuant to the order issued by the Comptroller of the Currency, shall not be construed as requiring the Bank to provide a duplicative restitution payment to that Customer under this Order.

**Credit Protection Redress**

47. For purposes of Credit Protection Redress, the following definitions shall apply:

(a) "Credit Protection Eligible Customer" is a Customer who, with respect to each Credit Protection Covered Product, was enrolled in a Credit Protection Covered Product through inbound or outbound telemarketing,

and was billed a Credit Protection Product Fee during the Credit Protection Relevant Time Period, and either (1) did not activate and receive Credit Protection Covered Product benefits at any time while enrolled in the product, or (2) activated and received Credit Protection Covered Product benefits while enrolled, but made a separate request for benefits that was denied or closed.

48. Credit Protection Redress shall include the following:

(a) The redress amount paid to each Credit Protection Eligible Customer shall include, as applicable to each Credit Protection Eligible Customer:

(i) If the Credit Protection Eligible Customer was enrolled in the product for 364 days or less and did not make a benefit request that was denied or closed, all Credit Protection Product Fees charged during the Credit Protection Relevant Time Period;

(ii) If the Credit Protection Eligible Customer was enrolled in the product for 365 days or more and did not make a benefit request that was denied or closed, or lodge a complaint, of which the Bank has a record, stating that he or she did not authorize enrollment, 300 days of Credit Protection Product Fees charged during the Credit Protection Relevant Time Period (based on the average daily fee paid by the consumer during the Credit Protection Relevant Time Period);

(iii) If the Credit Protection Eligible Customer made any request for benefits that was either denied or closed (including Credit

Protection Eligible Customers who may have received a benefit in response to another request), all Credit Protection Product Fees charged during the Credit Protection Relevant Time Period; or

(iv) If, prior to the Effective Date, the Credit Protection Eligible Customer lodged with the Bank or the CFPB a complaint, of which the Bank has a record, stating that he or she did not authorize enrollment in the Credit Protection Covered Products, all Credit Protection Product Fees charged during the Credit Protection Relevant Time Period.

(b) Credit Protection Redress shall also include: (1) a reduction in charged-off balances for Credit Protection Eligible Customers that is attributable to Credit Protection Product Fees charged during the Credit Protection Relevant Time Period not included in the redress amounts described above; and (2) the benefits provided to customers as a result of a six-month no-cost protection period (March 1, 2013 through September 1, 2013) provided to all Customers who were enrolled in the Credit Protection Covered Products as of March 1, 2013.

(c) Credit Protection Redress shall allow for a reduction in the amount of redress provided to a Credit Protection Eligible Customer by: (1) the amount of any refunded Credit Protection Product Fees a Credit Protection Eligible Customer received prior to the Effective Date and (2) the amount of any award a Credit Protection Eligible Customer received through the Class Action Settlement.

49. The estimated value of the restitution and additional redress to Credit Protection Eligible Customers as set forth in Paragraphs 48(a) and 48(b), after applicable reductions as set forth in Paragraph 48(c), is $268 million. The estimated value of the restitution and additional redress to Credit Protection Eligible Customers will be validated as part of the Redress Review.

**Identity Protection Redress**

50. For the purposes of Identity Protection Redress, the following definitions shall apply:

(a) "Identity Protection Eligible Customer" is any customer who, between October 2000 and September 2011, enrolled in an Identity Protection Covered Product and who was Unprocessable during any portion of his or her enrollment.

(b) "Identity Protection Reimbursement End Date" is the date on which the Identity Protection Eligible Customer's Unprocessable status ended.

(c) "Identity Protection Reimbursement Start Date" is the date on which the Identity Protection Eligible Customer entered Unprocessable status.

(d) "Unprocessable" refers to the status of a Customer who, at a given time, was being billed for an Identity Protection Covered Product but who, for any reason (i) was not receiving full credit monitoring; (ii) was receiving partial credit monitoring and/or credit report retrieval and had not received notice of the partial monitoring or credit report retrieval; and/or (iii) was not receiving credit report retrieval benefits.

51. The redress amount paid to each Identity Protection Eligible Customer shall include, as applicable to each Identity Protection Eligible Customer:

(a) The sum of:

(i) The full amount of Identity Protection Covered Product Fees paid by an Identity Protection Eligible Customer from his or her Identity Protection Reimbursement Start Date through his or her Identity Protection Reimbursement End Date;

(ii) The full amount of any overlimit fees, as calculated pursuant to the methodology in the Redress Plan, paid by an Identity Protection Eligible Customer from his or her Identity Protection Reimbursement Start Date through his or her Identity Protection Reimbursement End Date; and

(iii) The amount of the estimated finance charges, as calculated pursuant to the methodology in the Redress Plan concerning Identity Protection Redress, paid by an Identity Protection Eligible Customer on Identity Protection Covered Product Fees from his or her Identity Protection Reimbursement Start Date through his or her Identity Protection Reimbursement End Date.

(b) Less any amount that was a previous refund of the fees and charges described above in Subection (a) of this Paragraph.

52. Notwithstanding Paragraphs 48 and 51, no Customer shall be precluded from receiving redress with respect to more than one Covered Product. For any Customer who is eligible with respect to more one than Covered Product, the Customer's redress will be determined for each Covered Product separately pursuant to Paragraphs 48 and 51 above.

**Redress Plan**

53. Within ninety (90) days of the Effective Date, the Bank shall prepare and submit a Redress Plan ("Redress Plan") to the Regional Director for review and non-objection. The Regional Director shall have the discretion to make a determination of non-objection to the Redress Plan or to direct the Bank to revise the Plan, consistent with the terms of this Order. The Regional Director shall notify the Bank in writing of his or her objection or non-objection to the Plan. In the event the Regional Director directs the Bank to revise the Redress Plan, the Bank shall make revisions and resubmit the Redress Plan to the Regional Director within twenty (20) days.

54. The Redress Plan shall provide processes covering all Credit Protection Eligible and Identity Protection Eligible Customers regardless of their current account status with the Bank, including open accounts, closed accounts with and without a balance, and charged off accounts.

55. The Bank represents that it has completed a plan to reimburse Identity Protection Eligible Customers for certain Identity Protection Covered Product Fees and associated fees and charges that they paid. This plan shall be documented as part of the Redress Plan, and shall be subject to the requirements of this Order. The Redress Plan shall include an accounting of amounts the Bank has already reimbursed to Identity Protection Eligible Customers. If any additional redress is required, it shall be provided consistent with the process previously used to provide redress to Identity Protection Eligible Customers.

56. The process for providing Credit Protection Redress shall include the following requirements:

(a) For any open credit card account, the Bank shall provide a credit posted to the account, regardless of whether the crediting of a Customer results in a credit balance.

(b) For any closed credit card account with no balance outstanding, the Bank shall mail a certified or Bank check to any Eligible Customer.

(c) For any closed credit card account with a balance outstanding, the Bank shall provide a credit posted to the account. Where a credit is issued that is greater than the existing balance, the Bank shall mail to the Customer a certified or Bank check in the amount of the excess.

(d) For any charged-off account, either a credit shall be issued decreasing the charged-off balance by the amount of redress, or the Bank shall issue redress consistent with the requirements for closed credit card accounts set forth in Paragraph 56(b). Where a credit is issued that is greater than the existing charged-off balance, the Bank shall mail to the Customer a certified or Bank check in the amount of the excess. Any Redress Notification Letter, as described in Paragraph 57 below, sent with regard to a charged-off account will notify the Customer of the credit decreasing the charged-off balance as well as any additional money the Customer is receiving.

(e) With respect to any bankruptcy, estate, accounts in litigation, or account where the account holder is deceased, if the account remains open and the balance is greater than the refund, the Bank shall provide a statement

credit to the account, and otherwise a refund check for the remaining refund shall be sent in accordance with applicable law.

57. With respect to redress paid to Credit Protection Eligible Customers, the Redress Plan shall include: (1) the form of the letter ("Redress Notification Letter") to be sent notifying Credit Protection Eligible Customers of the redress; and (2) the form of the envelope that will contain the Redress Notification Letter. The letter shall include language explaining the manner in which the amount of redress was calculated; an explanation of the use of a credit and/or check as applicable; and a statement that the provision of refund payment is in accordance with the terms of this Order. The Bank shall not include in any envelope containing a "Redress Notification Letter" any materials other than the approved letters, and when appropriate, redress checks, unless the Bank has obtained written confirmation from the Regional Director that the CFPB does not object to the inclusion of such additional materials.

58. The Redress Plan shall include a description of the following:

(a) methods used and the time necessary to compile a list of potential Credit Protection Eligible and Identity Protection Eligible Customers;

(b) methods used to calculate the amount of redress to be paid to each Credit Protection Eligible and Identity Protection Eligible Customers as required herein;

(c) procedures for issuance and tracking of redress to Credit Protection Eligible and Identity Protection Eligible Customers; and

(d) procedures for monitoring compliance with the Redress Plan.

59. The Bank shall not attach any conditions to the provision of any credit or check for redress to a Credit Protection and Identity Protection Eligible Customer, including requiring the Credit Protection and Identity Protection Eligible Customer to waive any right.

60. The Bank has made or shall make reasonable attempts to locate Credit Protection and Identity Protection Eligible Customers, including standard address search using the National Change of Address System, whose Redress Notification Letter and/or check is returned for any reason. The Bank has re-mailed, or shall re-mail to corrected addresses, any returned letters and any redress checks, within ninety (90) days of receiving such return. Any unclaimed funds will be disposed of in accordance with the Redress Plan.

61. With respect to any Credit Protection and Identity Protection Eligible Customer's account that receives redress as a credit that decreases the existing balance or charged-off balance, the Bank shall, as permitted by law and in accordance with existing procedures:

(a) report the updated balance to each credit reporting agency to which the Bank had previously furnished balance information for the account;

(b) delete the account trade line at each credit reporting agency to which the Bank had previously furnished balance information for the account; or

(c) in the case of an account sold to an unaffiliated third party, request that such third party owner of the debt report the updated balance to, or delete the account trade line at, each credit reporting agency to which the Bank or the third party owner of the debt had previously furnished balance information for the account.

62. Upon notification that the Regional Director has made a determination of non-objection to the Redress Plan, the Bank shall implement and adhere to the steps,

recommendations, deadlines, and timeframes set forth in the Redress Plan. Any proposed changes, to or deviation from, the approved Redress Plan shall be submitted in writing to the Regional Director for review and non-objection.

**Assessment of Redress**

63. Within ninety (90) days from completion of the Redress Plan, the Bank's Internal Audit department shall review and assess compliance with the terms of the Redress Plan (the "Redress Review").

64. The Redress Review shall include an assessment of the Redress Plan and the methodology used to determine the population of Eligible Customers, the amount of redress for each Eligible Customer, the procedures used to issue and track redress payments, the procedures used for reporting and requesting the reporting of updated balances, deleting or requesting the deletion of account trade lines, as applicable, to the credit reporting agencies, and the work of any independent consultants that the Bank has used to assist and review its execution of the Redress Plan.

65. The Redress Review shall be completed and summarized in a written report (the "Redress Review Report"), which shall be completed within sixty (60) days of completion of the Redress Review. Within ten (10) days of its completion, the Redress Review Report shall be submitted to the Regional Director and the Board.

**Payment Floor For Credit Protection Eligible Customers**

66. For the purpose of providing restitution as required by this Order, the Bank shall provide restitution as set forth in Paragraph 48(a), in an amount not less than two-hundred fifteen million dollars ($215,000,000), less any restitution made by the Bank prior to the Effective Date of this Order that complies with the requirements of this Order ("Payment Floor"). If the Bank

claims to have made any restitution prior to the Effective Date of this Order that complies with the requirements of this Order, the Bank shall provide appropriate proof of such restitution to the Regional Director within thirty (30) days of the Effective Date.

67. The Bank shall make all restitution to Credit Protection Eligible Customers required by this Order, regardless of whether the total of such restitution exceeds the Payment Floor.

