

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bullion Standard, Inc.,<br><br>                          Plaintiff,<br><br>v.<br><br>Bank of America, N.A., et al.,<br><br>                          Defendants. | Case No.:  25-CV-1299-W-SBC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND DENYING MOTION TO STRIKE [DOC. 23]** |

Before the Court is Defendant Bank of America's motion to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief may be granted. (*Motion* [Doc. 23].)  In this removed case, Plaintiff Bullion Standard, Inc. ("Bullion") complains that their bank account was wrongfully frozen, their funds were stolen and withdrawn, and their account was otherwise mishandled by the Bank of America ("BOA" or the "Bank"), consistent with its historical pattern of defrauding customers and account holders generally and Plaintiff specifically.  The central disputes are (1) whether BOA wrongfully treated Bullion's account as holding fraudulent funds, (2) whether BOA wrongfully conducted or failed to conduct an investigation into Bullion's account, and (3) whether BOA wrongfully froze or retained Bullion's funds.

The Court finds this motion suitable for determination on the papers submitted and without oral argument.  Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).  The Court concludes

25-CV-1299-W-SBC

that the motion (Doc. 23) is **GRANTED IN PART and DENIED IN PART**, as explained here.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

BOA removed this case on July 16, 2025.  Bullion filed its first amended complaint (the "Complaint") on September 2, 2025.  (*Compl.* [Doc. 21].)  BOA moved to dismiss the complaint in its entirety.  (*Motion* [Doc. 23-1].)  Plaintiff responded in opposition.  (*Oppo.* [Doc. 25].)  BOA replied in support.  (*Reply* [Doc. 26].)

Bullion is a California online precious metals retailer that prides itself on a reputation as "the trusted choice for discerning precious metals investors."[1]  (*Compl.* ¶¶ 1, 5, 11.)  Bullion opened a bank account with BOA to receive wire transfers from its customers buying precious metals.  (*Id.* ¶ 6.)  Bullion's reputation among customers is vital to its business due to the fierce competition in the bullion retail market.  (*Id.* ¶¶ 13–14.)  Part of Bullion's strategy to build customer confidence and maintain its strong reputation was to enact several anti-fraud policies to ensure that customers are not identity thieves and that they receive their goods when purchased.  Bullion's policies to this end include "IPQS Enterprise grade fraud software, telephonic order verification, email verification, tracked shipping, and signature delivery confirmation."  (*Id.* ¶ 14.)

Bullion contacted BOA before opening its account to confirm whether it needed to meet additional prerequisites, such as anti-money laundering certifications, in light of its need for wire transfers as a core component of its precious metals trade.  (*Id.* ¶ 22.)  BOA represented it was more than able to handle Bullion's business needs and induced Bullion to open the account based on BOA's representations.  (*Id.*)  Bullion opened a direct deposit account (the "Account") with BOA on January 17, 2024, with confidence in

---

[1] The Court assumes the truth of all factual allegations when reviewing this Rule 12(b)(6) motion and construes the facts in the light most favorable to the nonmoving party, Bullion.  *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996); *Barrett v. Belleque*, 544 F.3d 1060, 1061 (9th Cir. 2008) (per curium).

25-CV-1299-W-SBC

BOA's capabilities. (*Compl.* ¶ 22.) Bullion only later learned that its confidence was misplaced because of multiple scams or violations of law BOA committed to deprive classes of customers of their money. (*Id.* ¶¶ 16–22.) During the next year of its commercial banking, there were no problems with BOA, and approximately $4,000,000 was received into the Account during that time. (*Id.* ¶ 23.)

### A.    BOA's Historical Scams Against Classes Of Customers Not Alleged To Include Bullion

Bullion alleged broadly that BOA has a notorious and somewhat recent history of fraudulent practices and conduct against the interests of its customers in general. (*Compl.* ¶¶ 16-21.) In support, Bullion alleged BOA committed four historical scams against the Bank's customers in defined classes—the credit card scam, the garnishment scam, the fraud reporting scam, and the theft scam. (*Id.*) There is no allegation that Bullion was impacted directly by any of these scams. Rather, Bullion alleges them as relevant to BOA's treatment of its customers and alleges that the orders entered in response to those scams are evidence of BOA's knowledge of its own wrongdoing.

First, the credit card scam alleged that BOA deceptively marketed their credit card add-on products and "illegally charged approximately 1.9 million consumer accounts for credit monitoring and credit reporting services that they were not receiving," by misrepresentation and engaged in unfair billing. (*Id.* ¶ 18.) BOA was ordered, among other penalties, to pay approximately $268 million to approximately 1.4 million customers, approximately $459 million to roughly 1.9 million customer accounts who enrolled in credit monitoring, and a penalty of $20 million in penalty to the Consumer Fraud Protection Bureau's ("CFPB"). (*Id.*) The second alleged historical scam was the garnishment scam. (*Id.* ¶ 19.) Bullion alleged that the CFPB described BOA's misconduct to include, among other things, false representation regarding rights to have funds exempted from garnishment, and in response to an adverse finding, BOA paid a $10 million penalty to the CFPB. (*Id.*) The third alleged historical scam was the fraud

3

25-CV-1299-W-SBC

reporting scam. (*Id.* ¶ 20.) The CFPB described the primary wrongdoing as using a fraud filter, as opposed to reasonable investigation, that automatically imposed an account freeze to the debit cards of unemployment insurance benefit accounts. (*Id.*) The final alleged historical scam is the theft scam. (*Id.* ¶ 21.) Plaintiff alleged that, in 2023, the CFPB concluded that BOA was liable for wrongfully retaining the money of its poorest customers, causing customers to be charged wrongful fees and to suff harm on their credit profiles. (*Id.*)

### B.    Wrongdoing Alleged to Harm Bullion Specifically

Here, Bullion's claims arise from BOA's conduct in early 2025, over the course of multiple transactions between Bullion and three of its customers. (*Compl.* ¶ 25.)