68. Upon completion of all restitution pursuant to Paragraph 56, if the amount of restitution provided to Credit Protection Eligible Customers is less than two-hundred fifteen million dollars ($215,000,000), the Bank shall pay the difference in accordance with the processes set forth in Paragraph 56, through a *pro rata* distribution, as appropriate, to the restitution group set forth in Paragraph 48(a)(ii).

## ARTICLE X
## CIVIL MONEY PENALTY

**IT IS FURTHER ORDERED** that:

69. Pursuant to Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law and/or regulations set forth in the Findings and Conclusions, and taking into account the factors set forth in 12 U.S.C. § 5565(c)(3), the Bank shall pay to the CFPB a civil money penalty of fifteen million dollars ($15,000,000) with respect to Credit Protection, and five million dollars ($5,000,000) with respect to Identity Protection, as directed by the CFPB and as set forth herein.

70. Within ten (10) days of the Effective Date, the Bank shall pay the civil money penalty in the form of a wire transfer to the CFPB or to such agent as the CFPB may direct, and in accordance with wiring instructions to be provided by counsel for the CFPB.

71. The civil money penalty paid pursuant to this Order shall be deposited in the Civil Penalty Fund of the CFPB in accordance with Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d), and 12 C.F.R. part 1075.

72. In the event of any default on the Bank's obligations under this Section, interest, computed pursuant to 28 U.S.C. § 1961, as amended, shall accrue on any outstanding amounts not paid from the date of default to the date of payment, and shall immediately become due and payable.

73. The Bank shall treat the civil money penalty as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, the Bank shall not:

(a) Claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any civil money penalty that the Bank pays pursuant to this Order; or

(b) Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including, but not limited to, payment made pursuant to any insurance policy, with regard to any civil money penalty that the Bank pays pursuant to this Order.

74. To preserve the deterrent effect of the civil money penalty, in any Related Consumer Action, the Bank shall not argue that the Bank is entitled to, nor shall the Bank benefit by, any offset or reduction of any compensatory damages imposed in any Related Consumer Action, by any amount of the civil money penalty paid in this action ("Penalty Offset"). If the court in any Related Consumer Action grants such a Penalty Offset, the Bank shall, within thirty (30) days after entry of a final order granting the Penalty Offset, notify the Regional Director, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment shall not be

deemed an additional civil money penalty and shall not be deemed to change the amount of the civil money penalty imposed in this action.

75. The Bank shall relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law. The Bank shall make no claim to or demand for return of the funds, directly or indirectly, through counsel or otherwise.

## ARTICLE XI
## RECORDKEEPING

**IT IS FURTHER ORDERED** that:

76. Beginning on the Effective Date, for a period of at least two years from the date a Customer is no longer enrolled in an Identity Protection Product or Credit Protection Product program, the Bank must ensure that the following records, to the extent they exist, are retained:

(a) For each individual Customer and his or her enrollment in that program:

(i) Records containing, with respect to each Customer, his or her name, addresses, email addresses, phone numbers, dollar amounts paid, benefits applied for and/or received, quantity of products purchased, description of the product purchased, the date on which the product was purchased, and a copy of the welcome kit mailed to each Customer (if a Customer left the program, include the date the Customer left a program and the reason the Customer left the program);

(ii) Records for each Customer reflecting that the Customer expressly agreed to purchase the product, including audio recordings of telephone calls during which a Customer purchased the Add-On Product;

(iii) For Identity Protection Products, a copy of the Customer's authorization to access his or her credit information from the credit reporting agencies for purposes of activating credit monitoring or retrieval, and the date the Customer was first charged for Identity Protection Products.

(b) For each Identity Protection Product or Credit Protection Product in general:

(i) Records reflecting the expenses and revenues related to the Identity Protection Product or Credit Protection Product;

(ii) Records reflecting, on an annual basis, the number of Customers who canceled the Identity Protection Product or Credit Protection Product, and the number of Customers whose Customer accounts were charged off by the Bank;

(iii) Records of all Customer complaints that are recorded and tracked by the Bank in accordance with Bank policies and refund requests (whether received directly or indirectly, such as through a Service Provider), and any responses to those complaints or requests; and

(iv) Copies of all sales scripts; sales/marketing training materials; advertisements; or other marketing materials, including terms and conditions, fulfillment packages, and welcome kits; and including any such materials used by Service Providers on the Bank's behalf.

77. For a period of six years from the Effective Date, the Bank must retain the following records:

(a) All documents and records necessary to demonstrate full compliance with each provision of this Order; and

(b) All records pertaining to the redress, described above in Article IX, including, but not limited to, documentation of the processes and procedures used to determine the Eligible Customers, as that term is defined in Article IX above, the names, contact and account information of the Eligible Customers, any mailing records, and documentation that the appropriate restitution was made.

## ARTICLE XII
## DISTRIBUTION OF ORDER

**IT IS FURTHER ORDERED** that:

78. Within thirty (30) days of the Effective Date, the Bank shall deliver a copy of this Order to each member of the Board and the executive officers, as well as to any Service Providers or other agents providing services related to the marketing or administration of Add-On Products as of the Effective Date.

79. For a period of three years from the Effective Date, the Bank shall deliver a copy of this Order to any future board members and executive officers, as well as any Service Providers or other agents providing services related to the marketing or administration of Add-On Products, before they assume their responsibilities.

80. The Bank shall secure a signed and dated statement acknowledging receipt of a copy of this Order with any electronic signatures complying with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within thirty (30) days of delivery, from all persons receiving a copy of this Order pursuant to this Section.

## ARTICLE XIII
## NOTICES

**IT IS FURTHER ORDERED** that:

81. Unless otherwise directed in writing by a CFPB representative, all submissions, requests, communications, consents or other documents relating to this Order shall be in writing and shall be sent by overnight courier (not the U.S. Postal Service), as follows:

**To the CFPB:**

Regional Director, CFPB Southeast Region
Consumer Financial Protection Bureau
1700 G Street, N.W. Washington D.C. 20552

The subject line shall begin: *In re Bank of America, N.A., et al*. Provided, however, that the Bank may send such reports or notifications by first-class mail, but only if the Bank contemporaneously sends an electronic version of such report or notification to Enforcement_Compliance@cfpb.gov.

## ARTICLE XIV
## EXTENSIONS OF TIME

**IT IS FURTHER ORDERED** that:

82. Upon a written showing of good cause, the Regional Director may, in his/her discretion, modify any non-material provisions of this Order (e.g., reasonable extensions of time). Any such modification by the Regional Director shall be in writing.

## ARTICLE XV
## ADMINISTRATIVE PROVISIONS

83. Except as set forth in Paragraph 88, the provisions of this Order shall not bar, estop, or otherwise prevent the CFPB, or any other federal or state agency or department, from taking any other action against the Bank.

84. This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 5563(b), and expressly does not form, and may not be construed to form, a contract binding the CFPB or the United States.

85. This Order shall be effective on the date of issuance, and shall remain effective and enforceable, except to the extent that, and until such time as, any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the CFPB or its designated agent.

86. Calculation of time limitations shall run from the Effective Date and shall be based on calendar days, unless otherwise noted.

87. The provisions of this Order shall be binding upon the Bank, its officers, agents, servants, employees, and/or attorneys, and any successors and assigns thereof.

88. This Order constitutes a settlement of the administrative proceeding against the Bank contemplated by the CFPB, based on the conduct described in the Findings and Conclusions set forth in this Order. The CFPB releases and discharges the Bank from all potential liability (other than as set forth in this Order) for a cease and desist or other order or civil money penalty that has or might have been asserted by the CFPB based on the conduct described in the Findings and Conclusions, to the extent such practices occurred prior to the Effective Date and are known to the CFPB as of the Effective Date of the Order. Notwithstanding the foregoing, the practices alleged in this Order may be utilized by the CFPB in future enforcement actions against the Bank and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release shall not preclude or affect any

right of the CFPB to determine and ensure compliance with the terms and provisions of the Order, or to seek penalties for any violations thereof.

89. The provisions of this Order shall be enforceable by the CFPB. Any violation of this Order may result in the imposition by the CFPB of the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c).

90. The provisions of this Order shall be severable and, should any provisions be declared by a court of competent jurisdiction to be unenforceable, the other provisions shall remain in full force.

91. No promises, representations or warranties other than those set forth in this Order and the accompanying Stipulation have been made by any of the parties. This Order and the accompanying Stipulation supersede all prior communications, discussions, or understandings, if any, of the parties, whether oral or in writing.

92. Nothing in this Order or the accompanying Stipulation shall be construed as allowing the Bank, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 7th day of April, 2014.

Richard Cordray
Richard Cordray
Director
Consumer Financial Protection Bureau

# EXHIBIT 3B

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2022-CFPB-0002

In the Matter of:

**BANK OF AMERICA, N.A.**

# CONSENT ORDER

The Consumer Financial Protection Bureau ("Bureau") has reviewed the garnishment-related practices of Bank of America, N.A. ("Respondent") and has identified the following law violations: (1) Respondent engaged in unfair acts and practices by responding to and processing garnishment notices against out-of-state bank accounts in violation of certain garnishment-issuing states' prohibitions against out-of-state garnishment; (2) Respondent engaged in unfair acts and practices by failing to apply the appropriate state exemptions to certain consumers' deposit accounts after receiving garnishment notices; (3) Respondent engaged in deceptive acts and practices by misrepresenting to consumers, by implication, the applicable state exemption rights for garnishment by applying the issuing state's exemptions instead of the exemptions of the consumer's state of residence, where

the states of issuance and residence differ; (4) Respondent engaged in unfair acts and practices by using a deposit agreement that required consumers to direct Respondent not to contest legal process and waive Respondent's liability for its unlawful garnishment conduct; and (5) Respondent engaged in deceptive acts and practices by suggesting consumers could not bring legal claims misrepresenting consumers' legal rights against Respondent regarding garnishment proceedings, all in violation of Sections 1031(a) and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). Under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order ("Consent Order").

## I.

## Jurisdiction

1. The Bureau has jurisdiction over this matter under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565.

## II.

## Stipulation

2. Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 29, 2022 ("Stipulation"), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent

Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III.

## Definitions

3. The following definitions apply to this Consent Order:

   a. "Affected Consumers" are Consumers who, as a result of Respondent acting upon an Out-of-State Garnishment Notice issued by a court, attorney, or other authorized person (*i.e.*, issuing entity) in a Restriction State, paid Garnishment-Related Fees between August 1, 2011 and the Effective Date.

   b. "Board" means Respondent's duly-elected and acting Board of Directors or a committee thereof.

   c. "Consumer" means an individual holding at least one active Deposit Account with Respondent.

   d. "Deposit Account" means a consumer deposit account held by one or more Consumers between August 1, 2011 and the Effective Date.

e. "Deposit Agreement" means the standard deposit agreement to which Consumers consent when opening a Deposit Account.

f. "Effective Date" means the date on which the Consent Order is issued.

g. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

h. "Garnishment Notice" means the first notice of legal process by one or more creditors or judgment creditors, their counsel, or a court, of a legal proceeding seeking that Respondent turn over funds in a Consumer's Deposit Account in Respondent's custody or control to satisfy an amount owed to a creditor or judgment creditor, including—but not limited to—a garnishment, writ of attachment, execution, levy, restraining order, restraining notice, restraining notice and information subpoena, seizure order, forfeiture, or other similar legal process or order, but excluding any legal process where (1) the party seeking to have Respondent turn over a Consumer's funds is a federal, state, municipal, or local governmental agency or entity, or (2) the creditor is seeking to satisfy a judgment awarding child support, alimony, or spousal maintenance.

i. "Garnishment-Related Fees" means legal order processing fees, attorneys' fees, overdraft fees, insufficient funds fees, or account maintenance fees assessed by Respondent after processing an Out-of-State Garnishment Notice issued from a Restriction State from the time Respondent froze or held the Consumer's Deposit Account until 30 days after the freeze or hold was removed.

j. "Issuing State" means the State from which a particular Garnishment Notice, including an Out-of-State Garnishment Notice, was issued.

k. "Out-of-State Account" means a Deposit Account located in a State other than the Issuing State.

l. "Out-of-State Garnishment Notice" means a Garnishment Notice concerning an Out-of-State Account but does not include Garnishment Notices domesticated in the state where the Consumer's Deposit Account is located.

m. "Regional Director" means the Regional Director for the Southeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his or her delegate.

n. "Related Consumer Action" means a private action by or on behalf of one or more Consumers or an enforcement action by another governmental agency brought against Respondent based on

substantially the same facts as described in Section IV of this Consent Order.

o. "Relevant Period" means August 1, 2011 to March 29, 2022.

p. "Respondent" means Bank of America, N.A. and its successors and assigns.

q. "Restriction State" is a State that prohibited or otherwise restricted garnishment of Out-of-State Accounts, at the time Respondent was served with or acted upon an Out-of-State Garnishment Notice issued from that State. Restriction States include but are not limited to Alabama, Arizona (before August 2019), California, Florida (after August 2014), and Oregon.

r. "States" or "states" means all U.S. states where Respondent has a physical presence as well as the District of Columbia and any U.S. territory where Respondent has a physical presence.