### 1.    Customers 1 and 2

Between January 8, 2025, and February 13, 2025, Customer 1 purchased approximately $380,000 of precious metals from Bullion over a series of transactions, sending multiple wire transfers of money to the Account. (*Compl.* ¶ 25.) After each transaction, Bullion transferred the funds to its wholesaler to fulfill Customer 1's orders. (*Id.*) Bullion monitored the transactions and confirmed the product was delivered to Customer 1 for each order. (*Id.*) Customer 1 verified receipt of the product on February 17, 2025, and Bullion believed the transaction was complete. (*Id.*) In fact, without Bullion's knowledge, Customer 1 gave their product to an unknown third party, according to Bullion's complaint, "Potential Thief 1." (*Id.* ¶¶ 25–26.) According to Bullion, Potential Thief 1 obtained the product under false pretenses, and Customer 1 was a victim of the third party's fraud. (*Id.* ¶ 26.) Customer 1 then allegedly went to BOA (there is no allegation that Customer 1 was also a BOA account holder) and reported the product stolen. (*Id.* ¶ 27.) BOA opened a fraud dispute and debited $381,000 from the Account. (*Id.* ¶ 28.) Bullion demonstrated to BOA that the wire transfers from Customer 1 were legitimate business transactions, and Customer 1 clarified to BOA that Bullion

25-CV-1299-W-SBC

was not the defrauding party. (*Id*. ¶ 36–39.) Based on that information, BOA closed the investigation and released $381,000 to Bullion. (*Id*. ¶¶ 36, 39, 41–42.)

Just weeks later, at the end of February, Customer 2 purchased approximately $75,000 worth of product from Bullion and wire transferred funds to Bullion's Account. (*Id*. ¶ 29.) Bullion transferred funds to its wholesaler and conveyed the product to Customer 2. (*Id*.) Customer 2 subsequently claimed to have been defrauded into conveying the product to an unknown third party, "Potential Thief 2." (*Id*. ¶ 30.) As before, Customer 2 reported to their local BOA (again, there is no allegation that Customer 2 was also a BOA account holder) that their product had been stolen. (*Id*. ¶ 32.) Without conducting an investigation and without notice to Bullion, BOA debited the Account $75,000 in March 2025. (*Id*. ¶ 32.) Later, Bullion and Customer 2 notified BOA that Bullion was not the defrauder, and BOA closed its investigation and credited the Account. (*Id*. ¶¶ 36, 43, 44.)

Before alleging facts regarding Bullion's Customer 3, the Complaint details Bullion's efforts to correct its Account with BOA after the two initial, wrongful debits of approximately $430,000. (*Id*. ¶ 33.) BOA failed to notify Bullion of the debits or BOA's actions with respect to Customers 1 and 2. (*Id*.) Once Bullion discovered the errors, it undertook to investigate, to pursue information from BOA and Bullion Customers directly, and to show BOA that the transactions were not fraudulent. (*Id*. ¶ 33, 34.) Bullion visited a BOA branch, where a manager ultimately spoke to BOA's fraud prevention department. (*Id*. ¶ 40.) Fraud prevention confirmed that Customer 1 had requested Bullion's funds be released to Bullion, but BOA did not release the funds connected with those transactions for several days. (*Id*. ¶¶ 42 –43.) Customer 2 also asked BOA to return Bullion's funds, and BOA did not immediately return the money. (*Id*. ¶ 43.) BOA finally credited and unfroze the Account in mid-March 2025. (*Id*. ¶ 44.) That same day, BOA mailed notice to Bullion of the disputed transactions, and Bullion alleged that this notice contained materially false statements. (*Id*. ¶ 46.) Bullion later learned that BOA had concluded, as of this same day in March 2025, that

25-CV-1299-W-SBC

Bullion committed fraud on its customers and had flagged Bullion's Account for fraud without evidence. (*Id.* ¶ 47.) BOA should have disclosed this conclusion to Bullion. (*Id.*) About this time, Bullion began to look for a new financial institution to hold its business accounts. (*Id.* ¶¶ 47, 48.) During this time, Bullion alleged it lost business daily from a lack of access to funds and a loss to its business goodwill. (*Id.* ¶ 49.)

### 2. Customer 3

Also in March 2025, Bullion entered a transaction with Customer 3 who purchased about $50,000 of product and sent a wire transfer to Bullion's Account. (*Compl.* ¶ 50.) When Bullion attempted to pay its wholesaler, it learned BOA had frozen the Account. (*Id.* ¶ 51.) Bullion contacted BOA's fraud prevention line which confirmed the transaction was marked as potentially fraudulent without any complaint from Customer 3. (*Id.* ¶¶ 52–53.) At Bullion's request, Customer 3 attempted to contact BOA, and BOA refused to speak with Customer 3. (*Id.* ¶¶ 52–54.)

Confusion between Bullion and BOA continued over the question of how or when funds would be returned to Bullion or Customer 3. (*Id.* ¶¶ 55–56.) Bullion received various estimations of time to resolve the dispute. (*Id.* ¶¶ 56 –61.) Bullion alleges that as of the filing of the Complaint, BOA still wrongfully retains Customer 3's funds wired to the Account. (*Id.* ¶¶ 60, 61.)

### 3. The Biggest Trading Day In History

Finally, Bullion alleged the loss of its business, due to the loss of access to the Account, on the "biggest trading day in history" on April 4, 2025. (*Compl.* at 30.) That day President Trump announced new tariffs that caused the "precious metals industry" to "explode" in response. (*Id.* ¶¶ 62–66.) "Prices of gold and silver crashed significantly, where volatility fueled mania brought enormous buying pressure into the precious metal sector." (*Id.* ¶ 65.) Without access to the Account or funds, Bullion "fielded dozens of calls and emails from potential customers who were unable to purchase through Bullion."

25-CV-1299-W-SBC

(*Id.*)  As of the filing of its Complaint, Bullion is still working to establish banking relationships and recover from damage caused by BOA.  (*Id*. ¶¶ 67–69.)

### 4.  The Deposit Agreement Governing Bullion's Account

The Complaint's allegations depend upon a deposit agreement between BOA and Bullion regarding the Account, but the contract that it agreed to upon opening its Account is not attached to the Complaint or put before the Court with foundation by the Bank's motion.  Bullion opened a BOA direct deposit account and received wire transfers there from its customers.  (*Compl*. ¶¶ 6, 22.)  In pursuit of this Account, Bullion submitted an online application and specified the Account would be used as a "precious metals dealer account" on the "bank's pre-populated data form."  (*Id*. ¶ 22.)  The Complaint alleges that, as part of this Account creation process, BOA represented that it would be able to handle Bullion's wire transfer business practices.  (*Id*.)  Bullion "agreed to open an Account with B.O.A."  (*Id*.)  The allegations necessitate the parties' agreement to open a direct deposit account.[2]  The specific terms of that agreement are not included in the Complaint or its attachments or in the moving papers.