## IV.

## Bureau Findings and Conclusions

The Bureau finds the following:

4. Respondent is a national bank headquartered in Charlotte, North Carolina with branches and ATMs located in 38 states and the District of Columbia. As of December 31, 2021, Respondent had $2.5 trillion in consolidated

assets, which makes it an insured deposit institution with assets greater than $10,000,000,000 within the meaning of 12 U.S.C. § 5515(a).

5. Respondent is a "covered person" under 12 U.S.C. § 5481(6) because it "engages in offering or providing a consumer financial product or service," including by engaging in deposit-taking activities for use by Consumers primarily for personal, family, or household purposes.

## Respondent's Garnishment Practices

### Background

6. Garnishment (referred to in some states as "attachment") is a common method used by a creditor to enforce a money judgment against a debtor. After a creditor receives a judgment in a lawsuit, the "judgment creditor" can seek authorization from a court to garnish the bank account of the "judgment debtor" in a post-judgment garnishment proceeding. To do so, either a court in the state that issued the underlying judgment or the judgment creditor itself issues a Garnishment Notice against the judgment debtor and serves it on a financial institution (the "garnishee").

7. Bank account garnishments are governed by state law. Each state has a judicial process by which a judgment creditor can freeze or hold and then seize money from a judgment debtor's deposit account to enforce a civil judgment against the judgment debtor.

8. To garnish a bank account lawfully, a state court must have jurisdiction over the garnishee (the bank that holds a deposit account) and the property to be garnished (the deposit account).

9. During the Relevant Period, Respondent's standard consumer deposit agreement defined the location of the Consumer's account as the branch where the account was opened.

<u>Out-of-State Garnishments</u>

10. During the Relevant Period, Respondent processed hundreds of thousands of Garnishment Notices issued by courts across the country, including Out-of-State Garnishment Notices. In many cases, Respondent failed to follow certain state-specific requirements and instead generally treated all Garnishment Notices alike: if the Garnishment Notice was issued from a state where Respondent had a financial center, it responded to the Garnishment Notice by indicating that the identified Consumer had a Deposit Account with potentially-garnishable assets and froze or held the Consumer's account, regardless of whether the account was located outside of the Issuing State.

11. In many cases, Respondent's responses to Garnishment Notices did not distinguish between Out-of-State Garnishment Notices issued in Restriction States and Out-of-State Garnishment Notices issued in non-

Restriction States. Garnishment Notices issued from a state other than where the bank account is located—*i.e.*, Out-of-State Garnishment Notices—require further scrutiny from Respondent.

12. Respondent frequently answers Out-of-State Garnishment Notices by identifying all Deposit Accounts it held for the Consumer anywhere in the nation and held or froze the funds in those Deposit Accounts regardless of where the Deposit Accounts were located.

13. In most cases, Respondent's state-specific policies and procedures specifically instructed its staff to identify and process Garnishment Notices (which may include holding or freezing funds) without regard for whether the Consumer's accounts were located in the same state as the court that issued the Garnishment Notice.

14. During the Relevant Period, Respondent has responded to Consumers who complain about Out-of-State Garnishment Notices by telling Consumers that it will identify assets held in accounts located in any state where it is located "subject to any limitations imposed by state law."

15. Respondent's training materials also teach Respondent employees that, for the most part, a Garnishment Notice issued by a court or other issuing entity in one state reaches accounts located outside that state. During the Relevant Period, Respondent's training materials identified a few of the

Restriction States that limit the reach of Out-of-State Garnishment Notices issued by courts or other issuing entities in those States and instruct Respondent employees not to process those Out-of-State Garnishment Notices. But, during the Relevant Period, Respondent's training materials did not include all of the Restriction States identified in this Consent Order. Moreover, Respondent did not consistently apply those instructions. During the Relevant Period, Respondent processed Out-of-State Garnishment Notices from Restriction States identified in Respondent's training materials.

16. In many cases, when answering Out-of-State Garnishment Notices, Respondent did not notify the issuing court or other issuing entity that the funds sought to be garnished were located in another state, which would have put the issuing court or other issuing entity on notice that the funds were outside the state.

17. Instead, Respondent routinely responds to Out-of-State Garnishment Notices from the Restriction States with an answer or other document that identified Consumers' funds held in accounts that were not located in those states. It then often held or froze and eventually turned over those funds to the judgment creditor. In some other cases, however, Respondent responded by informing the issuing court or other issuing entity that the

Consumer did not have any attachable funds or accounts within the Issuing State and declined to process the Out-of-State Garnishment Notice. This approach was not done consistently in the Restriction States that Respondent identified in its training materials.

18. After receiving Garnishment Notices from certain states, but before turning over Consumers' funds, Respondent charged legal order processing and, sometimes, attorneys' fees to Consumers' frozen or held Deposit Accounts, unless doing so would be inconsistent with the relevant state law. It then paid the amount of the Out-of-State Garnishment Notice, or as much of the amount as could be paid from funds available in the garnished Deposit Accounts.

19. During the Relevant Period, Respondent has processed at least 3,700 Out-of-State Garnishment Notices from Restriction States without notifying the issuing court or other issuing entity that the Consumer's Deposit Account was not located in the Issuing State. Affected Consumers have paid at least $592,000 in Garnishment-Related Fees to Respondent because of these Out-of-State Garnishment Notices.

<u>State-Specific Exemption Laws</u>

20. Many state laws exempt, or prohibit the garnishment of, certain amounts of money from a Consumer's Deposit Account. These state exemption laws

often provide that funds up to a certain defined amount are temporarily or permanently protected from garnishment. In many states, Consumers may affirmatively assert their statutory protections in court. In most such states, Consumers make exemption claims pursuant to forms provided or prescribed by the courts. In other states, the garnishee, like Respondent, is required to apply certain exemptions on the Consumer's behalf, and the Consumer may then claim additional exemptions, where applicable. Financial institutions, including Respondent, are also required to apply federal exemptions.

21. For those states where Respondent is required to apply certain state exemptions on behalf of the Consumer, Respondent's policy and practice when responding to Garnishment Notices, including Out-of-State Garnishment Notices, is to apply the exemption law of the state that issued the Garnishment Notice—*i.e.*, the Issuing State—rather than the law of the state where the Consumer resides in those instances where the two states differ.

<u>Respondent's Deposit Agreement and Disclosures</u>

22. Respondent's Deposit Agreement purports to have Consumers "direct" Respondent, when served with legal process such as a writ of garnishment, "not to contest the legal process," and states that Respondent has "no

liability to [the Consumer] if [Respondent] accept[s] and compl[ies] with legal process as provided in this section or by law."

23. Respondent directs Consumers to this waiver when responding to Consumers who complain that their accounts were frozen, held, or garnished in response to an Out-of-State Garnishment Notice.

24. Federal law, such as the Treasury Department's rule on Garnishment of Accounts Containing Federal Benefit Payments, 76 Fed. Reg. 9939, 9951 (Feb. 23, 2011) (Federal Benefits Garnishment Rule), and many states' laws, prohibit banks from requiring consumers to waive certain exemption rights.

25. The Federal Benefits Garnishment Rule, which protects a litany of federal benefits from garnishment and the claims of judgment creditors, prohibits a financial institution from requiring an account holder to waive any protection available under the rule.

26. Respondent's Deposit Agreement, however, purports to require that Consumers waive all claims against Respondent, regardless of whether it applies the Consumer's correct exemption rights, as a condition of opening a Deposit Account.

**Findings and Conclusions as to Responses to Out-of-State Garnishment Notices (Unfair Practice)**

27. The CFPA prohibits covered persons or service providers from engaging "in any unfair, deceptive, or abusive act or practice." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

28. An act or practice is unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which are not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c).

29. Section 1054(a) of the CFPA grants the Bureau authority to commence a civil action against any person who violates a Federal consumer financial law. 12 U.S.C. § 5554(a). The CFPA is a Federal consumer financial law. 12 U.S.C. § 5481(14).

30. In at least 3,700 instances during the Relevant Period, Respondent responded to Out-of-State Garnishment Notices from the Restriction States without disclosing to courts or other issuing entities in its answers or other responses that the Deposit Accounts in question were not located in the states from which the Garnishment Notices issued.

31. In many of those instances where Respondent failed to disclose to a Restriction State court or issuing entity that the Out-of-State Garnishment

Notices were for bank accounts located outside of the state, Respondent informed the Consumer about the Out-of-State Garnishment Notice, subsequently processed the Out-of-State Garnishment Notice, froze or held the Consumer's funds, turned over those funds to the judgment creditor, and imposed Garnishment-Related Fees on the Consumer.

32. In at least 3,700 instances, Respondent's conduct caused or was likely to cause substantial injury to Affected Consumers in the form of Garnishment-Related Fees, frozen or held funds, and funds turned over to judgment creditors.

33. As a result of Respondent's practices related to Out-of-State Garnishment Notices, Affected Consumers often lost access to funds that Respondent froze or held when it received those notices. Consumers may also have suffered a permanent loss of the account funds when Respondent responded to these Out-of-State Garnishment Notices without indicating that the relevant account was not located in the issuing Restriction State, froze or held the funds, and ultimately turned the funds over to judgment creditors.

34. Respondent charged Consumers fees for responding to a Garnishment Notice, including legal order processing fees and, where applicable, attorneys' fees. Respondent may also have assessed other fees such as

overdraft, insufficient funds, or account maintenance fees, which might not have been assessed had Respondent declined to process the Out-of-State Garnishment Notices.

35. Consumers could not reasonably avoid such substantial injury. Consumers do not and cannot control whether Respondent discloses to the issuing court or entity that Consumers' Deposit Accounts are located outside of the state that issued the Garnishment Notice. Further, even if a Restriction State's procedural requirements allow Consumers to object to a Garnishment Notice, it is not reasonable to expect Consumers to have the necessary understanding of the reach of Garnishment Notices issued from states that limit or restrict out-of-state garnishment and any rights they may have to object to them to avoid the harm.

36. The substantial injury Respondent caused or was likely to cause to Consumers is not outweighed by countervailing benefits to Consumers or to competition.

37. Respondent's acts and practices as described herein constituted unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Application of the Wrong State Law for Garnishment Exemptions (Unfair Practice)**

38. In numerous instances during the Relevant Period, when garnishing Consumers' Deposit Accounts, Respondent has applied the exemption laws of the Issuing State rather than the laws of the state where the Consumer resides, in circumstances where the applicable exemption law is that of the consumer's state of residence. Most states require their garnishment exemptions to be applied to their residents.

39. Respondent's conduct caused or was likely to cause substantial injury to Consumers. Because exemptions vary by state, applying the wrong state's exemption law will frequently harm Consumers by failing to apply exemptions of the Consumer's state of residence and thus failing to protect the full amount of exempt funds.

40. Consumers could not reasonably avoid this substantial injury. Consumers cannot control Respondent's policy of applying the exemption laws of the state where the court that issued the Garnishment Notice is located rather than the laws of the state where the Consumer resides. Further, Consumers are unlikely to understand which state's exemption law applies or any rights they may have to object to Respondent's failure to apply the proper exemptions to avoid the harm.