Also, the deposit agreement between the parties is specifically referenced in letters between counsel and attached to the Complaint.  (*See id*. Exh. 1 (referencing "Bullion's BOA Account"), Exh. A (a redacted copy of Bullion's BOA Account statement), Exh. 2 (BOA's counsel's letter referencing Bullion's deposit agreement with the bank and stating that Bullion's "CEO, Kyle Horn, acknowledged [that Bullion] agreed its account would be 'maintained in the name of the Business with the Bank in accordance with the terms of the applicable Deposit Agreement'"), Exh. 3 (Bullion's counsel's letter disputing the accuracy and enforceability of the Deposit Agreement attached to BOA's

---

[2] Also, that BOA and its account holders enter a deposit agreement is further implied by Bullion's allegations with regard to the alleged historical scams.  Those allegations and the attached Consent Orders by the Consumer Financial Protection Bureau identify the deposit agreements between the bank and its deposit account holders.   (*Compl*. ¶¶ 18, 19; *id*. at Exh. 3B (Consent Order).)

25-CV-1299-W-SBC

counsel's letter because counsel admitted the agreement was created after Bullion opened its account).)  The Complaint and its attachments on their own do not provide the terms of the deposit agreement between the parties.  (*Id*.)  Based on the Complaint and the briefing, the parties disagree about the accuracy or applicability of the form direct deposit agreement to Bullion and the enforceability of its terms.

### C.  Causes of Action

The Complaint identifies seven causes of action, (1) declaratory relief, (2) receipt of stolen property under Cal. Penal Code § 496, (3) indebitatus assumpsit, (4) intentional interference with contractual relationships, (5) intentional interference with prospective economic relations, (6) negligent interference with prospective economic relations, and (7) violation of Cal. Bus. & Prof. Code § 17200.  (*Compl*. ¶¶ 70–126.)  All of these claims arise from Bullion's Account, the Bank's conduct in freezing (and allegedly stealing) funds from the Account on suspicion of fraud, and the Bank's alleged pattern of unlawful conduct harming its customers, including Bullion.  (*See id*. ¶¶ 75, 76, 121–26; *see also id*. at Exh. A (March 2025 Bank Statement [Doc. 21 at 51]).)

### II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to file a motion to dismiss a complaint for failing "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency.  *N. Star Int'l v. Ariz. Corp. Comm'n*., 720 F.2d 578, 581 (9th Cir. 1983).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory.  *Robertson v. Dean Witter Reynolds, Inc*., 749 F.2d 530, 534 (9th Cir. 1984).  In evaluating the motion, the Court must assume the truth of all factual allegations and must "construe them in light most favorable to the nonmoving party."  *Gompper v. VISX, Inc*., 298 F.3d 893, 895 (9th Cir. 2002).

25-CV-1299-W-SBC

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although well-pled allegations in the complaint are assumed true, a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679.

## III.  ANALYSIS

### A.  Defenses That Rely on the Deposit Agreement Between the Parties May Not Be Considered At This Stage

At the outset, the Court addresses the deposit agreement governing Bullion's Account. The allegations depend upon the existence of some deposit agreement to open Bullion's Account. The agreement governing the Account underpins the facts and claims alleged throughout the Complaint, primarily, the wire transfers of funds into the Account, BOA's withdrawal of funds from the Account, and the Bank's determination to freeze the Account. (*Compl.* ¶¶ 6, 22.) Plaintiff attaches no deposit agreement governing the Account that forms the basis of its Complaint and allegations. In this circumstance, a defendant might have requested the Court's consideration of the deposit agreement between the parties by judicial notice or under the doctrine of incorporation by reference. *See generally Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("incorporation-by-reference is a judicially created doctrine that treats certain documents

25-CV-1299-W-SBC

as though they are part of the complaint itself," in part to prevent the omission of necessary documents).

Here, however, the Court will not review the form deposit agreement BOA attaches to its motion because BOA failed to offer any evidence showing that both parties agreed to the contract and failed to show that the dates of the contract apply to the Account.  BOA attaches a copy of a deposit agreement with no signatory page and without any indication of Bullion's agreement to BOA's form terms.  (*McCormick Decl.* [Doc. 23-2] at 8–77.)

Attached as an exhibit to the motion to dismiss is a July 16, 2025, letter from BOA's counsel to Bullion's counsel.  (*Id.*)  The letter confirms that Bullion's Account had been closed, (*McCormick Decl.* at 4), as alleged by Bullion, and purports to demonstrate that "Plaintiff's CEO, Kyle Horn, acknowledged on [Plaintiff's] behalf that [Plaintiff] agreed that its account would be 'maintained in the name of the Business with the Bank in accordance with the terms of the applicable Deposit Agreement.' A copy of that acknowledgment is attached." (*Id.*)  No such acknowledgment by Kyle Horn appears in the McCormick Declaration.  (*See id.* at 5–79.)  Instead, the exhibit contains a form copy of Bank of America's "Deposit Agreement and Disclosures" effective as of February 14, 2025, after the date the Account was opened, that is, January 17, 2024.  (*See id.* at 8; *Compl.* ¶ 22.)  The exhibit also contains four copies of a letter from BOA to Plaintiff on April 9, 2025, confirming that the account is closed and that money would not be returned to the account holder at that time, under the terms of the Deposit agreement, while the review of the transactions and source of the funds proceeded. (*McCormick Declaration* at 6–7, 78, 79.)  Nothing in support of the Bank's motion to dismiss connects BOA's Deposit Agreement and Disclosures with either Bullion or Kyle Horn, outside of the statement of BOA's counsel.  (*See id.* at 4.)  Likewise, nothing in support of the Bank's motion connects Bullion's agreement to terms effective when the Account was opened.  (*See id.*)

25-CV-1299-W-SBC

In relevant part, the Complaint alleges that Plaintiff (1) "submitted an online application and specified that the account would be utilized as a 'precious metals dealer account' in accordance with the bank's pre-populated data form," (2) opened the Account at BOA, and (3) was dependent solely on that Account to do its business.  (*Compl.* ¶¶ 22–23.)  In light of these allegations, it is reasonable to infer that some agreement was entered.  (*Id.* ¶¶ 2, 5–7, 22–23.)  However, the Court would be speculating to suggest how the agreement may have been signed or acknowledged or what terms the agreement contained.  There are no facts before the Court to permit an interpretation of the terms or acknowledgments that Kyle Horn or Bullion may or may not have agreed to.