41. The substantial injury Respondent caused or was likely to cause to Consumers is not outweighed by countervailing benefits to Consumers or to competition.

42. Respondent's acts and practices as described herein constitute unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Misrepresentations to Consumers about the Applicable State Garnishment Exemptions (Deceptive Practice)**

43. An act or practice is deceptive if it misleads or is likely to mislead a consumer, the consumer's interpretation is reasonable under the circumstances, and the misleading act or practice is material.

44. During the Relevant Period, by stating to Consumers that it has applied the exemption law of the Issuing State, Respondent has implicitly represented to Consumers that their rights to have certain funds exempted from garnishment were governed by the law of the Issuing State.

45. In fact, in most cases, the exemption rights of Consumers are not controlled by the law of the state where the court that issued the Garnishment Notice is located; rather, Consumers' exemption rights are usually determined by the law of the state where the Consumer resides.

46. Respondent's implied misrepresentations concerning which state's exemption law applies were likely to mislead Consumers acting reasonably under the circumstances.

47. These misrepresentations were material because they concerned the terms and limitations of Respondent's transactions with Consumers. Consumers relying on these misrepresentations would have been misinformed about the protections available to them, and potentially dissuaded from seeking to effectuate such protections.

48. Respondent's acts and practices as described herein constitute deceptive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Use of a Deposit Agreement That Requires Consumers to Direct It Not to Contest Legal Process and Waive Its Liability (Unfair Practice)**

49. Respondent requires Consumers to agree to its lengthy Deposit Agreement to open a Deposit Account. The Deposit Agreement states that Consumers "direct" Respondent "not to contest [any] legal process," including process "served at locations other than the location where the account, property, or records are held." The Deposit Agreement further states that Respondent has "no liability to [the Consumer] if [Respondent] accept[s] and compl[ies] with legal process as provided in this section or by law."

50. Many federal and state exemption rights and similar protections cannot be waived.

51. Respondent's practice of requiring Consumers to "direct" Respondent not to contest legal process and to waive its liability for its actions regarding all legal process causes or is likely to cause substantial injury to Consumers by (1) purportedly allowing Respondent to process Out-of-State Garnishment Notices issued by a Restriction State it knows or should know to be improper; and (2) preventing Consumers from pursuing any legal claims against Respondent for improperly handling Garnishment Notices.

52. This injury is not reasonably avoidable by Consumers. Consumers cannot negotiate the terms of their deposit agreements, are unlikely to realize that the waiver language will eliminate their ability to pursue legal remedies against Respondent related to garnishment, and are unlikely to be able to shop for other bank accounts based on this term.

53. The substantial injury Respondent caused or was likely to cause to Consumers is not outweighed by countervailing benefits to Consumers and competition.

54. Respondent's acts and practices as described in Paragraphs 22–26 constitute unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

### Findings and Conclusions as to Respondent's Communications to Consumers about the Garnishment of Their Deposit Accounts (Deceptive Practice)

55. During the Relevant Period, Respondent represented in communications to Consumers that because they signed a Deposit Agreement that included broad language directing Respondent not to contest legal process, Consumers had waived their right to hold Respondent liable for improperly responding to Garnishment Notices.

56. In fact, regardless of the language in the Deposit Agreement, Consumers have the right to go to court to attempt to prevent wrongful garnishments or seek to have the appropriate state or federal exemptions applied. Many federal and state exemption rights and similar protections cannot be waived.

57. These misrepresentations were likely to mislead Consumers acting reasonably under the circumstances because they were express statements in documents that appeared to state Consumers' rights under the circumstances.

58. These misrepresentations were material because they concerned the terms and limitations of Respondent's Deposit Agreement with Consumers. Consumers relying on these misrepresentations would have been

misinformed about the protections available to them, and potentially dissuaded from seeking to effectuate such protections.

59. Respondent's acts and practices as described herein constitute deceptive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## CONDUCT PROVISIONS

## V.

## Prohibited Conduct

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

60. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, in connection with processing Garnishment Notices, including responding to Out-of-State Garnishment Notices, freezing or holding Consumers' accounts in connection with processing Out-of-State Garnishment Notices except as provided herein, turning over funds in response to Out-of-State Garnishment Notices issued by courts in Restriction States except as directed by a court to do so, or imposing fees on Consumers related to Garnishment Notices issued by courts in Restriction States.

61. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, must take the following affirmative actions:

Out-of-State Garnishments

a. Compile and maintain accurate up-to-date information about the limits of Out-of-State Garnishment Notices issued by each state where Respondent processes such Notices, maintains a financial center, or otherwise is subject to the state's jurisdiction, including identifying all Restriction States.

b. Create, maintain, and implement policies and procedures that accurately and consistently comply with the current, relevant state and federal laws regarding Out-of-State Garnishment Notices.

c. Train Respondent personnel responsible for processing Garnishment Notices on the policies and procedures for Out-of-State Garnishment Notices created and maintained in subpart (b) and monitor compliance with those policies and procedures.

d. Answer or otherwise reply to all facially valid Out-of-State Garnishment Notices by notifying the issuing court or other issuing entity that the relevant Deposit Account is not located in the state from which the Out-of-State Garnishment Notice was issued. If such

notice is provided to an entity other than a court, the form and substance of the notice must be included in the Compliance Plan as described in Paragraphs 63–65.

e. Answer or otherwise reply to all facially valid Out-of-State Garnishment Notices issued by a court in the Restriction States by notifying the issuing court or other issuing entity if Respondent does not have garnishable assets located within the state.

f. Cease freezing or holding funds in an Out-of-State Deposit Account on receipt of an Out-of-State Garnishment Notice from any Restriction State, unless required to do so under state law.

g. Unless prohibited by applicable law, provide notice to the named Consumer that Respondent has received a Garnishment Notice and has acted upon (or will act upon) the Garnishment Notice, identifying (i) the Deposit Accounts responsive or potentially responsive to the Garnishment Notice; (ii) the state(s) where each of the Deposit Accounts is located according to Respondent's records; (iii) the Issuing State; and (iv) the Consumer's state of residence as determined by Respondent's current records.

h. Maintain records of each Out-of-State Garnishment Notice Respondent receives (however, Respondent is not required to keep

records of Garnishment Notices it rejects or takes no action on), what notice Respondent provided to the issuing court or other issuing entity in response, and whether Respondent froze, held, or turned over funds to the judgment creditor.

State Exemption Rights

i. Compile and maintain accurate up-to-date information about state-specific garnishment exemptions in every state where Respondent maintains Consumers' Deposit Accounts or has a financial center.

j. Create, maintain, implement, and routinely update policies and procedures that accurately and consistently follow the relevant state laws regarding state garnishment exemptions.

k. Train Respondent personnel responsible for processing Garnishment Notices on the policies and procedures for state garnishment exemptions created and maintained under subpart (j) and monitor compliance with those policies and procedures.

l. For those states where Respondent is required to apply certain state exemptions on behalf of the Consumer, Respondent must accurately and consistently apply the correct state's exemptions pursuant to the information compiled under subpart (i) for each Garnishment Notice it processes, and refrain from garnishing exempted funds.

m. For those states where Respondent is not required to apply state exemptions on behalf of the Consumer, Respondent must notify each Consumer named in a Garnishment Notice that Respondent has processed (or will process) that:

i. the Garnishment Notice may identify exemptions under the law of the state where the judgment was obtained (*i.e.*, the Issuing State); and

ii. if they reside outside of the Issuing State, the Consumer may be entitled to claim exemptions pursuant to the law of their state of residence and that they may wish to consult an attorney.

The form and substance of these notices must be included in the Compliance Plan as described in Paragraphs 63–65.

<u>Deposit Agreement Waiver Language</u>

n. Cease including in Respondent's Deposit Agreement or any other Consumer-facing document the language identified in Paragraphs 22–26 of this Consent Order, referring to Respondent's standard Deposit Agreement or any similar language requiring Consumers to direct Respondent not to contest legal process on their behalf with respect to processing Garnishment Notices or requiring Consumers to waive consumer protection rights.

o. Cease communicating to Consumers that they have purportedly waived any rights regarding garnishment or Garnishment Notices as a result of entering into Respondent's Deposit Agreement.

Credit Reporting

p. In instances where (i) the Deposit Accounts of Affected Consumers went into overdraft status within 30 days of Respondent charging the Consumers Garnishment-Related Fees resulting from unlawful Out-of-State Garnishment Notices and (ii) as a result, Respondent reported the overdraft status of those accounts to Chex Systems, Inc. ("Chex") and/or Early Warning Services ("EWS"), Respondent shall instruct Chex, EWS, or any other consumer reporting agency to which Respondent has furnished the information in this subpart, to remove those reports from their respective databases.

62. Respondent must provide the appropriate staffing and resources necessary to comply with Paragraphs 63–65.

## VI.

## Compliance Plan

**IT IS FURTHER ORDERED** that:

63. Within 90 days of the Effective Date, Respondent must submit to the Enforcement Director for review and determination of non-objection a

comprehensive compliance plan designed to ensure that Respondent's garnishment-related conduct pertaining to Out-of-State Garnishment Notices and state exemptions as set forth in this Consent Order complies with all applicable Federal consumer financial laws and the terms of this Consent Order ("Compliance Plan"). The Compliance Plan must include, at a minimum:

a. Detailed steps for addressing each action required by this Consent Order as set forth in Paragraphs 60–61, including identifying all Restriction States; and

b. Specific timeframes and deadlines for implementation of the steps described above.

64. The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Enforcement Director within 30 days.

65. After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

66. The Board or a committee thereof must review all submissions (including plans, reports, and programs) required by this Consent Order prior to submission to the Bureau.

67. Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Enforcement Director, the Board or a committee thereof will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws and this Consent Order.

68. In each instance that this Consent Order requires the Board or a committee thereof to ensure adherence to, or perform certain obligations of Respondent, the Board or a committee thereof must:

a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b. Require timely reporting by management to the Board or a committee thereof on the status of compliance obligations; and

c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## MONETARY PROVISIONS

## VIII.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

69. Respondent must refund all Garnishment-Related Fees that were paid by Affected Consumers during the Relevant Period and cancel any unpaid Garnishment-Related Fees charged to Affected Consumers. The refunded amount will not be less than $592,000.

70. Within 60 days of the Enforcement Director's non-objection of the Compliance Plan, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order ("Redress Plan"). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 30 days. After receiving notification that the Enforcement

Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

71. The Redress Plan must explain how Respondent will refund all Garnishment-Related Fees to Affected Consumers and cancel any unpaid Garnishment-Related Fees charged to Affected Consumers and must:

a. Identify each Affected Consumer;

b. Describe the method used by Respondent to identify Affected Consumers, including Affected Consumers who no longer have active Deposit Accounts with Respondent;

c. Describe the method used by Respondent to calculate Garnishment-Related Fees;

d. State the total amount of Garnishment-Related Fees the Affected Consumers paid;

e. State the amount of Garnishment-Related Fees paid by each Affected Consumer;

f. State the total amount of unpaid Garnishment-Related Fees charged to Affected Consumers;

g. State the amount of unpaid Garnishment-Related Fees charged to each Affected Consumer;

h. Describe the procedures for the issuance and tracking of redress to Affected Consumers, including how Respondent will issue and track redress to those Affected Consumers who no longer have active Deposit Accounts with Respondent;

i. Describe the process for providing redress to Affected Consumers;

j. Include the template of the communication that will be sent notifying Affected Consumers of their redress ("Redress Notification"), and, if the Redress Notification will be mailed, the form of the envelope that will contain the Redress Notification. The Redress Notification must include language explaining the manner in which the amount of redress was calculated and a statement that the refund payment is being made in accordance with the terms of this Consent Order;

k. Provide that Respondent will pay all costs of administering redress as required by this Consent Order; and

l. Set forth all procedures, deadlines, and timeframes for completing each step of the Redress Plan, consistent with the terms of this Consent Order.

72. Respondent must make reasonable attempts to obtain a current physical address for any Affected Consumer for a period of 360 days from the date

the redress was sent, during which period such amount may be claimed by such Affected Consumer upon appropriate proof of identity.