Although the averments of counsel would also be insufficient to demonstrate the existence of an agreement between the parties, defense counsel's declaration here is silent about the foundation of the Deposit Agreement's application to Bullion.  (*McCormick Decl.* at 2 ("I . . . attached a copy of [the Bank's] deposit agreement.").)  Neither is there any evidence to support that the parties entered the agreement by digital signature or digital acknowledgment.  (*See id.*)  In its reply, BOA argues that the deposit agreement is publicly available.  (*Reply* [Doc. 26] at 2, 6.)  However, BOA does not point to any publicly available document demonstrating that Bullion agreed to specific terms or a specific contract.

Accordingly, BOA's defenses dependent on the existence or terms of a deposit agreement must fail, until such time as the contract or deposit agreement both parties entered is properly before the Court.  For now, these unavailable defenses are: (1) BOA has a right to hold Bullion's funds based on the parties' deposit agreement, and (2) Bullion's claims for relief are limited to those sounding in contract.  (*See Motion* at 6–8, 8–9.)

To be clear, Bullion's allegations are dependent upon the existence of the parties' agreement to open a direct deposit account permitting wire transfers.  (*Compl.* ¶¶ 2, 5–6, 22–23.)  The parties' relationship is governed in part by California law.  Under California law, "the relationship between a bank and its depositor is not fiduciary in character but,

25-CV-1299-W-SBC

rather, founded on contract, ordinarily memorialized by a signature card that the depositor signs upon opening the account." *Wartell v. Wells Fargo Bank, N.A.*, 755 F. Supp. 3d 1252, 1257 (N.D. Cal. 2024) (quoting *Kurtz-Ahlers, LLC v. Bank of Am., N.A.*, 48 Cal. App. 5th 952, 956 (2020). Moreover, California law provides that "the relationship between a bank and its depositor is one of debtor and creditor." *Crocker-Citizens Nat. Bank v. Control Metals Corp.*, 566 F.2d 631, 637 (9th Cir. 1977) (overruled in part on other grounds); *Kurtz-Ahlers*, 48 Cal. App. 5th at 956. [3] However, the Court will not infer the terms of that agreement from a general form contract on BOA's Website, one which does not demonstrate that both parties agreed to its terms. Next, the Court addresses the sufficiency of Plaintiff's causes of action.

### B. Declaratory Relief

Bullion's first cause of action for declaratory relief arises from BOA's wrongful determination that Bullion's business or transactions were fraudulent after BOA's investigation into the transactions of Customers 1 and 2. (*Compl.* ¶ 71.) Bullion alleges that BOA made false statements to other banking institutions about Bullion based upon its wrongful determination of fraud. (*Id.* ¶ 72.) Bullion seeks a judicial declaration that Bullion did not commit fraud against Customer 1 or 2. (*Id.* ¶¶ 71, 72.) The Bank moves to dismiss the declaratory relief claim on the grounds that it is duplicative and it fails as a matter of law because it does not seek to redress future harm, as required.

---

[3] In response, Bullion argues that the Complaint does not plead the existence of a contract or deposit agreement. The existence of an agreement between the parties is reasonably inferred from the allegations that Bullion opened an account and used the Account as its only means to receive wired transfers from its customers. (*Compl.* ¶¶ 5–7, 9, 48–49, 114–15.) The crux of the dispute presented by the motion to dismiss is the absence of a controlling contract. Bullion argues, but does not allege, that either a deposit agreement did not exist or is unenforceable. The Bank, presumably the party with the best access to the contract governing Bullion's Account, has not yet demonstrated the contract or terms Bullion agreed to in creating or using its Account.

Under the Declaratory Judgment Act, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). However, "[a] court may dismiss a claim for declaratory relief if it is duplicative of, substantially similar to, or commensurate with relief sought under another cause of action." *In re Albert-Sheridan*, 658 B.R. 516, 543 (B.A.P. 9th Cir. 2024) (citation omitted). For example, "[w]here a breach of contract claim resolves all questions regarding contract interpretation, declaratory relief may be duplicative and inappropriate." *Fine v. Kansas City Life Ins. Co.*, 627 F. Supp. 3d 1153, 1164 (C.D. Cal. 2022) (citations omitted). Ultimately, "[t]he decision to grant declaratory relief is a matter of discretion even when the court is presented with a justiciable controversy." *United States v. Washington*, 759 F.2d 1353, 1356 (9th Cir. 1985) (citations omitted).

Here, the Complaint alleges facts specific to the declaratory relief claim beyond those relevant to the other causes of action. Bullion alleges an ongoing controversy based upon the allegedly wrongful determination that Bullion's dealings with Customers 1 and 2 was fraudulent. (*Compl.* ¶¶ 71, 72.) Bullion alleges that this wrongdoing impacted its ability to secure another deposit agreement based on "false statements" the Bank made to other financial institutions. (*Id.* ¶ 71.) Viewed in the light most favorable to Bullion, these allegations are sufficient to allege that the claim for declaratory relief is not wholly duplicative and that it is not limited only to past wrongs. The allegation that the controversy continues as of the date of the Complaint's filing, while not dispositive, weighs in favor of permitting the declaratory relief claim to survive the pleading stage. Accordingly, the Court denies the motion to dismiss the claim for declaratory relief.

### C. Receipt of Stolen Property under Cal. Penal Code § 496

Plaintiff's second cause of action for receipt of stolen property under California Penal Code § 496 governs the receipt or concealment of stolen property. Subsection (a)

13

provides in relevant part that "[e]very person who [] receives any property that has been stolen or that has been obtained in any manner constituting theft . . ., knowing the property to be so stolen or obtained . . . shall be punished by imprisonment. . . ."  Cal. Penal Code § 496(a); ; *see also Bell v. Feibush*, 212 Cal. App. 4th 1041, 1047 (2013); *Siry Inv., LP v. Farkhondehpour*, 13 Cal. 5th 333, 349–50 (2022).  A civil cause of action lies for any "person who has been injured by a violation of subdivision (a)."  *Id*. at § 496(c).