73. After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than the sum total of the amount calculated under Paragraph 71(d) of this Order, within 30 days of the completion of the Redress Plan, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference.

74. The Bureau may use these remaining funds to pay additional redress to Affected Consumers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

75. Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

## IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

76. Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $10,000,000 to the Bureau.

77. Within 10 business days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

78. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

79. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment

made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

80. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in any Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

81. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest—computed under 28 U.S.C. § 1961, as amended—will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

82. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

83. Under 31 U.S.C. § 7701, Respondent must furnish to the Bureau its taxpayer-identification numbers, unless it already has done so, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

84. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Enforcement Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to Consumers and describe the

Consumers or classes of Consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XI.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

85. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but, in any case, no later than 14 days after the development.

86. Within 7 days of the Effective Date, Respondent must designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent.

87. Respondent must report any change in the information required to be submitted under Paragraph 85 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

88. Within 90 days of receiving non-objection to the Compliance Plan, and again one year after receiving non-objection to the Compliance Plan, Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board or a committee thereof, sworn to under penalty of perjury, which, at a minimum:

a. Lists each applicable paragraph and subparagraph of the Consent Order and describes in detail the manner and form in which Respondent has complied with each such paragraph and subparagraph of the Consent Order;

a. Describes in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan; and

b. Attaches a copy of each acknowledgment of receipt of this Consent Order obtained under Section XII, unless previously submitted to the Bureau.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

89. Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

90. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each member of its Board and executive officers, as well as to any managers, employees, outside counsel, or other agents and representatives who have non-ministerial responsibilities related to the subject matter of the Consent Order.

91. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future Board members and executive officers, as well as to any managers, employees, outside counsel, or other agents and representatives who will have non-ministerial responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

92. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic

signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

93. Within 90 days of the Effective Date, Respondent must provide the Bureau with a list of all persons and their titles to whom this Consent Order was delivered through that date under Paragraphs 90–91 and a copy of all signed and dated statements acknowledging receipt of this Consent Order under Paragraph 92.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

94. Respondent must create and retain the following business records:

a. All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

b. All documents and records pertaining to the Redress Plan, described in Section VIII above;

c. All documents and records pertaining to the Compliance Plan, described in Section VI above;

d. Copies sufficient to show the form of Respondent's Deposit Agreement and communications with Consumers regarding Garnishment Notices;

e. All Consumer complaints and refund requests (whether received directly or indirectly, such as through a third party) regarding Respondent's processing of garnishments, and any responses to those complaints or requests;

f. Records showing, for each employee providing services related to garnishments, that person's name, telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination; and

g. Records showing, for all outside counsel providing services related to garnishments, the name of a point of contact, and the attorney's telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination.

95. Respondent must make the documents identified in Paragraph 94 available to the Bureau upon the Bureau's request.

## XIV.

## Notices

**IT IS FURTHER ORDERED** that:

96. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re* Bank of America, N.A., File No. 2022-CFPB-0002," and send them by overnight courier or first-class mail to the below address and contemporaneously by email to Enforcement_Compliance@cfpb.gov and to:

Assistant Director for Enforcement
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

and

Regional Director, CFPB Southeast Region
Peachtree Summit Building
401 W. Peachtree Street
Atlanta, GA 30308

## XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

97. Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected

Consumer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

## XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

98. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

99. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section IV; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

100. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

101. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

102. The Enforcement Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

## ADMINISTRATIVE PROVISIONS

## XVIII.

**IT IS FURTHER ORDERED** that:

103. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

104. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

105. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

106. This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is

either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

107. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted. Deadlines that fall on a weekend or federal holiday shall carry over to the following business day.

108. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

109. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under §1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found, and Respondent may not contest that court's personal jurisdiction over Respondent.

110. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

111. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 4th day of May, 2022.

Rohit Chopra
Rohit Chopra
Director
Consumer Financial Protection Bureau

# EXHIBIT 3C

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2022-CFPB-0004

| | |
|---|---|
| In the Matter of:<br><br>**BANK OF AMERICA, N.A.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the administration of unemployment insurance benefit prepaid debit cards by Bank of America, N.A. (Respondent, as defined below) and has identified the following law violations in connection with Respondent's treatment of unemployment insurance benefit recipients who filed notices of error concerning alleged unauthorized electronic fund transfers (EFTs): (1) Respondent engaged in unfair acts or practices by determining no error had occurred and freezing cardholder accounts based solely on the results of Respondent's automated Fraud Filter, in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B); (2) Respondent failed to conduct reasonable investigations of unemployment insurance benefit prepaid

debit cardholders' notices of error, in violation of Sections 908 and 909 of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E; and (3) Respondent engaged in abusive acts or practices by retroactively applying its automated Fraud Filter to reverse permanent credits for unemployment insurance benefit prepaid debit cardholders whose notices of error Respondent had previously investigated and paid, in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (d)(2)(B), 5536(a)(1)(B). The Bureau has also identified that: (4) Respondent engaged in unfair acts or practices by impeding unemployment insurance benefit prepaid debit cardholders' efforts to file notices of error and seek liability protection from unauthorized EFTs, in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B); and (5) Respondent failed to timely investigate and resolve unemployment insurance benefit prepaid debit cardholders' notices of error concerning alleged unauthorized EFTs, in violation of EFTA, 15 U.S.C. § 1693f(a), (c), and Section 1005.11(c)(2)-(3) of Regulation E. Under Sections 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I.

## Jurisdiction

1. The Bureau has jurisdiction over this matter under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, and Section 918(a)(5) of EFTA, 15 U.S.C. § 1693o(a)(5).

## II.

## Stipulation

2. Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated July 13, 2022 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III.

## Definitions

3. The following definitions apply to this Consent Order:

   a. "Affected Consumers" means a consumer who during the Relevant Period: (1) qualified for and received government unemployment insurance benefit payments electronically through prepaid debit cards issued by Respondent; (2) filed a notice of error concerning alleged

unauthorized EFTs with Respondent; and (3) for whom Respondent incorrectly determined, based solely on the results of Respondent's Fraud Filter, that no error occurred, and, as a result, Respondent (i) denied the consumer's error claim or reversed permanent credits previously granted to the consumer and (ii) froze or, after March 17, 2021, blocked the consumer's unemployment insurance benefit prepaid debit card account.

b. "Board" means Respondent's duly-elected and acting Board of Directors or a committee thereof.

c. "Consequential Harm" means the financial harm Affected Consumers incurred due to the time their unemployment insurance benefit prepaid debit card account remained frozen or blocked after Respondent incorrectly determined that no error occurred on the consumer's unemployment insurance benefit prepaid debit card account, based solely on the results of Respondent's Fraud Filter.

d. "EDD" means the California Employment Development Department.

e. "EDD Cardholder" means a consumer who received an EDD Prepaid Debit Card.

f. "EDD Prepaid Debit Cards" means Respondent-issued and Respondent-administered unemployment insurance benefit prepaid debit cards linked to individual EDD Prepaid Debit Card Accounts.

g. "EDD Prepaid Debit Card Accounts" means depository accounts maintained by Respondent for the Prepaid Card Unemployment Insurance Benefits Program and holding unemployment insurance and other public benefits from EDD for consumers.

h. "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

i. "Electronic Fund Transfer" or "EFT" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7).

j. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

k. "Error Resolution Investigation" means the procedures and duties required of financial institutions as described in 12 C.F.R. § 1005.11.

l. "Fraud Filter" means the automated fraud detection process that Respondent used to investigate unemployment insurance benefit prepaid card notices of error between September 28, 2020 and June 8, 2021.

m. "OCC Consent Order" means the Consent Order issued by the Office of the Comptroller of the Currency against Respondent on July 14, 2022.

n. "Prepaid Card Unemployment Insurance Benefits Program" means the program through which Respondent issued and administered prepaid debit cards and associated accounts containing unemployment insurance benefits granted to consumers in certain states.

o. "Regional Director" means the Regional Director for the Southeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his or her delegate.

p. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

q. "Relevant Period" means March 1, 2020 to June 8, 2021.

r. "Respondent" means Bank of America, N.A. and its successors and assigns.

## IV.

## Bureau Findings and Conclusions

The Bureau finds the following:

4. Respondent is a national bank headquartered in Charlotte, North Carolina with branches and ATMs located in 38 states and the District of Columbia. As of December 31, 2021, Respondent had $2.5 trillion in consolidated assets, which makes it an insured depository institution with assets greater than $10,000,000,000 within the meaning of 12 U.S.C. § 5515(a).

5. Respondent is a "covered person" under 12 U.S.C. § 5481(6) because it "engages in offering or providing a consumer financial product or service," including by engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by consumers primarily for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(iv).

6. Respondent is a "financial institution" under EFTA and Regulation E because it is a national bank holding consumer deposit accounts. 15 U.S.C. § 1693a(9).

7. During the Relevant Period, Respondent had contracts with 12 states, including California, to deliver unemployment insurance and other government benefit payments to consumers through prepaid debit cards and accounts.

8. For each consumer deemed eligible by the relevant state unemployment agency who elected to receive their benefit payments through a prepaid debit

card during the Relevant Period, the state notified Respondent, funded a prepaid debit card account with Respondent, and Respondent issued a prepaid debit card to the consumer.

9. In each of those states, Respondent was responsible for loading unemployment and other government benefit payments onto prepaid debit cards and for servicing consumers' prepaid debit card accounts.

10. The onset of the COVID-19 pandemic in March 2020 led to a surge in consumers seeking unemployment insurance benefits. These programs provide a temporary partial wage or income replacement for consumers who, through no fault of their own, have lost their jobs. Payments are made directly to unemployed consumers, so that consumers can continue to pay for the necessities of life while they search for work. The national unemployment rate in April 2020 was 14.7%, and it remained at significantly elevated levels through 2020. Millions of consumers were newly unemployed. They sought the benefits to which they were legally entitled via Respondent's prepaid debit cards.

**Respondent's Strategy for Prepaid Debit Cardholders Filing Notices of Error and Seeking Liability Protection**

11. When notified by a consumer of an error such as an unauthorized EFT on their account, a financial institution must investigate the alleged error,

determine whether an error has occurred, and report the results of its investigation and determination to the consumer pursuant to the requirements in Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

12. From January 2020 until late-September 2020, upon receiving a notice of error from an unemployment insurance benefit prepaid debit cardholder concerning alleged unauthorized EFTs, Respondent would conduct an investigation that could include, among other steps: comparing the location of the transaction with the consumer's residence or habitual transactions; accessing ATM camera footage (if the alleged unauthorized activity occurred at a Respondent ATM); and contacting the cardholder for further information.

13. Following a surge in notices of error filed by unemployment insurance benefit prepaid debit cardholders nationwide throughout the summer of 2020, Respondent changed its practices for investigating unemployment insurance benefit prepaid debit cardholder notices of error.

14. Under its new strategy, which Respondent implemented on September 28, 2020 for all of its state unemployment insurance benefit prepaid programs, Respondent only ran cardholders' notices of error concerning alleged unauthorized EFTs through its newly developed automated Fraud Filter, and

for notices of error that met any indicator used by the Fraud Filter ceased taking the steps described in Paragraph 12, above, as part of its investigation.

15. Beginning on September 28, 2020, for notices of error submitted by unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs that met any of the three indicators used by Respondent's new Fraud Filter, Respondent automatically determined that no error had occurred.

16. Between September 28, 2020 and June 8, 2021, for notices of error submitted by unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs that met any of the three indicators used by Respondent's Fraud Filter, along with determining no error had occurred, Respondent froze or, after March 17, 2021, blocked the consumer's prepaid debit card account.

17. The only exception was from October 4, 2020 through December 2, 2020, when unemployment insurance benefit prepaid debit card accounts flagged by Respondent's new Fraud Filter were not frozen as Respondent had intended. After Respondent discovered the issue, it froze those flagged unemployment insurance benefit prepaid debit card accounts on or about December 17, 2020, excluding accounts where a reconsideration request

from a consumer was pending or where Respondent had reversed its initial determination that no error had occurred.

18. A consumer whose unemployment insurance benefit prepaid debit card account is frozen cannot access the government benefits in their account.