BOA argues that this claim must be dismissed because there is no allegation BOA knew the money was stolen when it was deposited into the Account, and this omission cannot be remedied by amendment because Bullion alleges that each transaction underlying the deposits of Customers 1, 2, and 3 were lawful and the funds deposited into Bullion's account were not fraudulently obtained.  Put another way, BOA argues that Bullion must either lose its receipt of stolen property claim or reverse its factual allegations regarding the lawfulness of the underlying transactions.  Bullion's theory is that BOA violates § 496 by withholding funds from Bullion's account after stealing those funds from Bullion initially—in other words, the withdrawal by the Bank is the initial stealing and its refusal to return the money on Bullion's demand is a withholding made actionable by § 496.  *See* Cal. Penal Code § 496(a) ("Every person who . . . withholds, or aids in . . . withholding any property from the owner, knowing the property to be so stolen" is liable); *see also Bell v. Feibush*, 212 Cal. App. 4th 1041, 1049 (2013) (defendant "violated section 496(a) ... by withholding that property when [plaintiff] asked for it back").

The Complaint alleges that BOA "falsely and wrongfully stole approximately $49,526.90 of Bullion's money related to Customer 3's deposit which was to be utilized to purchase five bars of Platinum [] as well as an additional $741.01 which was already in the account.  (*Compl*. ¶ 75.)  Bullion alleges two "theft-based schemes" by Defendant as alternate or joint theories to satisfy the statute's requirement that the property "has been obtained in any manner constituting theft," Cal. Penal Code § 496(a).  (*Id*. § 76.)

25-CV-1299-W-SBC

First, Bullion alleged a "theft through false pretenses" scheme committed by BOA as one basis for demonstrating the stolen element of its § 496 claim. (*Id*. ¶¶ 76-77.) To support theft by false pretenses, a plaintiff must show that "the defendant made a false pretense or representation with intent to defraud the owner of its property, and that the owner was in fact defrauded. It is unnecessary to prove that the defendant benefitted personally . . . . The false pretense or representation must have materially influenced the owner to party with its property, but the false pretense need not be the sole inducing cause." *Sina v. Schwartz Inv. Co, LLC*, 2025 Cal. Super. LEXIS 57490, at *5 (Sep. 30, 2025) (citing *People v. Ashley*, 42 Cal.2d 246, 259 (1954); *People v. Hartley*, 248 Cal. App. 4th 620 (2016); *People v. Miller*, 81 Cal. App. 4th 1427 (2000).

Here, the "theft by false pretenses" allegedly occurred when BOA "lured Bullion into making additional deposits which B.O.A. would then 'Freeze'—aka steal—without performing an adequate investigation." (*Id*.) Bullion states that (1) it has produced evidence that the Account is not "subject to fraud" and (2) that based upon this information, agents of the Bank's fraud prevention department closed fraud investigations into transactions with Customers 1 and 2. (*Id*. ¶¶ 77–78.) Finally, Bullion alleged that BOA has no good faith basis to withhold the money demanded and that its illegal intent is consistent with historic violations of law against customers not allegedly including or related to Bullion, including a theft of more than $727,000,000 in historical credit card and garnishment scams. (*Id*. ¶ 78.)

Second, Plaintiff alleged an embezzlement scheme as an additional or alternative basis for demonstrating the stolen element of this claim. Under the embezzlement scheme, BOA decided during the process of closing Bullion's account that it never needs to return the money taken from the Account. (*Id*. ¶ 78.) Bullion has not consented to this taking and instead demands the money. (*Id*.) Despite this demand, according to the Complaint, BOA falsely and fraudulently claims it is entitled to hold the money as long as it believes the Account was "subject to fraud" or other improper conduct, similarly to its conduct in the alleged, historical credit card scam and garnishment scam. (*Id*.) BOA

25-CV-1299-W-SBC

never had a legitimate basis to believe the Account was "subject to fraud" or improper conduct because BOA never properly investigated such conduct. (*Id.* ¶ 78.) Bullion further alleges that BOA's theft has "been authorized, ratified, and consented to" by BOA's "highest levels as demonstrated by the statements made by its counsel" in the letters attached to the Complaint. (*Id.* ¶ 81.)

To state a claim for receipt of stolen property, a plaintiff must plead three elements: "(a) the property was stolen, and (b) the defendant was in possession of it, (c) knowing it was stolen." *Verdugo-Gonzalez v. Holder*, 581 F.3d 1059, 1061 (9th Cir. 2009) (citing *People v. Anderson*, 210 Cal. App. 3d 414, 420 (1989)). The Bank argues the claim must be dismissed because Bullion must allege, and it has not, that BOA knew that the funds (the "approximately $49,526.90 [] related to Customer 3's deposit ["Customer 3's Deposit"] . . . as well as an additional $741.01 which was already in the [A]ccount") were stolen when they were deposited. "A necessary element of receipt of stolen property is the defendant's actual knowledge at the time of receipt that the property was stolen." *La Tech. & Consulting, LLC v. Am. Express Co.*, 2023 U.S. App. LEXIS 31225, at *2, 2023 WL 8166780 (9th Cir. Nov. 24, 2023) (citing *People v. Tessman*, 223 Cal. App. 4th 1293 (Cal. Ct. App. 2014)). Bullion provides legal authority for the sufficiency of its § 496 claim, but it does not respond to the challenge that it must plead the fact that BOA actually knew the funds were stolen at the time they were received, that is, deposited.

The Complaint does not allege that BOA knew the stolen nature of the funds at the time that it received them. (*Compl.* ¶¶ 74–81.) Rather, Bullion attempts to plead BOA's wrongful intent prior to Customer 3's Deposit through one or both of two schemes of theft through false pretenses or embezzlement. (*Id.*) Bullion makes no allegation regarding BOA's knowledge of the stolen nature of the $741.01 already in the Account at the time of Customer 3's Deposit. (*See id.*) Under California law, Bullion failed to plead sufficient factual allegations to state a claim under § 496 regarding Customer 3's Deposit

16

and the additional $741.01.  However, the Court will grant leave to amend as it is conceivable that these pleading deficiencies could be cured by amendment.