19. Respondent also will not accept new benefits payments for deposit into a frozen unemployment insurance benefit prepaid debit card account.

20. When Respondent blocks an unemployment insurance benefit prepaid debit card, no transactions are permitted. But unlike an account freeze, Respondent permits cardholders with blocks on their unemployment insurance benefit prepaid debit card to verify their identity directly with Respondent. Upon verification, Respondent releases the block, and the unemployment insurance benefit prepaid debit card becomes usable again.

21. Before implementing the Fraud Filter on September 28, 2020, Respondent knew, or should have known, that the Fraud Filter would, in certain cases, incorrectly determine that no error had occurred.

22. Likewise, before implementing the Fraud Filter, Respondent knew, or should have known, that not all unemployment insurance benefit prepaid accounts meeting its Fraud Filter indicators would be fraudulent and therefore should be frozen. Indeed, in an internal September 2020 presentation, Respondent acknowledged, “Fraudulent determinations would

require a detailed review of specific accounts, which given the volume, is unmanageable."

23. For notices of error meeting any of its Fraud Filter indicators, Respondent continued with its nationwide strategy of automatically determining no error occurred and freezing the cardholder's unemployment insurance benefit prepaid debit card account based solely on the Fraud Filter from September 28, 2020 to March 17, 2021.

24. Consumers whose unemployment insurance benefit prepaid debit card accounts Respondent froze through its Fraud Filter went weeks, and in some cases months, without access to their unemployment insurance benefits.

25. Some consumers whose prepaid debit card accounts Respondent froze incurred late fees and interest charges on their other accounts, and also missed phone and utility bill payments. Some consumers with frozen prepaid debit card accounts also faced other financial impacts, including foreclosure, eviction, and car repossession.

26. Beginning on March 18, 2021, for notices of error for which it determined no error had occurred based solely on the results of its Fraud Filter, Respondent blocked the cardholder's unemployment insurance benefit prepaid debit card, rather than freezing the cardholder's account.

27. For notices of error submitted by over 100,000 unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs that met one or more of the Fraud Filter indicators, Respondent continued to rely solely on the results of its Fraud Filter to determine no error had occurred until June 8, 2021.

**Respondent's Strategy as Applied to EDD Cardholders**

28. Eligible California consumers may receive their EDD unemployment insurance benefit payments through a check mailed by EDD or through EDD Prepaid Debit Cards and EDD Prepaid Debit Card Accounts.

29. During the Relevant Period, most eligible California consumers received their EDD unemployment insurance benefit payments through EDD Prepaid Debit Cards and Accounts.

30. From September 28, 2020 to March 17, 2021, for EDD Cardholders whose notices of error Respondent determined no error occurred through its Fraud Filter, Respondent sent denial notices reflecting Respondent's determination that the EDD Cardholder's Account or notice of error had been the subject of fraudulent or suspicious activity. Respondent's denial notices failed to mention that Respondent had also frozen the consumer's EDD Prepaid Debit Card Account.

31. Beginning in December 2020 and continuing to March 17, 2021, Respondent sent an additional letter notifying affected EDD Cardholders of their account freeze several days after the EDD Prepaid Debit Card Account freeze had gone into effect. In some cases, Respondent failed to notify affected EDD Cardholders that their EDD Prepaid Debit Card Accounts had been frozen at all.

32. EDD Cardholders seeking to file a notice of error with Respondent to seek liability protection spent hours a day on the phone attempting to notify Respondent that their EDD Prepaid Debit Card Account had been subject to unauthorized EFTs.

33. EDD Cardholders whose EDD Prepaid Debit Card Accounts Respondent froze based solely on its Fraud Filter spent hours a day on the phone with Respondent attempting to seek information regarding how to regain access to their frozen Account. Along with long hold times, Cardholders with EDD Prepaid Debit Card Accounts frozen as a result of the Fraud Filter were subject to disconnections, transfers, and inaccurate information from Respondent and its vendor agents, including that their Accounts had been frozen at the direction of EDD rather than by Respondent.

34. From September 28, 2020 to March 17, 2021, Respondent generally required EDD Cardholders with frozen EDD Prepaid Debit Card Accounts to reverify

their identity through EDD (rather than with Respondent) to regain access to their Account.

35. Respondent knew, or should have known, that EDD would not be able to handle the burden of quickly reverifying eligible EDD Cardholders whose EDD Prepaid Debit Card Accounts Respondent had frozen through its new strategy beginning on September 28, 2020.

36. During the summer of 2020, Respondent met with EDD dozens of times, often weekly, and was in telephone or email contact even more often.

37. In July 2020, EDD had approximately 1,400 staff to handle an average of 6.7 million consumer calls per week. In August 2020, EDD was answering and resolving only 1% of incoming calls.

38. Respondent did not inform EDD that it would be using a Fraud Filter and freezing unemployment insurance benefit prepaid debit card accounts before implementing that strategy on September 28, 2020.

39. Until March 18, 2021, the only exception to Respondent's requirement that EDD Cardholders reverify their identity through EDD to regain access to their frozen EDD Prepaid Debit Card Account was limited to Cardholders who filed a complaint asserting a particular hardship with Respondent through a state or congressional representative, a legal aid group or private attorney, or the media that reached the attention of Respondent's executives.

## Findings and Conclusions as to Respondent's Strategy in California (Unfair Practice)

40. Sections 1031 and 1036 of the CFPA prohibit a "covered person" from engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41. An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

42. From September 28, 2020 to March 17, 2021, Respondent automatically determined, without any further investigation, that no error had occurred for any EDD Cardholder notice of error concerning alleged unauthorized EFTs that met any of the three indicators in Respondent's Fraud Filter. During most of this period, when Respondent determined no error had occurred through its Fraud Filter, Respondent also froze the cardholder's EDD Prepaid Debit Card Account.

43. This caused substantial injury to consumers. Not only did Respondent, through its Fraud Filter, incorrectly and automatically determine no error had occurred for tens of thousands of EDD Cardholders who had filed

notices of error, but Respondent also froze those cardholders' EDD Prepaid Debit Card Accounts (except as stated in Paragraph 17), meaning those EDD Cardholders could not receive or access the unemployment insurance benefit funds in their Accounts.

44. This substantial injury was not reasonably avoidable by EDD Cardholders. During this period, Respondent generally required EDD Cardholders whose Accounts were frozen through its strategy to reverify their identity through EDD to regain access to their Accounts.

45. EDD Cardholders received conflicting and delayed information from Respondent regarding the reasons for their EDD Prepaid Debit Card Account freeze, and the steps they needed to take to unfreeze their Account.

46. This substantial injury was not outweighed by any countervailing benefits to consumers or to competition.

47. As a result, Respondent engaged in unfair acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Retroactive Application of Its Fraud Filter (Abusive Practice)**

48. An act or practice is abusive if it, among other things, takes unreasonable advantage of the inability of a consumer to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

49. In late September 2020 or early October 2020, Respondent also applied its Fraud Filter to more than 11,000 notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders between April 1, 2020 and September 27, 2020 for which Respondent had previously provided the EDD Cardholder a permanent credit.

50. For those more than 11,000 notices of error, Respondent retroactively determined that no error had occurred based on the results of its Fraud Filter, and reversed those EDD Cardholders' permanent credits.

51. Affected EDD Cardholders were unable to protect their interests because they could not control how and when Respondent would investigate and resolve their notices of error.

52. Until at least December 2021, Respondent did not correct its reversals of these more than 11,000 previously-investigated-and-paid notices of error without an EDD Cardholder's request for reconsideration.

53. By reversing the permanent credits for EDD Cardholders who had already received notice from Respondent that their error claim had been investigated and paid, Respondent took unreasonable advantage of EDD Cardholders' inability to protect their interests.

54. As a result, Respondent engaged in abusive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (d)(2)(B), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Failure to Conduct Reasonable Error Resolution Investigations (EFTA and Regulation E)**

55. Under EFTA, upon receiving notices of error, financial institutions may not determine no error had occurred without conducting a "good faith investigation of the alleged error" and without "a reasonable basis for believing that the consumer's account was not in error." 15 U.S.C. § 1693f(e).

56. Further, under Regulation E, when conducting an Error Resolution Investigation, a financial institution must conduct, at minimum, a "review of its own records regarding [the] alleged error." 12 C.F.R. § 1005.11(c)(4), and the Error Resolution Investigation "must be reasonable," 71 Fed. Reg. 1638, 1654 (Jan. 10, 2006).

57. From September 28, 2020 to June 8, 2021, Respondent used its Fraud Filter to determine no error had occurred for approximately 188,000 notices of error submitted by Affected Consumers nationwide concerning alleged unauthorized EFTs, without any further investigation or considering any other information relevant to Affected Consumers' notices.

58. As a result, Respondent violated the requirement to conduct a reasonable Error Resolution Investigation under Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

**Findings and Conclusions as to Respondent Impeding EDD Cardholders from Filing Notices of Error and Seeking Liability Protection from Unauthorized EFTs (Unfair Practices)**

59. Throughout the Relevant Period, Respondent and EDD both directed EDD Cardholders to contact Respondent to file a telephonic notice of error.

60. Throughout the Relevant Period, EDD Cardholders could not file notices of error with Respondent online, through Respondent's other (non-prepaid) customer service divisions, or in person at Respondent's branches.

61. EDD Cardholders who called for assistance after their EDD Prepaid Debit Card Account was subject to unauthorized EFTs were required to navigate Respondent's prepaid call center divisions staffed by vendor agents.

62. Throughout the Relevant Period, Respondent represented on its EDD Debit Card FAQ webpage that it would provide EDD Cardholders with "dedicated customer service representatives" who are "available 24 hours a day, 7 days a week" to help EDD Cardholders "investigate transactions."

63. Respondent further advised consumers in its EDD Cardholder Agreement, which Respondent mailed to all new EDD Cardholders, that "Telephoning is the best way of keeping your possible losses down."

64. Under Respondent's "Zero Liability" guarantee, which Respondent also includes in its EDD Cardholder Agreement, Respondent represents that EDD Cardholders will incur no liability for unauthorized use of their EDD Prepaid Debit Card up to the amount of the unauthorized transactions, provided they notify Respondent within a reasonable amount of time.

65. For much of 2020, EDD Cardholders faced long hold times when attempting to file a notice of error with Respondent over the phone and take advantage of Respondent's "Zero Liability" guarantee for unauthorized use of cardholders' EDD Prepaid Debit Cards.

66. Throughout the Relevant Period, EDD Cardholders were required to first speak with an agent in Respondent's main prepaid call center before being transferred to Respondent's prepaid claims initiation division, which was the only division authorized to accept EDD Cardholders' notices of error over the phone.

67. From May 1, 2020 to July 1, 2020, prepaid debit cardholders nationwide had to wait on average nearly two hours to speak with an agent in Respondent's prepaid claims initiation division.

68. From September 1 to December 1, 2020, prepaid debit cardholders nationwide had to wait on average over an hour to speak with an agent in Respondent's prepaid claims initiation division.

69. Unlike Respondent's main prepaid call center, throughout the Relevant Period Respondent's prepaid claims initiation division was not available 24 hours a day, 7 days a week, but instead kept the following business hours: Monday to Friday, 5am PT to 7pm PT; Saturday, 6:30am PT to 5pm PT; and closed on Sundays.

70. Through September 2020, Respondent's prepaid claims initiation division was still staffed by fewer than 300 vendor agents to assist unemployment insurance benefit prepaid debit cardholders nationwide with filing their notices of error.

71. Throughout 2020, certain EDD Cardholders remained on hold with Respondent's prepaid call center divisions for hours daily, over the course of weeks, in attempts to file notices of error.

72. EDD Cardholders were also subject to transfers, dropped calls, and misinformation from Respondent's prepaid call center agents, all of which further impeded their ability to successfully file notices of error with Respondent.

73. EDD Cardholders could not reasonably avoid the harm caused by extensive hold times, dropped calls, and misinformation from Respondent's prepaid call center agents because, among other reasons, Respondent directed EDD Cardholders to file notices of error by contacting Respondent by phone.