### D.  Indebitatus Assumpsit

Bullion's third cause of action is for Indebitatus Assumpsit, or a California common law cause of action for money had and received.  *See Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 937 (2011) (a claim for money had and received is stated when "the defendant is indebted to the plaintiff in a certain sum 'for money had and received by the defendant for the use of the plaintiff'") (quoting (*Schultz v. Harney*, 27 Cal. App. 4th 1611, 1623 (1994)); *see also Philpott v. Superior Ct. in & for Los Angeles Cnty.*, 1 Cal. 2d 512, 517 (1934) (stating "one of the common counts for money had and received, to wit, indebitatus assumpsit").  The Bank moves to dismiss this cause of action on grounds that the contract between the parties permits the Bank to withhold the money, and accordingly Bullion can have no claim that it be returned.  (*Motion* at 8–9.)  As explained above, the Bank failed to put before the Court a deposit agreement or other governing contract agreed to by both the Bank and Bullion.  On this record, the Court denies the motion to dismiss the third cause of action.

### E.  Intentional Interference Claims

Bullion's fourth cause of action is for intentional interference with contractual relationships, and its fifth cause of action is for intentional interference with prospective economic relations (the "intentional interference claims").  According to BOA, both causes of action should be dismissed for two reasons.  First, BOA argues the claims fail because Plaintiff failed to allege that BOA possessed the requisite knowledge of Bullion's relationships with its customers.  Second, BOA argues both claims fail because Bullion insufficiently alleged that either BOA desired to interfere or that interference was substantially certain to occur with both claims.

25-CV-1299-W-SBC

In California, the intentional interference claims are "related but distinct." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020) (addressing at-will contracts). Both claims require a plaintiff plead and prove a defendant's knowledge of the object of the claim—that is, knowledge of the contract for contractual relationships, on the one hand, and knowledge of the prospective economic relationship, on the other. *See id.*; *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). Also, both intentional interference claims require a plaintiff to plead and prove a defendant's intent. "It is not necessary to prove that the defendant acted with the specific intent, or purpose, of disrupting the plaintiff's prospective economic advantage [or contractual relationship]"; rather, a plaintiff may plead "the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *See San Jose Constr., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1544–45 (Cal. Ct. App. 2007) (quoting *Korea Supply Co.*, 29 Cal. 4th at 1155–57).

First, a claim for intentional interference with contractual relationships "requires allegations of the following elements: '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007) (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26 (1998)); *Ixchel Pharma*, 9 Cal.5th 1130. A plaintiff must allege the defendant's "specific knowledge of contracts with third parties." *Sarafan Mobile Ltd. v. Apple, Inc.*, No. 24-cv-2698-JSW, 2025 U.S. Dist. LEXIS 178530 at *17 (N.D. Cal. July 30, 2025) (citing *World Fin. Grp. Ins. Agency v. Olson*, No. 24-cv-480-EDJ, 2024 U.S. Dist. LEXIS 127975, 2024 WL 3498490, at *10–11 (N.D. Cal. July 19, 2024)). However, a plaintiff is not required to allege that "the defendant have the specific intent to interfere with a contract. A plaintiff states a claim so long as it alleges the defendant knew that interference was 'certain or substantially

25-CV-1299-W-SBC

certain to occur as a result of [defendant's] action.'" *Ixchel Pharma*, 9 Cal. 5th at 675–76 (quoting *Quelimane Co.*, 19 Cal. 4th at 56).

Second, a claim for intentional interference with prospective economic relations requires a plaintiff "plead and prove (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152, n.6 (2004) (citing Y*oust v. Longo*, 43 Cal.3d 64, 71, n. 6 (1987).)

In its motion, BOA challenges the sufficiency of both intentional interference claims on the grounds that Bullion insufficiently alleged the Bank's knowledge of (1) the contract between Bullion and Customer 3 and (2) the Bank's knowledge of Bullion's prospective economic relations.

With respect to the contractual relationship claim, Bullion alleges that it entered into a contract, on or about March 27, 2025, with Customer 3 for the purchase of approximately $50,000 worth of precious metals. (*Compl.* ¶ 87.) Bullion alleges without explanation: "Defendant knew of Plaintiff's contract with Customer 3 by virtue of the facts alleged above." (*Id.* ¶ 88.) There is no further factual allegation regarding the Bank's knowledge of Customer, of Bullion's contract with any customer on or about that date, or of the sale of precious metals for approximately $50,000. The Complaint alleges that the Bank was aware of (1) the nature of its business as a precious metals dealer, (2) Bullion's use of wire transfers as part of its business; and (3) Bullion's transactions with Customers 1 and 2, and of the parties' dispute about whether any part of those transactions was fraudulent. (*Compl.* ¶¶ 22, 25–47, 93.) None of these facts, however, permit the plausible inference that BOA was aware of Bullion's future transaction with Customer 3, beyond the general presumption that Bullion's business model would continue.

"Generalized knowledge that a party has contracts with others is not sufficient to support a claim for intentional interference with contractual relationships." *Trinidade v. Reach Media Grp., LLC*, No. 12-cv-4759-PSG, 2013 U.S. Dist. LEXIS 107707, 2013 WL 3977034, at *15 (N.D. Cal. July 31, 2013); *Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 596–97 (Cal. Ct. App. 2012). Bullion's position is that the Bank's knowledge of Customers 1 and 2, combined with its knowledge of Bullion's business and its need for wire transfers sufficiently demonstrate that the Bank knew "Customer 3's identity." (*Oppo.* at 16, ll. 1–15.) However, there is nothing alleged about the identities of Customers 1 or 2 that identify either Customer 3 to BOA or the terms or nature of Customer 3's contract with Bullion. The allegations support only that the Bank knew Bullion likely had contractual relationships with third parties, not that it knew the parties' identities or the terms of those contracts beyond generalized transactions for precious metals. These allegations are insufficiently specific to allege the requisite knowledge element. Viewing the pleading in the light most favorable to Bullion and considering all allegations that precede its statement of the Bank's knowledge in paragraph 88, there appears no fact supporting the inference that the Bank knew of Customer 3 or Customer 3's transaction. Although the Court is skeptical that Bullion can allege sufficient facts to satisfy the knowledge element, the Court cannot say that amendment would be futile. Accordingly, leave will be granted for Bullion to amend its allegations regarding the Bank's knowledge of the contract between Bullion and Customer 3, before the March 27, 2025, transaction. Because the claim for intentional interference with contractual relationship must be dismissed for failure to sufficiently allege a necessary element, the Court need not reach BOA's other grounds for dismissal.