74. This substantial injury to EDD Cardholders was not outweighed by any countervailing benefits to consumers or to competition.

75. As a result, Respondent engaged in unfair acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Failure to Timely Investigate EDD Cardholders' Notices of Error Concerning Alleged Unauthorized EFTs (EFTA and Regulation E)**

76. For timely-submitted consumer notices of error, EFTA requires financial institutions to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a).

77. A financial institution may extend that 10-business-day investigation deadline to 45 calendar days if it provisionally credits the consumer's account in the amount of the alleged error within 10 business days of receiving the error notice. 15 U.S.C. § 1693f(c); 12 C.F.R. § 1005.11(c)(2).

78. This 45-day investigation deadline may be extended to 90 calendar days if a notice of error involves an EFT that was not initiated within a state; resulted from a point-of-sale debit card transaction; or occurred within 30 days of the first deposit to the account. 12 C.F.R. § 1005.11(c)(3)(ii).

79. This extended 90-day investigation deadline does not apply to transactions at an ATM, including ATMs located at merchant locations. Official Interpretation Comment 11(c)(3)-1, 12 C.F.R. Pt. 1005, Supp. I.

80. In certain instances, for notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders during the Relevant Period, Respondent failed to complete its investigation within 10 business days and Respondent did not issue a provisional credit (or issued a provisional credit after 10 business days).

81. In certain instances, for notices of error concerning alleged unauthorized EFTs relating to ATM transactions submitted by EDD Cardholders during the Relevant Period, Respondent failed to complete its investigation within 45 calendar days.

82. In certain instances, for notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders during the Relevant Period, Respondent failed to complete its investigation within 90 calendar days.

83. As a result, Respondent violated EFTA and Regulation E by failing to timely investigate EDD Cardholders' notices of error concerning alleged unauthorized EFTs. 15 U.S.C. § 1693f(a), (c); 12 C.F.R. § 1005.11(c)(2)-(3).

## CONDUCT PROVISIONS

## V.

**IT IS ORDERED**, under Sections 1053 and 1055 of the CFPA, that:

84. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E, in connection with administering unemployment insurance benefit prepaid debit cards and accounts, including in connection with receiving, investigating, and resolving notices of error submitted by unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs.

85. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with administering unemployment insurance benefit prepaid debit cards and accounts, must take the following affirmative actions:

a. Respondent must not determine no error occurred solely based on the results of an automated fraud filter for notices of error submitted by unemployment insurance benefit prepaid debit cardholders;

b. Respondent must not freeze an unemployment insurance benefit prepaid debit card account solely based on the results of an automated fraud filter;

c. Respondent must, during the course of an Error Resolution Investigation, reasonably consider all information relevant to the unemployment insurance benefit prepaid debit cardholder's notice of error, including, but not limited to, information within Respondent's own records;

d. Respondent must not condition access to an open EDD Prepaid Debit Card Account for an existing EDD Cardholder on reverifying their identity through EDD, and must allow EDD Cardholders to attempt to verify their identity directly with Respondent, except in the cases where (i) EDD disqualified the EDD Cardholder or requested that the EDD Prepaid Debit Card Account be frozen, or (ii) reverification through EDD is requested by EDD or is required by law;

e. Respondent must allow EDD Cardholders to attempt to reverify their identity in order to unblock their EDD Prepaid Debit Card Account in person at Respondent's financial center branches. Respondent's financial center branches must have processes and procedures in place to facilitate telephonic submission of notices of error by EDD Cardholders; and

f. Respondent must conduct a risk assessment of its Prepaid Card Unemployment Insurance Benefits Program, including an assessment of risks associated with increased volumes of unemployment insurance benefit prepaid debit cardholders in the future. This requirement may be performed as part of the Program Risk Assessment required of Respondent by Article V of the OCC Consent Order.

86. Respondent must provide the appropriate staffing and resources necessary to comply with Paragraphs 87–89.

## VI.

## Compliance Plan

**IT IS FURTHER ORDERED** that:

87. Within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Respondent's administration of unemployment insurance benefit prepaid debit cards and accounts complies with all applicable laws that the Bureau enforces, including Federal consumer financial laws, and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a. detailed steps for addressing each action required by this Consent Order as set forth in Paragraphs 84–85; and

b. specific timeframes and deadlines for implementation of the steps described above.

88. The Regional Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Regional Director within 30 days.

89. After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

90. The Board, or a committee thereof, must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

91. Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Regional Director or Enforcement Director, the Board, or a committee thereof, will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws and this Consent Order.

92. In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board, or a committee thereof, must:

a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b. Require timely reporting by management to the Board on the status of compliance obligations; and

c. Require timely and appropriate corrective action to remedy any material non-compliance with Board directives related to this Section.

## MONETARY PROVISIONS

## VIII.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

93. Respondent shall provide redress to Affected Consumers, which shall include (i) compensation for the value of unauthorized EFTs alleged by Affected Consumers in notices of error that Respondent incorrectly denied through its Fraud Filter; (ii) compensation to Affected Consumers for related Consequential Harm, as required by this Section; and (iii) compensation to Affected Consumers through an individualized review process, as required by this Section. Respondent will not be required to pay redress to consumers meeting the definition of Affected Consumers as of the Effective Date for whom (i) the state benefit granting agency has determined or later determines should have been initially disqualified for unemployment insurance benefit payments, or (ii) whose unemployment insurance benefit prepaid debit card account is or becomes frozen, blocked, or closed by Respondent at the request of the state benefit granting agency, or due to suspected fraud, anti-money laundering, or financial crimes inquiries or determinations made in conjunction with law enforcement, or due to an independent legal requirement such as receipt of legal process or orders.

94. Within 90 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order

(Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 30 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

95. The Redress Plan must include:

a. A description of the methodology Respondent will use to identify Affected Consumers, including Affected Consumers who no longer have active unemployment insurance benefit prepaid debit card accounts with Respondent;

b. A description of the procedures and process Respondent will use to remediate each Affected Consumer, which shall include: (i) calculating the value of unauthorized EFTs alleged by Affected Consumers in notices of error that Respondent incorrectly denied through its Fraud Filter; (ii) calculating the lump sum Consequential Harm payment; and (iii) an individualized review process administrated by an independent third-party payment administrator that allows Affected Consumers to

seek additional redress compensation by submitting evidence of financial harm exceeding Consequential Harm-related payments;

c. A description of the methodology Respondent will use to calculate the amount of remediation to be paid as Consequential Harm for each Affected Consumer;

d. A description of the methodology Respondent will use to identify compensable financial impacts to Affected Consumers for the purpose of additional redress compensation exceeding Consequential Harm-related payments in connection with the individualized review process;

e. A description of the type of supporting documentation that will be required for Affected Consumers seeking additional financial redress compensation exceeding Consequential Harm-related payments in connection with the individualized review process;

f. A description of the procedures for issuing and tracking redress payments to Affected Consumers;

g. A description of the plan for developing communications that will be sent to notify Affected Consumers of their redress under the Redress Plan (Redress Notification). The Redress Notification must include a statement that the redress is being paid in accordance with terms of this Consent Order;

h. A description of the processes for handling any redress funds for Affected Consumers that remain unclaimed; and

i. The procedures, deadlines, and timeframes for completing each step of the Redress Plan, consistent with the terms of this Consent Order.

96. Following the implementation of the Redress Plan, Respondent must submit a report that:

a. Identifies each Affected Consumer evaluated as part of the Redress Plan;

b. States the amount of redress Respondent provided to each Affected Consumer for (i) notices of error that Respondent incorrectly denied; (ii) Consequential Harm; and (iii) pursuant to the individualized review process (if applicable);

97. Respondent must make reasonable attempts to obtain a current physical address for any Affected Consumer (i) before sending any redress payment required under this Section VIII and (ii) for a period of 360 days from the date the redress was initially sent to the Affected Consumer upon receipt of returned mail or failure to negotiate a check that is issued to the consumer.

98. Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

## IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

99. Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, Respondent must pay a civil money penalty of $100 million to the Bureau.

100. Within 10 business days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

101. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

102. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any

insurance policy, with regard to any civil money penalty paid under this Consent Order.

103. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

104. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest—computed under 28 U.S.C. § 1961, as amended—will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

105. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

106. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer-identification numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

107. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Enforcement Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

**COMPLIANCE PROVISIONS**

## XI.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

108. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

109. Within 7 days of the Effective Date, Respondent must designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent.

110. Respondent must report any change in the information required to be submitted under Paragraph 109 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

111. Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board or a committee thereof, sworn to under penalty of perjury, which, at a minimum:

a. Lists each applicable paragraph and subparagraph of the Order and describes in detail the manner and form in which Respondent has complied with each such paragraph and subparagraph of the Consent Order;

b. Describes in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan; and

c. Attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

112. Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

113. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its Board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

114. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future Board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

115. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

116. Within 90 days of the Effective Date, Respondent must provide the Bureau with a list of all persons and their titles to whom this Consent Order was delivered through that date under Paragraphs 112–114 and a copy of all

signed and dated statements acknowledging receipt of this Consent Order under Paragraph 115.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

117. Respondent must create and retain the following business records:

a. All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

b. All documents and records pertaining to the Redress Plan, described in Section VIII above;

c. All documents and records pertaining to the Compliance Plan, described in Section VI above;

d. For each individual Affected Consumer:

i. the consumer's name, address, and, if available to Respondent, phone number, and email address;

ii. the date(s) the consumer submitted a notice of error concerning alleged unauthorized EFTs that Respondent wrongly determined no error occurred based solely on the results of Respondent's Fraud Filter;

iii. the value of alleged unauthorized EFTs in the consumer's notice(s) of error that Respondent wrongly determined no error occurred based solely on the results of Respondent's Fraud Filter; and

iv. the length of time that Respondent froze or blocked the consumer's unemployment insurance benefit prepaid debit card account due to Respondent's determination that no error occurred based solely on the results of Respondent's Fraud Filter.

e. All consumer complaints and refund requests (whether received directly or indirectly, such as through a third party) regarding Respondent's administration of unemployment insurance benefit prepaid debit cards and accounts relating to government benefit payments, and any responses to those complaints or requests.

f. Records showing, for each Respondent employee or agent providing material services related to Respondent's unemployment insurance benefit prepaid debit card programs, that person's name, telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination.

g. Records showing, for each service provider providing services related to

Respondent's administration of unemployment insurance benefit prepaid debit cards and accounts, the name of a point of contact, and that person's telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination.

118. Respondent must make the documents identified in Paragraph 117 available to the Bureau upon the Bureau's request.

## XIV.

## Notices

**IT IS FURTHER ORDERED** that:

119. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re* Bank of America, N.A., File No. 2022-CFPB-0004," and send them by overnight courier or first-class mail to the below addresses and contemporaneously by email to Enforcement_Compliance@cfpb.gov and Southeastregion@cfpb.gov:

Regional Director, Bureau Southeast Region
Peachtree Summit Building
401 W. Peachtree Street
Atlanta, GA 30308

Assistant Director for Enforcement
Consumer Financial Protection Bureau
ATTENTION: Office of Enforcement

1700 G Street, N.W.
Washington D.C. 20552

## XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

120. Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Consumer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

## XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

121. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

122. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an

interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section IV; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

123. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

124. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

125. The Enforcement Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

## ADMINISTRATIVE PROVISIONS

## XVIII.

**IT IS FURTHER ORDERED** that:

126. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in Paragraph 127 below. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

127. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

128. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

129. This Consent Order will terminate on the later of 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent, if such action is initiated within 5 years of the Effective Date. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

130. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

131. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of

sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

132. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

133. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

134. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 14th day of July, 2022.

Rohit Chopra
_______________________________
Rohit Chopra
Director
Consumer Financial Protection Bureau

# EXHIBIT 3D

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2023-CFPB-0006

| | |
|---|---|
| In the Matter of:<br><br>**BANK OF AMERICA, N.A.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the practices of Bank of America, N.A. (Respondent or the Bank) related to assessing multiple non-sufficient funds fees (NSF Fees) on the same transaction and has identified the following law violation: the Bank committed unfair acts and practices when it charged consumers repeat NSF Fees on transactions resubmitted to the Bank for payment after they were initially declined (often referred to as "re-presenting" transactions). Under §§ 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

# I.

## Overview

1. Until 2021 and 2022, respectively, Respondent assessed consumers $35 NSF Fees each time the Respondent returned as unpaid a re-presented Automated Clearing House (ACH) transaction or check, despite already having charged consumers an NSF Fee on the initial returned transaction (Re-Presentment NSF Fees).