Turning to BOA's knowledge regarding Bullion's prospective economic advantage, the Complaint alleges that over $4,000,000 were handled through its BOA Account, and the Bank knew of these transactions. (*Compl.* ¶ 94–96.) Bullion anticipated at least $4,000,000 in sales per year for the next several years of business and

25-CV-1299-W-SBC

expected between one and two million dollars in sales on March 27, 2025.  (*Id.* ¶ 96–97.) According to the Complaint, the Bank's knowledge of Bullion's March 27, 2025, transaction with Customer 3 was based upon, (1) its knowledge of past sales expected to continue, (2) facts arising from the Bank's investigations into the transactions with Customers 1 and 2, and (3) the fact that Bullion told the Bank that withholding or freezing of funds would have a devastating effect on its business.  (*Id.* ¶¶ 99–100.) However, general and conclusory allegations regarding lost future sales, damage to the relationships between Plaintiff and its customers, or the Bank's knowledge of the prior fraud investigation and the closure of that investigation in Bullion's interest do not satisfy the pleading requirements of the knowledge element of this claim.  *See Sybersound Records v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008); *Vascular Imaging Prof'ls, Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1013 (S.D. Cal. 2019).

Bullion starts with the conclusions that (1) BOA's withdrawal of funds from the Account prevented Bullion's transaction with Customer 3, (2) BOA's closure of the Account shut down Bullion's business, which was expected to result in millions of dollars of sales, and (3) the Bank's closure of the Account cost Bullion then and future business in the form of lost goodwill and being delisted from various industry listings. (*Compl.* ¶¶ 95–104.)  But Bullion has failed to plead facts that demonstrate BOA's knowledge of the Customer 3 sale or, indeed, of any future customer or specific contract. *Iqbal*, 556 U.S. at 678 ("[t]hread bare recitations of the elements of a cause of action, supported by mere conclusory statements ... do not suffice" to state a claim).  Aside from a cursory reference that "Defendant knew of these [future] sales by virtue of the facts outlined above," the Complaint lacks any specific factual allegations related to the second element, namely the Bank's knowledge of any relationship between Bullion and Customer 3 or even of the Bank's knowledge of any relationship between Bullion and any specific future customer or contract.  It is insufficient that Bullion alleges BOA's knowledge of Bullion's sales business, knowledge of Bullion's intent to continue in that sales business, and knowledge based on Bullion's warning that the loss of its Account

25-CV-1299-W-SBC

would cause devastating harm.  Because the claim for intentional interference with prospective economic advantage must be dismissed for failure to sufficiently allege a necessary element, the Court need not reach BOA's other grounds for dismissal. Although the Court may be skeptical of Bullion's ability to sufficiently allege BOA's knowledge of its future economic advantage, it is not clear that amendment would be futile.  The Court dismisses the fifth cause of action and will grant leave to amend as it is not clear that Bullion cannot cure the deficiencies.

### F.  Negligent Interference With Prospective Economic Relations

Bullion's sixth cause of action is for negligent interference with prospective economic relations.  The elements of negligent interference are similar to those of the intentional interference claims, with the critical difference being the requisite mental state of defendants.  *See Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1077–78 (Cal. Ct. App. 2007) (addressing the jury instruction for the tort of negligent interference with prospective economic advantage).

> "The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship."

*Id*. at 1078 (quoting *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (Cal. Ct. App. 1997)).

As explained with regard to the intentional interference claims above, Bullion may not satisfy its pleading requirement with respect to the knowledge element of negligent

25-CV-1299-W-SBC

interference with general or conclusory allegations. *Iqbal*, 556 U.S. at 678 ("[t]hread bare recitations of the elements of a cause of action, supported by mere conclusory statements ... do not suffice" to state a claim). It is insufficient to merely allege that BOA knew "of the existence of the [economic relationship between plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff] and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship." *Venhaus*, 155 Cal. App. 4th at 1078; *Iqbal*, 556 U.S. at 678.

However, Bullion's allegation with respect to knowledge is sparser than this standard: "Defendant knew of [approximately $4 million in sales which were handled through Plaintiff's Account over the last year] by virtue of the facts outlined above." (*Compl.* ¶¶ 106–107.) As with the intentional interference claims, Bullion alleges that it "repeatedly advised" BOA "of the nature of its business" and of "the devastating effects Defendant's conduct would have on Plaintiff's business." (*Id.* ¶¶ 110–113.) Bullion also alleged Defendant's knowledge arising from the prior fraud investigation related to Customers 1 and 2, and of its prior wrongful conduct, determined by prior regulatory findings arising from the alleged historic scams. (*Id.* ¶ 111, 113.)

Bullion failed to allege sufficient facts to support the knowledge element of negligent interference with prospective economic relationships. Having so concluded, the Court need not address BOA's other grounds for dismissal and grants the motion to dismiss the sixth cause of action. As with the intentional interference claims, however, it cannot be said that amendment would certainly be futile. Accordingly, the Court will grant leave to amend the negligent interference claim.

### G. UCL Claim

Bullion's seventh cause of action is an Unfair Competition Law ("UCL") claim, or a violation of California Business and Professions Code § 17200. Under the UCL, a

25-CV-1299-W-SBC

business practice is deemed "unfair competition," and is thus prohibited, if it constitutes either: (1) an unlawful business practice; (2) an unfair business practice; or (3) a fraudulent business practice.  *See* Cal. Bus. & Prof. Code § 17200.  Each of these three prongs is a separate and independent cause of action.[4]  *Martinez v. Wells Fargo Home Mrtg., Inc.*, 598 F.3d 549, 554 (9th Cir. 2010) (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163 (1999)).  Furthermore, a "UCL action is equitable in nature; damages cannot be recovered.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 943, 1152 (2003) (holding that nonrestitutionary disgorgement of profits is not an available remedy" in a UCL action).  "Prevailing plaintiffs are generally limited to injunctive relief and restitution."  *Cel-Tech*, 20 Cal.4th at 179; *see also Korea Supply*, 29 Cal.4th at 943, 947, 1152.