2. Respondent ceased assessing these Re-Presentment NSF Fees on ACH transactions in November 2021 and ceased assessing them on checks, along with all other NSF Fees, in February 2022. The Bank's efforts to reduce fees, including NSF Fees, has led to the Bank charging customers millions of dollars less in fees.

3. From September 2018 until February 2022, Respondent generated hundreds of millions of dollars from its practice of charging multiple NSF Fees on re-presented checks or ACH transactions. These fees substantially harmed consumers.

4. Consumers could not reasonably understand that they could be assessed a new $35 fee each time Respondent declined to pay the same ACH transaction or check. Even if some consumers did understand that Respondent assessed these fees, they still could not reasonably avoid them

or otherwise protect their interests against incurring Re-Presentment NSF Fees.

## II.

## Jurisdiction

5. The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565.

## III.

## Stipulation

6. Respondent has executed a “Stipulation and Consent to the Issuance of a Consent Order,” dated June 28, 2023 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau’s jurisdiction over Respondent and the subject matter of this action.

## IV.

## Definitions

7. The following definitions apply to this Consent Order:

a. "Affected Consumers" includes all consumers who were assessed any Re-Presentment NSF Fees between September 1, 2018 and February 18, 2022.

b. "Board" means Respondent's duly-elected and acting Board of Directors.

c. "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

d. "NSF Fees" mean non-sufficient funds fees that Respondent assessed when it declined to pay or returned as unpaid any transaction.

e. "Regional Director" means the Regional Director for the Southeast Region for the Office of Supervision Examination for the Consumer Financial Protection Bureau, or his or her delegate.

f. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

g. "Relevant Period" is September 1, 2018 until February 18, 2022.

h. "Re-Presentment NSF Fees" means an NSF Fee assessed to a consumer for the same check or ACH transaction that had been previously declined or returned unpaid and assessed an NSF Fee.

i. "Respondent" means Bank of America, N.A. and its successors and assigns.

j. "Unreimbursed" means Re-Presentment NSF Fees assessed and collected by Respondent during the Relevant Period and not yet refunded in full to Affected Consumers.

## V.

## Bureau Findings and Conclusions

The Bureau finds the following:

8. Respondent is a national bank headquartered in Charlotte, North Carolina. As of March 31, 2023, Respondent had $2.4 trillion in consolidated total assets.

9. Respondent is a "covered person" under 12 U.S.C. § 5481(6).

### Respondent's Re-Presentment NSF Fee Practices

10. When a consumer writes a check or authorizes an ACH transaction to a merchant or other payee using their deposit account at Respondent, the merchant or other payee may then present that check or ACH authorization to Respondent for payment. If a consumer does not have sufficient funds in

their account to pay for the transaction, Respondent must decide whether to pay the transaction.

11. If Respondent does not pay the merchant or other payee when presented with a transaction for an account with insufficient funds, Respondent may—according to the terms of its deposit agreements in effect before February 2022—assess a $35 NSF Fee to the consumer.

12. Some merchants "re-present" these returned transactions—that is, they again try to receive payment—often multiple times. Merchants can re-present an ACH transaction as an ACH transaction, re-present a check as a check, or re-present a check as an ACH transaction.

13. During the Relevant Period, Respondent assessed NSF Fees on ACH and check transactions that it returned unpaid even though it had already assessed a $35 NSF Fee for the same ACH or check transaction that it had previously returned unpaid (*i.e.*, Re-Presentment NSF Fees). Respondent would assess these Re-Presentment NSF Fees potentially as soon as the next day after the initial transaction.

14. From September 2018 until February 2022, Respondent generated hundreds of millions of dollars in Re-Presentment NSF Fees.

15. Respondent ceased assessing Re-Presentment NSF Fees on ACH transactions in November 2021 and ceased assessing them on checks, along with all other NSF Fees, in February 2022.

16. Respondent has already waived, refunded, or agreed to refund approximately tens of millions of dollars in Re-Presentment NSF Fees that it assessed during the Relevant Period, and has charged off tens of millions of dollars more in Re-Presentment NSF Fees that it assessed during the Relevant Period but did not collect after it closed consumers' accounts.

**Respondent's Assessment of Re-Presentment NSF Fees During the Relevant Period Was Unfair**

17. Respondent had a policy of assessing Re-Presentment NSF Fees during the Relevant Period.

18. Respondent's policy of assessing Re-Presentment NSF Fees caused substantial injury because each fee cost $35. Consumers paid hundreds of millions of dollars in Re-Presentment NSF Fees during the Relevant Period.

19. Consumers could not reasonably avoid the Re-Presentment NSF Fees assessed under Respondent's policy. Whether or not consumers expected or understood that Respondent would charge a new $35 fee each time it returned the same transaction, they were not reasonably able to avoid the fee because they did not know when merchants would re-present transactions, which could occur as soon as the next day. Nor could consumers generally

stop payments or revoke authorizations on transactions easily or in time, and by attempting to stop payment they would incur substantial additional costs, even if the stop payment was untimely or otherwise unsuccessful. Further, the amount that consumers owed increased with each subsequent NSF Fee, adding to the difficulty for some consumers of avoiding the injury caused by these fees.

20. The substantial injury caused by Respondent's policy of assessing Re-Presentment NSF Fees was not outweighed by countervailing benefits to consumers or competition. Charging Re-Presentment NSF Fees provided little to no benefit to consumers. Moreover, Re-Presentment NSF Fees serve no deterrent purposes relevant to the integrity of the financial system since consumers cannot reasonably avoid them.

21. Respondent's assessment of Re-Presentment NSF Fees constituted unfair acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

## CONDUCT PROVISIONS

## VI.

## Prohibited Conduct

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

22. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, and are prohibited from assessing Re-Presentment NSF Fees.

## VII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

23. Respondent's Board, or a committee thereof, will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws and this Consent Order.

24. Respondent's Board, or a committee thereof, must review all plans and reports required by this Consent Order, and any submissions to the Bureau prior to such submission.

25. One year after the Effective Date, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, or a committee thereof, the accuracy of which is sworn to under penalty of perjury, and which, at a minimum:

    a. Describes the steps that Respondent has taken to reasonably assess whether Respondent is complying with the Redress Plan and each applicable paragraph and subparagraph of the Order;

    b. Describes in detail whether and how Respondent has complied with the Redress Plan and each applicable paragraph and subparagraph of the Order, including the manner of verification of such compliance and any corrective actions taken to remedy potential non-compliance with the applicable requirement, paragraph, or subparagraph; and

    c. Attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

26. Respondent's Board, or a committee thereof, must:

a. Authorize whatever actions are necessary for Respondent to assess whether Respondent is complying with the Redress Plan and each applicable paragraph and subparagraph of the Order;

b. Authorize whatever actions, including corrective actions, are necessary for Respondent to fully comply with the Redress Plan and each applicable paragraph and subparagraph of the Order; and

c. Require timely reporting by management to Respondent's Board, or a committee thereof, on the status of compliance obligations.

## MONETARY PROVISIONS

## VIII.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

27. Respondent must redress all Affected Consumers for all Unreimbursed Re-Presentment NSF Fees, providing not less than $80,400,000 in total consumer redress.

28. Respondent must reimburse Affected Consumers by direct deposit whenever feasible. Whenever direct deposit is not feasible, Respondent must reimburse Affected Consumers by paper check.

29. Within 90 days of the Effective Date, Respondent must submit to the Regional Director for review and non-objection a comprehensive written

plan for providing redress consistent with this Consent Order (Redress Plan). The Regional Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Regional Director within 30 days. After receiving notification that the Regional Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

30. The Redress Plan must:

a. Describe the methodology Respondent proposes to use to identify Affected Consumers and the amount of redress to be provided to each Affected Consumer;

b. Identify the amount of redress that would be provided to each Affected Consumer under the methodology described in subsection (a);

c. Describe how Respondent proposes to remediate Affected Consumers, including how Respondent proposes to identify current mailing addresses for Affected Consumers for whom redress by direct deposit is not feasible, which must include reasonable efforts to identify

current addresses prior to mailing redress checks and once any redress checks are returned as undeliverable;

d. Specify that Respondent will provide a notification explaining that Respondent's redress payment is in accordance with the terms of this Consent Order and provide an exemplar of this notification; and

e. In the event that redress to Affected Consumers is less than the amount identified in Paragraph 27, specify a method for providing alternative consumer redress to satisfy Respondent's obligations to pay the redress amount identified in Paragraph 27.

31. Respondent must provide the redress and notification described in this section within 60 days of the Regional Director's non-objection to the Redress Plan.

32. Within 30 days of the completion of the Redress Plan, if the amount of redress provided to consumers is less than the redress amount identified in Paragraph 27, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to consumers and the amount of redress identified in Paragraph 27.

33. The Bureau may use these remaining funds to pay additional redress to Affected Consumers. If the Bureau determines, in its sole discretion, that

additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

34. Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

## IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

35. Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, Respondent must pay a civil money penalty of $60,000,000 to the Bureau.

36. Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

37. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

38. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

    a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

    b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

39. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the

amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

40. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

41. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

42. Respondent acknowledges that its Taxpayer Identification Number, which Respondent previously submitted to the Bureau, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

43. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional

Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XI.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

44. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

45. Within 7 days of the Effective Date, Respondent must:

a. Designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent; and

b. Designate at least one telephone number and email, physical, and postal addresses as points of contact for consumers with inquiries related to consumer relief under the Consent Order.

46. Respondent must report any change in the information required to be submitted under Paragraph 44 at least 30 days before the change or as soon as practicable after learning about the change, whichever is sooner.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

47. Within 7 days of the Effective Date, Respondent must submit to the Regional Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

48. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its Board members and senior executive officers, as well as to any business leaders and managers who have responsibilities related to the subject matter of the Consent Order.

49. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future Board members and senior executive officers, as well as to any business leaders and managers who will have responsibilities related to the subject matter of the Consent Order within 10 days of assuming their responsibilities.

50. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, within 45 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

51. Ninety days from the Effective Date, Respondent must submit to the Bureau a list of all persons and their titles to whom this Consent Order has been delivered under the Section of this Order titled "Order Distribution and Acknowledgment" and a copy of all signed and dated statements acknowledging receipt of this Consent Order under Paragraph 50.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

52. Respondent must create and retain the following business records:

    a. All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions

to the Bureau; and

b. All documents and records pertaining to the requirements of this Consent Order.

53. Respondent must make the documents identified in Paragraph 52 available to the Bureau upon the Bureau's request.

**XIV.**

**Notices**

**IT IS FURTHER ORDERED** that:

54. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re Bank of America, N.A.*, File No. 2023-CFPB-0006," and send them to the following email Enforcement_Compliance@cfpb.gov addressed as follows:

ATTN: Regional Director, Bureau Southeast Region
Consumer Financial Protection Bureau

**XV.**

**Compliance Monitoring**

**IT IS FURTHER ORDERED** that:

55. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information,

which must be made under penalty of perjury; provide sworn testimony; or produce documents.

56. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section V; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

57. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVI.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

58. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

59. The Regional Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines good

cause justifies the modification. Any such modification by the Regional Director must be in writing.

## ADMINISTRATIVE PROVISIONS

## XVII.

**IT IS FURTHER ORDERED** that:

60. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in Paragraph 61. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

61. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect

any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

62. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

63. This Consent Order will terminate on the later of 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent, if such action is initiated within 5 years of the Effective Date. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

64. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted. Deadlines that fall on a weekend or federal holiday shall carry over to the following business day.

65. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

66. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under §1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

67. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

68. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, its Executives, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 10 th day of July, 2023.

Rohit Chopra
Director
Consumer Financial Protection Bureau