Here, Bullion alleges the Bank violated the UCL by wrongfully obtaining more than $50,000 from Bullion's Account, exclusive of fees and other charges, based on the Bank's "fraudulent, deceptive, and unfair conduct."  (*Compl*. ¶¶ 119–20.)  Bullion alleges that BOA's historical wrongful or unlawful conduct, as evidenced in the alleged historical scams, demonstrates that BOA has recently been punished and ordered to disgorge similarly wrongfully obtained monies and fees.  (*Id*. ¶¶ 17–21, 89, *Compl*. at Exh. 3 (letter from Bullion's counsel to BOA's counsel).)  Bullion prays for "disgorgement of B.O.A.'s ill-gotten gains" and an order enjoining the Bank from continuing to conduct business through fraudulent, deceptive or unfair acts.  (*Compl*. ¶ 120.)

First, BOA argues that the Complaint fails to state which of the three prongs of unfair competition is alleged.  This is incorrect.  The Complaint attempts to allege a claim

---

[4] UCL allegations based on the fraud prong are subject to the pleading requirements of Fed. R. Civ. P. 9. *See Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir. 2009); *NJOY, LLC v. Imiracle (HK) Ltd.*, 760 F. Supp. 3d 1084, 1117 (S.D. Cal. 2024).  The Court need not address Rule 9's application here as explained next.

under all three, as quoted above. (*Id*. ¶ 120.) The challenge for Bullion's Complaint is whether its allegations under each prong are sufficient.

Second, BOA objects to the generality of Bullion's factual allegations with respect to unfair competition. The Court agrees. Bullion's allegations are merely a statement of the three UCL prongs and an allegation that the Bank's "bad conduct," which viewing the Complaint in the light most favorable to Bullion includes all preceding allegations of wrongdoing, harmed Bullion by depriving it of more than $50,000 of its Account funds. This allegation of merely "prior bad acts" is insufficient to state a UCL claim, even if it were true that it is remotely possible to connect one of the prior factual allegations of the Bank's wrongful conduct to Bullion's loss of some $50,000. *See Iqbal*, 556 U.S. at 678 ("[t]hread bare recitations of the elements of a cause of action, supported by mere conclusory statements ... do not suffice" to state a claim). This failure to adequately plead the connection of BOA's conduct to each of the prongs of unfair competition, unlawful, unfair, and fraudulent is fatal to Bullion's UCL claim. A UCL "plaintiff must establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." *Albillo v. Intermodal Container Servs., Inc.*, 114 Cal. App. 4th 190, 206 (2003) (citing *Olsen v. Breeze*, 48 Cal.App.4th 608, 617–618 (1996); *Saunders v. Superior Court*, 27 Cal.App.4th 832, 839 (1994)). Or, in this case, Bullion must establish which business practice is unlawful, which is unfair, and which is fraudulent, if it chooses to pursue each UCL prong.

Finally, BOA argues that the UCL claim must be dismissed in its entirety because, as a claim in equity, it may not be brought in addition to legal claims seeking substantially similar remedies. In BOA's view, Bullion both fails to allege it lacks an adequate remedy at law and also prays for a remedy at law, disgorgement, as part of its equitable UCL claim. (*Motion* at 19.) The Court agrees that Bullion has not alleged the absence of an adequate remedy at law and also that the summary prayer for "disgorgement of B.O.A.'s ill-gotten gains" falls within the remedies at law that are

25-CV-1299-W-SBC

unavailable under the UCL. *See Korea Supply Co.*, 29 Cal.4th at 1150–52 (discussing the UCL's legislative scheme of limiting available remedies). However, Bullion also prays for injunctive relief in the form of an order limiting the Bank's future conduct. (*Compl.* ¶ 120.) Neither party addresses the equitable remedy alleged in the Complaint as a basis for the UCL claim to survive dismissal. Having failed to adequately allege the particular BOA business activity that underpins the unfair competition claim, the Complaint's UCL claim will be dismissed. Because Bullion requests leave to amend, and amendment of the UCL claim is not futile on this record, the Court grants leave to amend the UCL claim.

### H. Jury Trial Demand

Bullion did not demand a jury trial in its state court complaint. (Doc. 1-2.) Bullion did not file a separate notice of jury demand after removal. When Bullion filed its operative Complaint pursuant to this Court's order, it did not include a jury trial demand anywhere in the caption or text of the Complaint itself. Instead, when electronically filing the Complaint, counsel named the docket entry, "AMENDED COMPLAINT with Jury Demand against All Defendants." (No. 3:25-cv-01299-W-SBC, *Bullion Standard, Inc. v. Bank of America, N.A. et* al, CM/ECF Docket Report at Doc. 21 (S.D. Cal. Sep. 2, 2025).)

BOA moves to strike Bullion's invocation of a jury trial on the docket report. (*Motion* at 16.) BOA argues the demand for jury trial is waived. BOA provides no citation to Rule 12(f) (governing motions to strike pleadings) and no discussion of Rule 12(f)'s application to the jury demand that in this case appears on the CM/ECF docket but not in the caption or text of the Complaint. For these reasons, the Court denies without prejudice the motion to strike. Moreover, even if a jury trial is waived, a "court may, in its discretion upon just terms, allow a trial by jury." Fed. R. Civ. P. 39(b)–(c), 81(c)(3). The resolution of this issue is better addressed at a later stage in the proceedings.

25-CV-1299-W-SBC

## IV. CONCLUSION

For the foregoing reasons, the Court denies the motion to dismiss Bullion's claims for declaratory relief and indebitatus assumpsit (Claims 1 and 3).

The Court grants the motion to dismiss Bullion's claims for receipt of stolen property under Cal. Penal Code § 496, interference with contract or prospective economic relations, and violation of California Business & Professions Code § 17200 (Claims 2, 4–7). Plaintiff requests leave to amend and is granted such leave with respect to the claims for receipt of stolen property under § 496, interference with contract or prospective economic relations, and violation of California Business & Professions Code § 17200 (Claims 2, 4–7). Any amended complaint must be filed on or before **March 9, 2026**. If Bullion opts to amend its Complaint, the factual allegations in its second amended complaint must be "consistent with" and may "not contradict the allegations in the original complaint." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).

The Court denies without prejudice the Bank's motion to strike Bullion's jury trial demand.

It is so Ordered.

Dated: February 17, 2026

_____
Hon. Thomas J. Whelan
United States District Judge