Matthew J. Faust, State Bar No. 254145
*faust@shariffaust.com*
Khodadad D. Sharif, State Bar No. 187992
*sharif@shariffaust.com*
~~Yasaman Sharif, State Bar No. 298318~~
~~*ysharif@shariffaust.com*~~
SHARIF | FAUST LAWYERS, LTD.
600 B Street, Suite 2490
San Diego, CA 92101
Telephone: (619) 233-6600
Facsimile: (619) 233-6602

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

BULLION STANDARD, INC., a California corporation

Plaintiff,

vs.

BANK OF AMERICA, N.A.; and DOES 1 through 25,

Defendants.

Case No.: 25-CV-1299 W (SBC)

~~FIRST~~SECOND AMENDED COMPLAINT:

1. DECLARATORY RELIEF;
2. ~~RECEIPT~~VIOLATION OF ~~STOLEN PROPERTY~~CAL. PENAL CODE § 496;
3. INDEBITATUS ASSUMPSIT;
4. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;
5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;
6. NEGLIGENT INTEREFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;
7. VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200.

**JURY TRIAL DEMANDED**

**COMES NOW**, PLAINTIFF BULLION STANDARD, INC. who brings this action against DEFENDANTS BANK OF AMERICA, N.A., and DOES 1 through 25 and allege as follows:

## GENERAL ALLEGATIONS

1) PLAINTIFF, BULLION STANDARD, INC. ("Bullion Standard") is a California corporation doing business in this judicial district.

2) DEFENDANT, BANK OF AMERICA, N.A. ("B.O.A."), is a national association, qualified to do business in the state of California and actually doing business in this judicial district. B.O.A. maintains a branch at 655 W. Broadway, Ste 101, San Diego California, 92101. This location is a four minute walk from this Courthouse.

3) PLAINTIFF is ignorant of the true names and capacities of the DEFENDANTS sued herein under the fictitious names DOES 1 through 25, inclusive. PLAINTIFF is informed and believes that each of the DEFENDANTS was responsible in some manner for the current damages alleged in this Complaint.

4) At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each DEFENDANT, was the agent/employee of each and every other DEFENDANT. In doing the things alleged in the causes of action to which this paragraph is incorporated by reference, each and every DEFENDANT was acting within the course and scope of this agency and employment and was acting with the consent, permission, and authorization of each of the other DEFENDANTS. All actions of each DEFENDANTS alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other DEFENDANTS.

## FACTUAL BACKGROUND

5) Bullion Standard is an online precious metals retailer that stands out as the trusted choice for discerning precious metals investors. It maintains a commitment to competitive pricing, superior products, and exceptional customer service.

6) In operating its business, Bullion Standard opened a bank account at B.O.A. to receive wire transfers from its customers.

7) In a matter of days, B.O.A. has destroyed Bullion Standard's 15 years of goodwill and business development. As will be explained below, B.O.A. acted unlawfully and in violation of their own duties to their customers generally, and Bullion Standard specifically.

8) B.O.A. has falsely accused Bullion Standard of committing fraud after committing a bad faith "investigation" and intentionally overlooked overwhelming evidence which demonstrates Bullion Standard committed no fraudulent acts. Based upon its bad faith "investigation" of Bullion Standard, B.O.A. stole $ 50,000 from Bullion Standard's account which was to be utilized to purchase precious metals for one of Bullion Standard's customers. B.O.A. then closed the account, without providing immediate and actual notice and in bad faith, closed Bullion Standard's account, rendering it unable to facilitate any wire transfers. This has irreversibly and permanently damaged Bullion Standard's business.

9) Bullion Standard ~~has been~~was shut down until it ~~can~~could open new bank accounts. Due to anti-money laundering protocols imposed on precious metal retailers, this process can take several weeks. By the time that Bullion Standard ~~is~~was able to re-establish banking relationships with institutions that do not breach their duties to their customers, Bullion Standard ~~will have~~ lost millions of dollars of sales~~.~~ and saw its valuable business relationships harmed.

10) Accordingly, Bullion Standard brings this action against B.O.A. to recover the money it stole from Bullion Standard as well as remuneration for the bad faith actions of the defendants.

## I. **Bullion Standard**

11) Bullion Standard started business in 2010 as a local precious metals dealer in America's finest city of San Diego, CA, and has evolved into one of the industry's premier online bullion retailers, trusted by investors nationwide. Bullion Standard is driven by a shared vision of revolutionizing the retail bullion industry.

12) Traditional bullion retailers often fall short when it comes to fair pricing, customer service, and education, so Bullion Standard decided to take action. Harnessing a collective experience of more than 24 years in the precious metals industry, Bullion Standard embarked on reshaping those standards.

13) Bullion Standard prides itself on being a BBB accredited business with an A+ rating, member dealers of the National Coin and Bullion Association (NCBA), the American Numismatic Association (ANA), and authorized dealers for PCGS and NGC, ensuring that its customers can trust in its reliability and reputation. At Bullion Standard, transparency and integrity are at the core of everything it does, embodying the principle that "you only get one chance to make it right in this business."

14) Competition in the bullion retail space is fierce, which means retailers, like Bullion Standard, rely upon an excellent reputation amongst its customer base. Bullion Standard's customers expect excellence. Winning their business is hard and requires time and money. Building its customers' trust is paramount to Bullion Standard's success. To build good faith in the marketplace, Bullion Standard has enacted several anti-fraud policies to ensure that its customers are who they say they are (e.g., not identity thieves) and that they receive their goods when they purchase them. The steps that Bullion Standard takes includes IPQS Enterprise grade fraud software, telephonic order verification, email verification, tracked shipping, and signature delivery confirmation.

15) By taking the above-steps to protect its customers, Bullion Standard has been able to build its business over the past 15 years to the point where it was able to expand its operations. Bullion Standard recently began offering a membership program, which allowed its customers to purchase an unlimited amount of product for a low monthly charge

(the "Membership Program"). Bullion Standard's sales under this program were especially dependent upon having reliable banking relationships.

///

///

///

## II. B.O.A.'s Shameful and Deceitful History of Defrauding its Customers

16) B.O.A. is one of the largest financial institutions in the world. As of March 31, 2023, B.O.A. had approximately $ 2,400,000,000,000.00 ($ 2.4 trillion) in combined assets and $ 1,900,000.000,000.00 ($ 1.9 trillion) in domestic deposits.

17) Unbeknownst to Bullion Standard, Bank of America has a history of defrauding its customers. In fact, in the last ten years, the United States Consumer Financial Protection Bureau ("C.F.P.B.") has ordered B.O.A. to pay over $ 1,000,000,000.00 ($ 1 billion) in penalties, fines, and disgorgements.

### A. The Credit Card Scam

18) In 2014, the C.F.P.B. ordered B.O.A. to pay $ 727,000,000.00 ($ 727 million) in redress to its victims—a.k.a. customers—for illegal credit card practices and was entered in C.F.P.B. Case No. 2014-CFPB-0004. This will be referred to in this complaint as the **Credit Card Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.A.

(a) The C.F.P.B. described B.O.A. fraudulent and illegal conduct in the **Credit Card Scam** as follows:

(i) Roughly 1.4 million consumers were affected by Bank of America's deceptive marketing of their add-on products. B.O.A. also illegally charged approximately 1.9 million consumer accounts for credit monitoring and credit reporting services that they were not receiving. B.O.A was ordered to pay a $20 million civil money penalty to the C.F.P.B.

(ii) B.O.A. led some consumers to believe that the first 30 days of coverage were free of charge when, in fact, by enrolling, consumers were "agreeing" to purchase the credit protection products. Consumers would begin incurring charges unless they cancelled within an initial 30-day review period, in which case any fees previously paid would be reimbursed.

(iii) B.O.A. misled some consumers about the enrollment process for these products, telling them that there were additional steps to enroll in or purchase the products after the telemarketing call or that, on the call, they were merely agreeing to receive additional information. In reality, B.O.A. was enrolling these consumers in the products during these calls and then charging consumers for the products.

(iv) B.O.A. misrepresented the benefits consumers could receive from the products, telling consumers they could receive benefits for a longer period of time than was allowed under the terms and conditions of the credit protection products. B.O.A. also led some consumers to believe they would be entitled to a "$25,000 death benefit" by enrolling in Credit Protection Plus when that was not the case. Telemarketers misled consumers by implying the benefits of these products were automatic upon notice of a qualifying event when, in fact, benefits were contingent on the successful completion of a benefit request submission and approval process.

(v) B.O.A. illegally charged customers for these products as soon as they enrolled even if they were not actually receiving the services yet.

(vi) The unfair monthly fees that customers were charged sometimes resulted in customers exceeding their credit card account limits, which lead to additional fees for the customers. Some consumers also paid interest charges on the fees for services that were never received.

(vii) B.O.A. engaged in these unfair billing practices from at least October 2000 through September 2011. About 1.9 million consumer accounts were improperly billed product fees while not receiving the full product services, affecting roughly 1.5 million consumers. The

unfair billing practices resulted in about $459 million in harm to consumers.

(viii) Consumers may have been under the impression that their credit was being monitored for fraud and identity theft, when, in fact, these services were either not being performed at all, or were only partially performed.

(b) As a result of its illegal, unfair, deceptive, and abusive actions in the **Credit Card Scam**, B.O.A. was ordered to undertake the following corrective actions:

(i) B.O.A. was prohibited from marketing any credit protection or credit monitoring add-on products until it submits a compliance plan to the C.F.P.B.

(ii) Consumers were no longer be billed for these products if they are not receiving the promised benefits. B.O.A. was ordered to review and, if necessary, improve its policies to ensure that it does not commit unlawful acts in the future.

(iii) B.O.A. was ordered to provide approximately $ 268,000,000.00 ~~( $~~($ 268 million) in refunds and additional relief to more than 1.4 million customers subjected to deceptive marketing practices. B.O.A. was also ordered to pay approximately $ 459,000,000.00 ($ 459

million) to roughly 1.9 million customer accounts, representing approximately 1.5 million consumers who enrolled in the credit monitoring products and were charged while B.O.A. did not perform all of the promised services.

(iv) B.O.A. reimbursed consumers for the unfair billing practices relating to the identity protection products. For the credit protection products, if the consumers were B.O.A. customers, they were to receive a credit to their accounts. If they were no longer a B.O.A. credit card holder, they were to receive a check in the mail or have charged-off balances reduced by the amount they were charged in fees. Consumers were not required to take any action to receive their credit or check.

(v) B.OA. was ordered to make a $20 million penalty payment to the CFPB's Civil Penalty Fund.

**B. The Garnishment Scam**

19) In 2022, the C.F.P.B. ordered B.O.A. to pay a $ 10,000,000.00 ($ 10 million) civil penalty for illegally garnishing its victims'—customers'—moneys in C.F.P.B. Case No. 2022-CFPB-0002. This will be referred to in this complaint as the **Garnishment**

**Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.B.

(a) The C.F.P.G. described B.O.A.'s misconduct in the **Garnishment Scam** as follows:

(i) B.O.A. falsely represented to customers that their rights to have certain funds exempted from garnishment were governed by the law of the issuing court's state. By stating to its customers that it applied the exemption law of the garnishment issuing state, B.O.A. misrepresented to customers that their rights to have certain funds exempted from garnishment orders were governed by the laws of the issuing states when, actually, in most states, customers' own state laws apply.

(ii) B.O.A. required customers to "direct" it not to contest garnishment orders and to waive the company's liability for its actions regarding the out-of-state garnishment orders. This prevented customers from pursuing legal claims against B.O.A. for improperly handling garnishments. B.O.A. also represented to its customers that they waived their right to hold the company liable for improperly responding to garnishment notices; however, account holders have the right to challenge garnishments despite any language in their account agreements to the contrary.

(iii) B.O.A. acted on garnishment orders without disclosing that the accounts were located out-of-state and protected from the issuing courts' garnishment orders. B.O.A. applied the consumer protections and exemption rights of the state that issued the garnishment order and not those of the state where the individual lived. As a result, it improperly held, froze, and eventually turned over its customers' funds to judgment creditors.

(b) As a result of B.O.A.'s unfair, deceptive and abusive acts in the **Garnishment Scam**, the C.F.P.B. ordered it to:

(i) Refund at least $ 592,000.00 in garnishment-related fees to harmed customers.

(ii) Review and reform its system for processing garnishments, and notify courts or other garnishment issuers when accounts were located out-of-state.

(iii) B.O.A. was ordered to cease including language in customer contracts that purports to limit customer rights to challenge garnishments.

(iv) B.O.A. was ordered to pay a $10,000,000.00 ($ 10 million) dollar penalty to the CFPB, which will be deposited into the CFPB's Civil Penalty Fund.

**C. The Fraud Reporting Scam**

20) In 2022, the C.F.P.B. and the United States Office of the Comptroller of the Currency ("O.C.C.") fined B.O.A. $ 225,000,000.00 ($ 225 million) and required it to pay hundreds of millions of dollars in redress to consumers for botched disbursement of state unemployment benefits at the height of the COVID-19 pandemic. This occurred in C.F.P.B. Case No. 2022-CFPB-0004. This scam will be referred to in this complaint as the **Fraud Reporting Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.C.

(a) The C.F.P.B. described B.O.A.'s misconduct in the **Fraud Reporting Scam** as follows:

(i) In the fall of 2020, and continuing through mid-2021, B.O.A. changed its practices for investigating prepaid debit card fraud on the unemployment insurance benefit accounts. Instead of conducting reasonable investigations, it implemented a fraud filter with a simple set of flags that automatically triggered an account freeze. This set a low bar to freeze the unemployment insurance benefits of many people, harming thousands of legitimate cardholders needing the money. The bank also retroactively applied its fraud filter to deny some notices of

error submitted by prepaid debit cardholders that the bank had previously investigated and paid.

(ii) B.O.A. made it very difficult for people to unfreeze their prepaid debit cards or for people to report fraudulent use of their cards. People with unemployment insurance benefit prepaid debit cards could not make reports online, or in person at bank branches. People were on hold for hours every day for weeks trying to talk to someone at the bank. Furthermore, the bank told customers they had agents available 24 hours a day, seven days a week, when, in fact, it operated a more limited schedule for its claim call center. Because Bank of America was the strongly preferred provider for California unemployment benefits, consumers were caught without any choice to switch providers.

(iii) When consumers sought assistance, the bank often sent them back to the California state unemployment department for verification in order to regain access to their benefits. But the bank knew the department was stretched and unable to provide services; the bank met with the department dozens of times in the summer of 2020 and should have known it was essentially redirecting people into a black hole.

(b) As a result of the illegal, unfair, deceptive, and abusive actions in the **Fraud Reporting Scam**, B.O.A. was ordered to undertake the following corrective actions:

(i) B.O.A. was ordered to pay back the money that they wrongly denied to consumers across the country because of the faulty fraud filter. The bank was also ordered to provide each affected consumer with a lump sum consequential harm payment, which was determined through a methodology of financial harm consumers suffered due to the time their accounts remained frozen or blocked. Finally, affected consumers had the opportunity to receive additional redress through an individualized review process.

(ii) B.O.A. was ordered to pay a $100 million dollar penalty to the CFPB, which will be deposited into the victims relief fund. The penalty reflects the severity and scope of the consumer harm caused by the bank's practices. The OCC is separately fining the bank $125 million to be remitted to the Treasury.

## D. The Theft Scam

21) In 2023, B.O.A. was caught tricking its customers and stealing in excess of $ 100,000,000.00 ($ 100 million) from its poorest customers in C.F.P.B. Case No. 2023-

CFPB-0006. In addition to being ordered to return what it stole, B.O.A. also paid penalties of $ 90,000,000 to the C.F.P.G. and $ 60,000,000 to the O.C.C. This will be referred to in the complaint as the **Theft Scam**. A true and correct copy of the consent order in which B.O.A. pleaded guilty to the conduct described below is attached hereto as Exhibit 3.D.

(a) The C.F.P.B. described B.O.A.'s **Theft Scam** as follows:

(i) B.O.A. had a policy of charging customers $35 after the bank declined a transaction because the customer did not have enough funds in their account. The C.F.P.B.'s investigation found that B.O.A. double-dipped by allowing fees to be repeatedly charged for the same transaction. Over a period of multiple years, B.O.A. generated substantial additional revenue by illegally charging multiple $35 fees.

(ii) To compete with other credit card companies, B.O.A. targeted individuals with special offers of cash and points when signing up for a credit card. B.O.A. illegally withheld promised credit card account bonuses, such as cash rewards or bonus points, to tens of thousands of consumers. B.O.A. failed to honor rewards promises for consumers who submitted in-person or over-the-phone applications. B.O.A. also denied sign-up bonuses to consumers due to the failure of B.O.A.'s business processes and systems.

(iii) From at least 2012, in order to reach now disbanded sales-based incentive goals and evaluation criteria, B.O.A. employees illegally applied for and enrolled consumers in credit card accounts without consumers' knowledge or authorization. In those cases, B.O.A. illegally used or obtained consumers' credit reports, without their permission, to complete applications. Because of B.O.A.'s actions, consumers were charged unjustified fees, suffered negative effects to their credit profiles, and had to spend time correcting errors.

(iv) B.O.A. also violated the Fair Credit Reporting Act by using or obtaining consumer reports without a permissible purpose in connection with unauthorized credit cards, as well as the Truth in Lending Act and its implementing Regulation Z, by issuing credit cards to consumers without their knowledge or consent.

(b) As a result of the foregoing deceptive, unfair, and illegal acts in the **Theft Scam**, B.O.A. was ordered to do the following:

(i) B.O.A. was ordered to stop opening unauthorized accounts and disclose material limitations on any rewards cards bonuses and provide bonuses as advertised. Additionally, B.O.A. was also strictly prohibited from charging repeat non-sufficient funds fees in the future.

(ii) B.O.A. was ordered to compensate consumers charged unlawful non-sufficient funds fees and who have not already been made whole by the bank, totaling approximately $ 80,400,000.00 ($ 80.4 million) in consumer redress. The bank was also ordered to compensate consumers who incurred costs stemming from the unauthorized opening of new credit card accounts, and any customers improperly denied bonuses whom the bank had not already made whole. The bank previously paid around $ 23,000,000/00 ($23 million) to consumers who were denied rewards bonuses.

(iii) B.O.A. was ordered to pay a $ 60,000,000.00 ($60 million) penalty to the CFPB for charging repeat non-sufficient funds fees, and a $ 30,000,000.00 ($30 million) penalty to the C.F.P.B. for its credit card rewards practices and for opening unauthorized accounts. The penalties were deposited into the C.F.P.B.'s victims relief fund. Separately, B.O.A. was also ordered to pay a $ 60,000,000 ($60 million) penalty to the O.C.C. for its double-dipping fee practices.

## III. <u>B.O.A.'s First Wrongful Freeze of Bullion Standard's Account</u>

22) On or about 17 January 2024, Bullion Standard opened a direct deposit account with B.O.A. (the "Account"). Without knowledge of B.O.A.'s fraudulent past,

Bullion Standard rather believed that B.O.A. was an world class bank which was more than capable of handling its business. Bullion Standard's personnel contacted the bank and discussed its business model to ascertain whether B.O.A. was a good bank for it to work with. Because of the nature of the precious metals industry, banks commonly require retailers like Bullion Standard to satisfy criteria additional to a typical business. For instance, Bullion Standard was required to comply with anti-money laundering certifications and present additional evidence of its business's valid, lawful operations. In anticipation of opening the account, Bullion Standard submitted an online application and specified that the account would be utilized as a "precious metals dealer account" in accordance with the bank's pre-populated data form. B.O.A.'s representative explained that they would be more than able to handle Bullion Standard's business. As a further inducement to obtain Bullion Stanard's business, and knowing that Bullion Standard intended on utilizing wire transfers as a core component of its business model, B.O.A. offered an account that would have no fees associated with receiving wire transfers. Based on these representations, Bullion Standard agreed to open an Account with B.O.A. After all of this, Bullion Standard's Account was finally opened on or about 17 January 2024.

23) For the next year, until the occurrence of the facts at issue in this complaint, Bullion Standard conducted its business, instructing its customers to deposit funds into the Account. In approximately one year's time, from January 2024 through February 2025, B.O.A. received approximately $ 4 million ~~n~~in transfers from Bullion Standard's

customers, without incident. In February 2025, Bullion Standard began listing its products with a website, www.findbullionprices.com (the "Listing Service"). Once Bullion Standard began working with the Listing Service, its sales exploded, and most of the $ 4 million in sales occurred in the month February 2025. March 2025 began with a bang, as Bullion Standard saw $ 1.5 million in sales in the first 11 days.

24) That was soon aboutall changed and came crashing to change. a halt when B.O.A. mishandled the Account, failed to exercise reasonable care, made false statements, and generally breached the implied covenant of good faith and fair dealing. As a result of these bad acts, B.O.A. has knowingly and cavalierly destroyed Bullion Standard's business. Only through superhuman efforts has Bullion been able to restart its shuttered business since the filing of the original complaint in this matter.

**A. Customer 1**

25) Between 8 January 2025 and 13 February 2025, Bullion Standard entered into a series of sales transaction with a customer who, to protect the customer's identity, will be identified under the fictitious name "**Customer 1**". Customer 1 purchased approximately $- 380,000.00 of product from Bullion Standard over a series of transactions and sent numerous wire transfers to Bullion Standard's B.O.A. Account to consummate the purchases. For each transaction, after verifying the sales and the availability of the funds, Bullion Standard transferred the funds to its wholesaler so as to fulfill Customer 1's

order(s). Thereafter, Bullion Standard monitored the transactions and confirmed that the product was delivered to Customer 1 for each order. Customer 1 verified their receipt of the product that they ordered on or about 2/17/2025. As far as Bullion Standard knew, this transaction was completed.

26) However, unbeknownst to Bullion Standard, Customer 1, acting on their own and without any instructions from Bullion Standard, gave their product to a third party, whose identity is unknown . For the purposes of this pleading, the third party shall be known as Potential Thief 1. Upon information and belief, that third party utilized false pretenses to wrongfully obtain the product from Customer 1. Upon information and belief, Customer 1 determined that they had been a victim of fraud perpetrated by Potential Thief 1.

27) Customer 1, who was a B.O.A. customer, then went to their local B.O.A. branch to report that their product had been stolen by Potential Thief 1. Customer 1 did not accuse Bullion Standard of committing, participating, or otherwise being aware of the actions of Potential Thief 1.

28) WithoutThereafter, the local branch manager, whose name was "Sherrel" contacted Customer 1 and told Customer 1, while knowing that Bullion was not the thief of Customer 1's gold, that she could help Customer 1 get her money back if she opened a fraud complaint against Bullion.

28)29) Branch manager "Sherrel" then opened such a fraud complaint against Bullion, while acting in her official capacity as a managing agent for B.O.A. and knowing that such a complaint was without factual or legal merit. B.O.A. continued the complaint without conducting any investigation into the matter, exercising reasonable care, or acting in accordance with its duties of good faith and fair dealing, on. On or about 11 March 2025, and without providing any notice to Bullion Standard, B.O.A. debited Bullion Standard's account in the amount of approximately $ 381,000.00.

**B. Customer 2**

29)30) On or about 2/27/2025 Bullion Standard entered into a sales transaction with a customer who, to protect the customer's identity, will be identified under the fictitious name "**Customer 2**". Customer 2 purchased approximately $ 75,000 of product from Bullion Standard and sent a wire transfer to Bullion Standard's B.O.A. Account to consummate the purchase. After verifying the sale and the availability of the funds, Bullion Standard transferred the funds to its wholesaler so as to fulfill Customer 2's order. Thereafter, Bullion Standard monitored the transaction and confirmed that the product was delivered to Customer 2. Customer 2 verified their receipt of the product that they ordered on or about 3/6/2025 As far as Bullion Standard knew, this transaction was completed.

30)31) However, unbeknownst to Bullion Standard, Customer 2, acting on their own and without any instructions from Bullion Standard, gave their product to a third

party, whose identity is unknown . For the purposes of this pleading, the third party shall be known as Potential Thief 2. Upon information and belief, that third party utilized false pretenses to wrongfully obtain the product from Customer 2. Upon information and belief, Customer 2 determined that they had been a victim of fraud perpetrated by Potential Thief 2.

~~31)~~32) Customer 2 then went to their local bank to report that their product had been stolen by Potential Thief 2. Customer 2 did not accuse Bullion Standard of committing, participating, or otherwise being aware of the actions of Potential Thief 2.

~~32)~~33) Without conducting any investigation into the matter, exercising reasonable care, or acting in accordance with its duties of good faith and fair dealing, on or about 12 March 2025, without providing any notice to Bullion Standard, B.O.A. debited Bullion Standard's account in the amount of approximately $ 75,000.00.

///

///

///

**C. Bullion Standard Obtains the Return of Its Funds**

~~33)~~34) After the wrongful debits identified above, B.O.A. showed Bullion Standard's Account had a balance of approximately ~~$~~ $ 430,000.00. B.O.A. failed to provide contemporaneous notice or explanation of its actions to Bullion Standard. Bullion

Standard was completely unaware of B.O.A.'s actions until B.O.A. logged into its account to verify it had received funds for another customer's purchase.

~~34)~~35) At that point Bullion Standard discovered that its account was negative and that it was without any ability to collect payments or conduct transactions for its customers. Bullion Standard's business was entirely shut down as a result of B.O.A.'s wrongful conduct.

36) Accordingly, Bullion Standard undertook a furious effort to understand what happened to its money.

~~35)~~37) Bullion Standard's personnel spent countless hours every day on B.O.A.'s "customer support" phone number, but it quickly became apparent that B.O.A.'s call center was unable to answer any meaningful questions about the account. Its representatives were unable to provide details about the nature of the bank's debits. Bullion Standard received contradictory and inconsistent information.

38) Notwithstanding this, Bullion Standard informed and advised B.O.A. that it would lose business and its relationships would be harmed if B.O.A. did not clear the situation. In calls with the "customer support" Bullion Standard explained that the negative balance would prevent it from paying orders to its wholesaler, which was Upstate Coin & Gold (the "Wholesaler" or "Upstate"), which with Bullion maintained a business-to-business relationship. This relationship was advantageous to Bullion because Upstate allowed Bullion to order in advance in exchange for being permitted to make automatic

debits from Bullion's Account. Bullion explained that when B.O.A. wrongfully caused Bullion's Account to go negative, it would interfere with its economic relationship with its Wholesaler. Without its relationship with its Wholesaler, Bullion would be unable to fulfill orders to its clients and it would have to close its online storefront—its only source of business. Bullion advised B.O.A. that the loss of this relationship would result in "devastating losses" to its business because it would be unable to fulfill any orders. In February 2025, Bullion had filled nearly $ 4 million in orders and in March 2025, prior to the wrongful debits described above, Bullion had filled approximately $ 1.5 million in orders.

~~36)~~39) Bullion Standard provided documentary evidence demonstrating the validity of the transactions and confirming that Customer 1 and Customer 2 actually did purchase and receive the product from Bullion Standard.

~~37)~~40) During this time, Customer 1 and Customer 2 both notified Bullion Standard that they believe their product had been stolen by Potential Thief 1 and Potential Thief 2, respectively.

~~38)~~41) Concurrent with its efforts to deal with B.O.A., Bullion Standard also worked to understand what Customer 1 and Customer 2 had said to the banks. Both Customer 1 and Customer 2 confirmed again that they had received the product that they ordered and that they knew that Bullion Standard did not do anything wrong. Customer 1 and Customer 2 each confirmed to Bullion Standard that they never told the bank that they

believed their purchase from Bullion Standard was fraudulent or made any comments indicating that Bullion Standard was engaged in fraud of any kind.

~~39)~~42) Thereafter, Customer 1 agreed to contact their local B.O.A. and reiterate to them that Bullion Standard had not engaged in fraud. They requested that they did not want Bullion Standard's funds frozen or withheld any further. B.O.A. noted the request, but did not immediately return Bullion Standard's money.

~~40)~~43) On or about 13 March 2025, Bullion Standard visited the B.O.A. branch located at 655 W. Broadway, Ste 101, San Diego California, 92101. At this meeting, Bullion Standard met with a manager (the "Manager") who was also unable to provide any additional information or introduce Bullion Standard to B.O.A.'s legal department to resolve the matter. The Manager was advised that they were not given any contact information for the legal department and could not connect Bullion Standard with a regional manager to discuss the problems. Notwithstanding this, the Manager did call B.O.A.'s customer service line and ultimately was able to use their credentials to dial into B.O.A.'s fraud prevention department. This was the first time any B.O.A. personnel had offered to provide this level of assistance to Bullion Standard.

~~41)~~44) The fraud prevention employee on the phone call further confirmed that Customer 1 had requested that the funds be released to Bullion Standard and that the investigation into the matter was being closed.

~~42)~~45) However, B.O.A. still did not release Bullion Standard's funds associated with Customer 1's purchase ~~for several days~~until 13 March 2025.

~~43)~~46) Thereafter, Customer 2 also contacted their bank to reiterate to them that Bullion Standard had not engaged in fraud. They requested that they did not want Bullion Standard's funds frozen or withheld any further. B.O.A. noted the file, but did not immediately return Bullion Standard's money.

~~44)~~47) Several days later, on or about ~~19~~17 March 2025, B.O.A. finally credited Bullion Standard's funds to it and unfroze the account. Of course, the funds never should have been withdrawn and the Account never should have been frozen. It was only a result of B.O.A.'s failure to adequately investigate the matter or act in accordance with its duty of good faith and fair dealing that the debits were made and the Account was frozen. In sum, B.O.A. had wrongfully debited Bullion Standard's account for a period in excess of one week, causing Bullion Standard to suffer actual damages in an amount to be proven at trial.

~~45)~~48) Also on 19 March 2025, over a week after taking Bullion Standard's funds, B.O.A. mailed written notice to Bullion Standard of the "disputes" relating to Customer 1 and Customer 2's funds. These notices included materially false statements indicating that the transactions related to Customer 1 and Customer 2 were "unauthorized," when in fact both Customer 1 and Customer 2 advised Bullion Standard and B.O.A. that purchases from Bullion Standard were legitimate.

~~46)~~49) Notwithstanding B.O.A.'s false and wrongful actions related to Customer 1 and Customer 2, B.O.A. advised Bullion Standard that both "investigations" were closed and that Bullion Standard's account would be unfrozen so that it could continue its business. This statement was made by a customer service representative on a telephone call. This statement was materially false.

~~47)~~50) Bullion Standard did not know it at the time, but B.O.A. had actually determined that Bullion Standard committed fraud on its customers, notwithstanding the undisputed evidence to the contrary. Additionally, Bullion Standard is informed and believes, and thereon alleges that B.O.A. had flagged Bullion Standard's account for fraud. None of these facts were known to Bullion Standard until much later, but should have been disclosed by B.O.A. on the phone call of mid-March 2025.

~~48)~~51) At this time, Bullion Standard understood it would need to establish a new banking relationship to continue its business. As outlined above, banks require several weeks of compliance and due diligence before opening a bank account for a bullion retailer. At the filing of this Second Amended Complaint, Bullion Standard ~~is undergoing the compliance process, but~~has been able to reestablish banking connections; however, B.O.A. has not ~~yet completed~~, to Bullion's knowledge, withdrawn the false determination of fraud that it has made.

~~49)~~52) Left without an account for the relevant times, Bullion Standard is seeing its business damaged daily. It has lost its goodwill and future business with its

customers. It'sIts inactivity in the precious metals business has caused it be delisted amongst various indexes that identify bullion retailers to the general public., including a website known as www.findbullionprices.com. On top of these harms, Bullion Standard has lost profits, including, as explained below, the most lucrative day in the history of precious metals sales.

## IV. B.O.A. Wrongfully "Determined" That Bullion Standard Committed Fraud and Withheld Customer 3's Funds

50)53) On or about 3/27/2025 Bullion Standard entered into a sales transaction with a customer who, to protect the customer's identity, will be identified under the fictitious name "**Customer 3**". Customer 3 purchased approximately $ 50,000 of product from Bullion Standard and sent a wire transfer to Bullion Standard's B.O.A. Account to consummate the purchase. Bullion Standard attempted to verify the sale and the availability of the funds so that it could pay the wholesalerWholesaler to fulfill Customer 3's order.

51)54) Instead, Bullion Standard logged into its account online and learned that B.O.A. had frozen the Account, makingtaking the funds and making all access from the account impossible..

52)55) Bullion Standard contacted B.O.A.'s fraud prevention line to enquire as to the "freeze.." The representative advised Bullion Standard that the transaction was

marked as "potentially fraudulent," although the representative confirmed that there was not a complaint from Customer 3 indicating the amount was fraudulent.

~~53)~~56) Bullion Standard contacted Customer 3 to explain the situation to them. Bullion Standard requested that they contact B.O.A. to explain the situation was not fraudulent and request that the funds be cleared so that the transaction could complete. In so doing, Bullion specifically advised BOA of Customer 3's identity, contract to purchase platinum from Bullion, and Bullion's need to access the Account (and the funds deposited therein) to fulfill Customer 3's order. Notwithstanding this, B.O.A., intentionally and knowingly interfered with Bullion's contract with Customer 3 by taking—stealing—the money out of the Account, freezing the Account, and preventing Bullion from fulfilling its order with Customer 3.

~~54)~~57) Customer 3 was irate and did not believe that a bank would act in a manner that B.O.A. had acted. Nonetheless, Customer 3 attempted to contact the bank as requested, but B.O.A. refused to speak with Customer 3 regarding the transaction. Upon information and belief, Customer 3's bank also attempted to secure the return of the funds, and B.O.A. also refused to return the money to the Customer 3's bank.

~~55)~~58) Throughout this time period, Bullion Standard contacted B.O.A.'s fraud prevention line daily to obtain updates on the matter. Ultimately, the representatives changed their story about the nature of the account. It was at this point that B.O.A.'s representatives revealed that Bullion Standard was "determined" by B.O.A. to have

committed fraud in connection with the transactions with Customer 1 and Customer 2, despite the overwhelming and undisputed evidence that Bullion Standard did not commit fraud. Because of this false determination, B.O.A. made the decision to close Bullion Standard's Account. Rather than notify Bullion Standard of its intent to close the Account, B.O.A. had reopened the Account and allowed Bullion Standard to receive funds for a sale. At that point, B.O.A. closed the account and froze Customer 3's funds from Bullion Standard's account.

59) Throughout this time period, Bullion Standard also told B.O.A. that these actions would cause devastating harm on Bullion's business. Bullion reiterated its concerns regarding the potential loss or interference with its Wholesaler (Upstate) as pleaded above.

60) Further, Bullion Standard also advised B.O.A. that the bank's conduct imperiled Bullion Standard's status as a "listed" bullion seller. Bullion Standard had an economic relationship with a business that ran a website at the following URL: www.findbullionprices.com. Bullion Standard paid the owner of this website a monthly fee to be "listed" on this website (the "Listing Service"). In exchange for this website, Bullion's products were listed on this website and Bullion Standard received advertising space on the website. At the time that B.O.A. stole Bullion's money and "froze" the account, approximately 85% of Bullion's sales were generated through the Listing Service. Bullion Standard advised B.O.A. personnel in calls, meetings, or both, of its economic

relationship with the Listing Service. Bullion Standard further advised B.O.A. that if Bullion was unable to fulfill orders, customers would complain to the Listing Service, which would result in Bullion being "delisted," or being taken off of the Listing Service.

~~56)~~61) Bullion Standard requested that the bank return the funds directly to Customer 3, but B.O.A. denied this request. Its representatives stated that the funds would be returned to Bullion Standard, but the representatives each had different dates for the return. One representative stated that the funds would be returned when the account was closed in the "next few weeks" (which would have been mid-April 2025). Another representative stated that the funds would be returned on or about 5/13/2025. A third representative said the funds would not be returned until it was determined that Bullion Standard had not engaged in fraud, and that investigation would take up to 90 days~~.~~ (approximately July of 2025).

62) Bullion Standard was without a bank account and it was unable to process customer orders. As feared, customers complained to the Listing Service of Bullion Standard's inability to take orders, and Bullion Standard was delisted. As a result, Bullion Standard lost out on the benefits of its valuable economic relationship with the Listing Service.

~~57)~~63) Bullion filed its original claim on or about 4/11/2025 and B.O.A. was served shortly thereafter. Upon information and belief, B.O.A. had not conducted any

investigation as to whether or not any fraudulent activity actually occurred on B.O.A.'s account at that point.

58)64) On or about 7/3/2025, Bullion's counsel sent B.O.A. a written demand for the return of its funds. That letter is attached hereto as Exhibit 1 (with Personally Identifying Information redacted). Notably, in that demand, Bullion provided indisputable proof of the origin of Customer 3's funds. The letter further put B.O.A. on notice that because it had failed to act in good faith that the funds would be treated as stolen from this point forward.

59)65) On or about 7/16/2025, B.O.A. responded, falsely claiming that it was permitted to keep Bullion's money so long as it determined that it—in its unilateral discretion—determined that the funds were the subject of fraud or other illegal activity. B.O.A.'s letter is attached hereto as Exhibit 2. Notably, B.O.A. conceded by silence that, contrary to its customer service representatives' statements to the contrary, there was no investigation. B.O.A. had misrepresented the status of the investigations into Bullion's Account. Even worse, B.O.A.'s letter implied that it was somehow authorized to keep Bullion's money forever pursuant to the terms of a so-called deposit agreement. These statements validated Bullion's concerns that B.O.A. had failed to conduct any investigation into the claimed fraudulent activity prior to 4/11/2025. Had such an investigation occurred, then B.O.A.'s letter of 7/16/2025 would have included more substantive discussion of such an investigation, instead of ignoring any mention of an investigation.

66) B.O.A.'s letter is further incorrect because no contract can authorize B.O.A.'s conduct.

(a) As a matter of law, any such contract is unlawful under § 1668 of the California Civil Code, which provides:

> All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

(b) As a matter of law, any such contract which is unconscionable, may be barred, in whole or in part, from being enforced, pursuant to § 1670.05 of the California Civil Code, which provides:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(c) As a matter of law, any such contract, which is not lawful, may be barred from being enforced under § 1667 of the California Civil Code. Pursuant to § 1667, this includes contracts that are: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals." As alleged above, B.O.A. has a pattern of engaging in illegal, immoral, abusive, fraudulent, deceptive, and unfair conduct against millions of people in the

United States as documented in the Credit Card Scam, the Garnishment Scam, the Fraud Reporting Scam, and the Theft Scam. These actions were all facilitated through deviously crafted deposit agreements that were presented to customers in misleading ways and sought to deprive them of their substantive rights, just like in this case. On their face these actions (including B.O.A.'s actions in this case)—facilitated by Machiavellian deposit agreements—are "contrary to good morals." Further, they are not only "contrary to express provision[s] of law," to the extent B.O.A. believes they found a legal "loophole" then those actions are "contrary to the policy express law, though not expressly prohibited."

60)67) On or about 8/14/2025, Bullion responded to B.O.A.'s letter. In its letter, attached hereto as Exhibit 3, Bullion debunked B.O.A.'s false statements and put it on notice of the stolen character of the moneys it is now evidently withholding in perpetuity.

61)68) To date, B.O.A. has wrongfully retained and kept the funds Customer 3 wired to Plaintiff for the purchase of precious metals products. Those funds are now stolen property that has been withheld and/or concealed from Bullion by B.O.A. because B.O.A. has misappropriated them to its own use and refused to return them to Bullion either in violation of California Penal Code §§ 484, 503, and 506 or, including through the making material false misrepresentations as outlined herein.

~~///~~

~~///~~

~~///~~

**V. Bullion Standard is Left Without Accounts for the Biggest Trading Day in History**

~~62)~~69) On 4/4/2025, President Trump unveiled a series of new tariffs to be imposed by the United States.

~~63)~~70) Precious metals investors (including Bullion Standard's customers and potential customers) had been eying this date as an important event in the purchase and sales of precious metals.

71) B.O.A. knew of "Tariff Day" and the effect this would have on a bullion reseller, like Bullion Standard. B.O.A. knew of Tariff Day because President Trump issued an executive order two days in advance of his "Tariff Day" announcement, on 2 April 2025. As of March 31, 2023, B.O.A. had approximately $ 2,400,000,000,000.00 ($ 2.4 trillion) in combined assets and $ 1,900,000.000,000.00 ($ 1.9 trillion) in domestic deposits. Thus, a bank of B.O.A.'s size undoubtedly knew of President Trump's announcements and monitored economic developments from the world at large, including those coming from the United States' President.

72) Further, B.O.A. gives investment advice to its customers related to investing in precious metals. Also, on information and believe, B.O.A. itself invests in precious

metals. Accordingly, B.O.A. knew or should have known, the effects of Tariff Day on a bullion reseller like Bullion Standard.

~~64)~~73) As a result of B.O.A.'s bad acts, however, Bullion Standard's Account was shuttered.

~~65)~~74) On 4/4/2025, President Trump announced the new tariff regime and the precious metals industry exploded. Prices of gold and silver crashed significantly, where the volatility fueled mania brought enormous buying pressure into the precious metals sector, and all Bullion Standard could do was watch. Its personnel fielded dozens of calls and emails from potential customers who were unable to purchase through Bullion Standard. The customers that joined Bullion Standard's Membership Program were livid that their membership would not permit them to participate in this historic event.

~~66)~~75) Defendant knew, at all times, that Plaintiff is a precious metal retailer, as evidenced by Plaintiff's numerous communications to Defendant, from the opening of the Account through Defendant's mishandling of the debits/freezes associated with Customer 1 and Customer 2.

~~67)~~76) ~~To date, Bullion Standard is still working to reestablish its banking relationships, but the damage has been done. Through its bad acts, B.O.A. has caused Bullion Standard's business to shutter and lose profits~~At the filing of its original complaint, Bullion had lost its banking relationships because of B.O.A.'s closure of the Account as well as B.O.A.'s identification of Bullion as a a fraudulent merchant. Since the filing of

the original complaint, Bullion has been able to reestablish some, but not all of its banking relationships. For instance, it has a new account through which it can receive wires; however, the reputational harm from being labeled a fraudulent merchant by B.O.A. has not been completely mitigated because B.O.A. has not conducted an investigation of the underlying transactions, taken any steps to clear Bullion's name, or released Customer 3's funds. Through the bad acts alleged above, B.O.A. has caused Bullion Standard's business to temporarily close and lose profits. Only through the exercise of extraordinary efforts has Bullion been able to mitigate some but not all of its harm by re-establishing its business. Bullion has still suffered, and will continue to suffer, lost profits for the time it was closed and it has seen a delayed growth in its business as it was forced to start over because of the harms inflicted by B.O.A. Further, upon information and belief, B.O.A. has reported to other banking institutions utilizing systems akin to a credit report that it has closed B.O.A.'s account for fraud related to transactions involving Customer 1 and Customer 2. This reporting is not publicly available but is in B.O.A.'s possession. Discovery and verification of these comments can only be obtained through compulsory discovery procedures. B.O.A. made these statements in gross disregard of the truth, namely that Bullion Standard did not defraud Customer 1 or Customer 2, that B.O.A. was provided with incontrovertible evidence of Bullion Standard's innocence, and that Customer 1 and Customer 2 both advised B.O.A. that Bullion Standard did not defraud them. Bullion Standard's merchant account, not administered by B.O.A. but rather by another institution, was closed and has

had a chargeback in excess of $ 193,000 applied against it. Upon information and belief, Bullion Standard alleges that B.O.A.'s false statements through inter-bank communications and/or databases are the cause for the losses associated with Bullion Standard's merchant services account.

~~68)~~77) Until B.O.A.'s negligent and bad faith conduct, Bullion Standard had steadily increased its good will in the marketplace, resulting in Bullion Standard collecting profits and setting an expectation for future profits. As a result of B.O.A.'s bad acts, Bullion Standard has lost out on:

(a) Moneys frozen and being held by BOA for an unknown amount of time from its account, in an amount to be proven at trial;

(b) Actual sales, in an amount to be proven at trial;

(c) Financial inability to meet its obligations as funds owed to primary ~~wholesaler~~Wholesaler cannot be repaid;

(d) Harm to Bullion Standard's relationship with Customer 3, the Wholesaler, and the Listing Service;

~~(d)~~(e) Reputational harm due to Bullion Standards inability to fulfill customer order;

~~(e)~~(f) Future profits and lost good will, in an amount to be proven at trial.

~~69)~~78) For these reasons, Bullion Standard brings this complaint.

## FIRST CAUSE OF ACTION

## (DECLARATORY RELIEF)

## (AGAINST ALL DEFENDANTS)

~~70)~~79) PLAINTIFF hereby incorporates by reference paragraphs 1-~~65~~78 of this Complaint as if fully set forth herein.

~~71)~~80) An actual controversy has arisen and now exists between Plaintiff and Defendant concerning their respective rights and duties in that Plaintiff contends that Defendant has wrongfully determined that Plaintiff's business was fraudulent based upon Defendant's "investigation" into the transactions involving Customer 1 and Customer 2. Based upon this wrongful determination, Defendant closed Plaintiff's Account and made false statements about Plaintiff to other banking institutions that Plaintiff engaged in fraudulent conduct.

~~72)~~81) Plaintiff desires a judicial determination of its rights and duties, and a declaration that it did not commit fraud against Customer 1 and Customer 2.

~~73)~~82) A judicial declaration is necessary and appropriate at this time under the circumstances that Plaintiff did not commit fraud against Customer 1 and Customer 2.

## SECOND CAUSE OF ACTION

## (~~RECEIPT~~VIOLATION OF ~~STOLEN PROPERTY)~~

## ~~(~~CAL. PENAL CODE § 496)

## (AGAINST ALL DEFENDANTS)

~~74)~~83) PLAINTIFF hereby incorporates by reference paragraphs 1-~~73~~82 of this Complaint as if fully set forth herein.

84) California Penal Code § 496 (a) establishes as a crime for one who "receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals . . . withholds, or aids in concealing . . . or withholding any property from the owner, knowing the property to be so stolen . . . ."

85) The phrase "any manner constituting theft" under Penal Code § 496(a) has been broadly construed and includes:

(a) To "steal [or] take . . . the personal property of another" (theft);

(b) To "knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . ." (theft by false pretenses);

(c) To "fraudulently appropriate property which has been entrusted to him or her" (embezzlement);

(i) "Embezzlement" has further been defined to be "the fraudulent appropriation of property by a person to whom it has been intrusted" by Cal. Penal Code § 503.

(ii) Further, Cal. Penal Code § 506 provides that, "[e]very . . . banker . . . otherwise intrusted with or having in his control property for the use of

any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose . . . is guilty of embezzlement."

86) California Penal Code § 496 (c) provides that "[a]ny person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

87) Thus, as will be explained below, B.O.A. is liable to Bullion through the application of § 496, subds. (a) and (c) by committing the theft-based crimes herein allege as well as "withholding" and "concealing" the stolen funds from Bullion. B.O.A. committed the theft based crimes by inducing Bullion to deposit funds through either or both of two separate theft-based schemes: an Embezzlement Scheme, or a Theft Through False Pretenses Scheme.

~~75)~~88) On or about 3/27/2025, B.O.A. falsely and wrongfully stole approximately $ 49,526.90 of Bullion's money related to Customer 3's deposit which was to be utilized to purchase five bars of Platinum (the "Platinum Money"), as well as an additional $ 741.01 which was already in the account by committing the crimes of embezzlement (Cal. Pen. Code §§ 484, 503, and 506.

~~76) B.O.A. stole Bullion's money utilizing either or both of two separate theft-based schemes: an Embezzlement Scheme, or a Theft Through False Pretenses Scheme.~~

~~77)~~89) Under the **Theft Through False Pretenses Scheme**, B.O.A. lured Bullion into making additional deposits which B.O.A. would then "Freeze"—aka steal—without performing an adequate investigation. Upon the facts known to Bullion now, this is how B.O.A. perpetrated the Theft Through False Pretenses Scheme:

(a) On or about 3/13/2025 and 3/17/2025, B.O.A.'s fraud prevention employees confirmed to Bullion's personnel that they had confirmed that complaints filed by Customers 1 and 2 were being withdrawn, respectively, that there was no fraud on Bullion's account, that the freezes on Bullion's account were being lifted, and that there was no further fraud investigations pending against Bullion's account.

(b) These statements were misleading. Although Customer 1 and Customer 2 had withdrawn their complaints and acknowledged that Bullion had not stolen any moneys from them, B.O.A. had apparently already begun plans to close Bullion's account and "freeze" Bullion's funds indefinitely.

(c) B.O.A. never told Bullion of its secret plans to close the account and to "freeze" Bullion's moneys.

(d) Had Bullion known of B.O.A.'s plans to indefinitely freeze Bullion's funds, Bullion would have opened a bank account elsewhere so that

B.O.A. would be unable to embezzle, or otherwise steal, any money from Bullion.

(e) Bullion would not have utilized the Account for those funds had B.O.A. not made the misrepresentations to Bullion.

(f) B.O.A. made these misrepresentations to Bullion with the intent of taking Bullion's money and misappropriating said money to its own purpose. B.O.A.'s fraudulent intent can be further inferred through its parallel bad conduct in the Fraud Scam and the Theft Scam when B.O.A. pleaded guilty to stealing in excess of $ 100,000,000.00 from customers across the nation.

~~78)~~90) Alternatively, or additionally, B.O.A. also engaged in the **Embezzlement Scheme**, outlined below:

(a) Independent of any misrepresentations B.O.A. made to Bullion, at some point in the process of closing Bullion's Account, B.O.A. has made the determination that it never needs to return the moneys it has taken from Bullion's Account.

(b) Bullion has never consented to this taking and has instead demanded the return of its moneys.

(c) Despite this, B.O.A. has falsely and fraudulently claimed that it is entitled to take Bullion's money so long as it believes that Bullion's ~~account~~Account was subject to fraud or other improper conduct.

(d) However, B.O.A. has never had a legitimate basis to believe that Bullion's Account was subject to fraud or other improper conduct because B.O.A. has never conducted an investigation into whether such conduct has ever occurred.

(e) In fact, Bullion has provided in numerous instances evidence demonstrating that it is not subject to fraud. Bullion's own customers, such as Customer 1, Customer 2, and Customer 3, have all called B.O.A. to explain that Bullion did not commit fraud against them. Based upon these statements, B.O.A.'s fraud prevention department closed the fraud investigations.

(f) B.O.A. has no good faith basis to withhold Bullion's funds, and thus, the taking of Bullion's funds are an illegal and unauthorized embezzlement in violation of California Penal Code §§ 484, 503, and 506.

(g) B.O.A.'s illegal and criminal intent is consistent with that demonstrated when it stole in excess of $ 727,000,000.00 from its customers in the Credit Card Scam and the Garnishment Scam as outlined above.

~~79)~~91) As of ~~7/~~3/~~2025~~4/2026, the value of five platinum bars had appreciated to ~~$ 68,188.85~~approximately $ 150,000.

92) Under each of these schemes, B.O.A. committed several theft-based crimes under §§ 484, 503 and 506 of the California Penal Code by taking the moneys out of

Bullion's Account without Bullion's authorization or consent and refusing to return the moneys, despite Bullion's repeated demands. At the filing of this Second Amended Complaint, the time of the taking will have been nearly one year ago, and B.O.A. has recalcitrantly refused to return any portion of the funds, despite: (1) being provided incontrovertible proof that the moneys do not belong to it, (2) receiving numerous letters demanding the moneys return, (3) being sued in state court, (4) removing this case to federal court, and (5) wrongfully/illegally exercising sole dominion and control over the moneys for the past year. The crimes that B.O.A. has committed include: Theft, Theft by False Pretenses, Embezzlement, and Embezzlement by a Banker.

93) Bullion has placed B.O.A. on notice of the stolen nature of the funds and requesteddemanded their return, as outlined in Exhibits 1 and 3; however, B.O.A. has withheld and concealed said funds.

94) Thus, B.O.A. is in violation of § 496 of the California Penal Code. – because:

(a) The moneys were stolen by B.O.A. through commission of the theft crimes alleged herein;

(b) B.O.A. is in possession of the moneys, *e.g.*, it is "conceal[ing]" and "withhold[ing] the property from the owner, knowing the property to be so stolen" in violation of § 496, subd. (a).

(c) B.O.A. knows of the stolen nature of the moneys because, like any other resident in California it is presumed to have knowledge of California's

Penal Code which criminalizes theft-based crimes, and also because Bullion put it on notice of the stolen nature of the moneys in Exhibits 1 and 3.

~~80)~~95) Accordingly, Bullion is entitled to treble damages and attorneys fees pursuant to subdivision (c) of § 496 of the California Penal Code.

~~81)~~96) B.O.A.'s actions as outlined above have been authorized, ratified, and consented to by B.O.A.'s highest levels as demonstrated by the statements made by its counsel in Exhibit 2, which countenanced such acts.

## THIRD CAUSE OF ACTION
## (INDEBITATUS ASSUMPSIT)
## (AGAINST ALL DEFENDANTS)

~~82)~~97) PLAINTIFF hereby incorporates by reference paragraphs 1-~~75~~96 of this Complaint as if fully set forth herein.

~~83)~~98) On or about March 27, 2025, B.O.A. has become indebted to Plaintiff in the sum of $ 50,~~927~~267.91 for money had and received by Defendant for the use and benefit of Plaintiff

~~84)~~99) Plaintiff has repeatedly demanded payment from Defendant. The last demand was made on 8/14/2025.

~~85)~~100) No payment has been made by Defendant to Plaintiff, and there is ~~no~~now owing the sum of $ 50,~~927~~267.91, with interest on that amount at the legal rate from 3/27/2025.

**FOURTH CAUSE OF ACTION**

**(INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS)**

**(AGAINST ALL DEFENDANTS)**

~~86)~~101) PLAINTIFF hereby incorporates by reference paragraphs 1-~~85~~100 of this Complaint as if fully set forth herein.

~~87)~~102) On or about March 27, 2025, Plaintiff and Customer 3 entered into a valid contract for the purchase of precious metals for approximately $ 50,000.

~~88)~~ Defendant ~~knew of~~froze Plaintiff's ~~contract with Customer 3 by virtue of the facts alleged above.~~

~~89)~~103) ~~Defendant converted~~Account and ~~misappropriated to its own use~~took the funds that Customer 3 deposited into Plaintiff's Account, leaving Plaintiff unable to fulfill Customer 3's order.

104) ~~Defendant~~Thereafter, Plaintiff contact Defendant and advised it of Plaintiff's contract with Customer 3 because Bullion specifically advised BOA of Customer 3's identity, contract to purchase platinum from Bullion, and Bullion's need to access the Account (and the funds deposited therein) to fulfill Customer 3's order.

105) Notwithstanding this, Defendant refused to return the money to either Plaintiff of to Customer 3 despite knowing that the money did not belong to Defendant. Instead, Defendant kept the money for itself —a classic instance of theft. What's worse, Defendant further refused to reopen the account, ironically claiming that Plaintiff, and not Defendant, had committed crimes.

106) Defendant knew that taking—and not returning—the funds from Plaintiff's Account was certain or substantially certain to disrupt Plaintiff's contractual relationship with Customer 3.

~~90)~~107) Defendant further knew of the wrongful nature of its conduct because it had already been punished and fined an amount in excess of $ 1,000,000,000.00 ($ 1 billion) by the C.F.P.B. and the O.C.C. for engaging in similar conduct in the Credit Card Scam, Garnishment Scam, and Fraud Reporting Scam~~ outlined above.~~. These Scams demonstrate that B.O.A. not only has a pattern of defrauding and stealing from its customers, but also that its upper levels of management know of the wrongfulness of the company's actions as follows:

(a) In the Credit Card Scam B.O.A. misrepresented to consumers the nature of its accounts so that it could obtain $ 459 million in fees from them. In this case, B.O.A. misrepresented to Plaintiff the nature of its "investigation" into the Account and ultimately took approximately $

50,000 based upon those misrepresentations knowing that Plaintiff needed those funds to fulfill Customer 3's orders.

(b) In the Garnishment Scam, B.O.A. misrepresented to consumers their rights under the law so as to relieve B.O.A. of its own obligations, resulting in losses to consumers that they otherwise would not have suffered. B.O.A. was ordered to pay a $ 10 million penalty into the C.F.P.B.'s Civil Penalty Fund. Similarly, B.O.A. failed to investigate the nature of the funds being deposited into the Account and simply kept them for itself without regard to Plaintiff's or Customer 3's rights under the law.

(c) In the Fraud Reporting Scam, B.O.A. set up an automated fraud filter with unreasonably low "flags" that automatically triggered an account freeze that harmed thousands of consumers by depriving them of their unemployment benefits. This is similar to this case because B.O.A.'s fraud reporting system also proved to be faulty and failed to correct itself here, causing harm to Plaintiff and Customer 3.

(d) In the Theft Scam, B.O.A. stole money from its customers and set up fraudulent bank accounts under sneaky deposit agreements which were also utilized to steal money from different customers. This is similar to this case because B.O.A. has stolen money from Bullion Standard and is

attempting to utilize a so-called, but unproven and unalleged, deposit agreement to "justify" its theft.

108) In all instances, B.O.A. had notice that these business practices would be likely to disrupt Bullion's contractual relationship with Customer 3 because it had entered into consent judgments regarding the Credit Card Scam, the Garnishment Scam, and the Fraud Reporting Scam.

~~91)~~109) Because of Defendant's wrongful conduct, Plaintiff is unable to deliver $ 50,000 of precious metals to Customer 3 as Customer 3 had ordered ~~because~~. As a result of the volatility of the precious metals market~~, and, accordingly,~~ it will cost more than $ ~~50~~150,000 to obtain for Customer 3 the product that Customer 3 ordered.

~~92)~~110) Additionally, Plaintiff will lose out on continued business from Customer 3 because Customer 3 has lost all faith and trust in Plaintiff's ability to fulfill orders. This will result in damages to Plaintiff in the form of loss or reputation, lost future profits, and other damages in a sum to be proven at trial.

~~93)~~111) The aforementioned acts of Defendant were willful, malicious, oppressive, and/or fraudulent. Plaintiff is therefore entitled to an award of punitive damages. Defendants' actions were instructed, approved, ratified, or consented to by the supervisors and other managing agents that supervised Defendant's fraud prevention unit and customer service hotlines.

///

///

///

///

///

## FIFTH CAUSE OF ACTION

## (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

## (AGAINST ALL DEFENDANTS)

~~94)~~112) PLAINTIFF hereby incorporates by reference paragraphs 1-~~92~~111 of this Complaint as if fully set forth herein.

~~95)~~ As outlined above, Plaintiff had built goodwill and a customer base generating approximately $ 4 million in sales during January 2024 through February 2025, and another $ 1.5 million in the first eleven days of March 2025, which were handled through Plaintiff's Account ~~over the last year.~~

~~96)~~113) ~~Defendant knew of these sales by virtue~~. Specific instances of ~~the facts outlined above.~~ Plaintiff's prospective economic opportunities include, but are not limited to:

(a) Customer 3;

(b) The Wholesaler (Upstate Coin & Gold);

(c) The Listing Service (www.findbullionprices.com).

~~97)~~114) As a result of its considerable track record of success, Plaintiff anticipated that it would generate at least another $ 4 million in sales per year for the next several years of its business. Based on the extreme growth patterns Bullion Standard saw during January through March of 2025, Bullion Standard expects that this number would have grown even larger.

~~98)~~115) In addition to above, as a result of historic events, Plaintiff expected to have an additional $ 1 million – $ 2 million in sales on the day of ~~March 27,~~4 April 2025.

116) Plaintiff advised Defendant of these relationships as follows:

(a) **Customer 3**: After Defendant stole Plaintiff's money and froze the Account at the end of March 2025, Plaintiff advised Defendant of the existence, nature, and amount of Customer 3's purchase;

(b) **The Wholesaler**: Plaintiff informed Defendant of its relationship with the Wholesaler twice. The first time occurred when Defendant took the money associated with Customer 1's and Customer 2's purchases. The second time occurred when Defendant stole Plaintiff's money and froze the Account at the end of March 2025.

(c) **The Listing Service**: After Defendant stole Plaintiff's money and froze the Account at the end of March 2025, Plaintiff advised Defendant of the existence, nature, and importance of its relationship with the Listing Service.

~~99)~~117) Additionally, Plaintiff had repeatedly advised Defendant of the nature of its business, and Defendant monitored all the wire transfers that Plaintiff's customers made into the Account. Defendant further knew that each of these transfers in was accompanied by a transfer out to ~~Plaintiff's wholesaler~~the Wholesaler.

118) Further, during the "investigations" into the transactions related to Customer 1 Customer 2, and Customer ~~2,~~3 Plaintiff's personnel~~,~~ told Defendant ~~knew (because Plaintiff told it)~~ of the devastating effects Defendant's conduct would have on Plaintiff's business as follows:

(a) **Customer 3**: Plaintiff advised Defendant that if it did not receive Customer 3's money it would be unable to fulfill Customer 3's order. As previously alleged, B.O.A. knows that precious metals do not stay at a constant price and were likely to appreciate in the turbulent economic times of 2025. Thus, B.O.A. knew that every day it stole, concealed, and withheld the money associated with Customer 3's purchase would make it more expensive to ultimately purchase the 5 Platinum Bars for Customer 3.

(b) **The Wholesaler**: Plaintiff advised Defendant that if its relationship with the Wholesaler was harmed it would be unable to fulfill customer orders, which were nearly $ 4 million in February 2025 and $ 1.5 million in the first eleven days of March 2025. Plaintiff further advised Defendant that its relationship with the Wholesaler is built upon mutual trust and that

interference with that trust would be difficult to rebuild, at a cost to Plaintiff, including less favorable terms in future transactions once it reestablished its business.

~~(a)~~(c) **The Listing Service**: Plaintiff advised Defendant that if its relationship with the Listing Service was harmed it would lose 85-90 percent of its business, which was nearly $ 4 million in February 2025 and $ 1.5 million in the first eleven days of March 2025.

~~100)~~119) Notwithstanding the foregoing, Defendant intentionally, wrongfully, and without justification, closed Plaintiff's Account and shut down its business. Defendant further knows of the extended amount of time it would take for Plaintiff to open new bank accounts because Defendant itself took time to open the Account for Plaintiff and Defendant knew that it labeled Plaintiff as a fraudulent merchant despite the fact that Plaintiff was not a fraudulent merchant.

120) ~~Defendant~~Defendant froze Plaintiff's Account and took the funds that Customer 3 deposited into Plaintiff's Account. This left Plaintiff unable to fulfill Customer 3's order, interfered with Plaintiff's relationship with the Wholesaler, and caused Plaintiff to become delisted with the Listing Service.

121) Defendant knew or should have known that taking and not returning the funds from Plaintiff's Account, in addition to those other acts alleged herein, was certain or

substantially certain to disrupt Plaintiff's economic relationships with Customer 3, the Wholesaler, and the Listing Service.

~~101)~~122) Defendant further knew of the wrongful nature of its conduct because it had already been punished and fined an amount in excess of $ 1,000,000,000.00 ($ 1 billion) by the C.F.P.B. and the O.C.C. for engaging in similar conduct in the Credit Card Scam, Garnishment Scam, and Fraud Reporting Scam ~~outlined above.~~ . These Scams demonstrate that B.O.A. knew of the wrongfulness of its actions as follows:

(a) In the Credit Card Scam B.O.A. misrepresented to consumers the nature of its accounts so that it could obtain $ 459 million in fees from them. In this case, B.O.A. misrepresented to Plaintiff the nature of its "investigation" into the Account and ultimately took approximately $ 50,000 based upon those misrepresentations knowing that Plaintiff needed those funds to fulfill Customer 3's orders.

(b) In the Garnishment Scam, B.O.A. misrepresented to consumers their rights under the law so as to relieve B.O.A. of its own obligations, resulting in losses to consumers that they otherwise would not have suffered. B.O.A. was ordered to pay a $ 10 million penalty into the C.F.P.B.'s Civil Penalty Fund. Similarly, B.O.A. failed to investigate the nature of the funds being deposited into the Account and simply kept them for itself without regard to Plaintiff's or Customer 3's rights under the law.

(c) In the Fraud Reporting Scam, B.O.A. set up an automated fraud filter with unreasonably low "flags" that automatically triggered an account freeze that harmed thousands of consumers by depriving them of their unemployment benefits. This is similar to this case because B.O.A.'s fraud reporting system also proved to be faulty and failed to correct itself here, causing harm to Plaintiff and Customer 3.

123) In all instances, B.O.A. had notice that these business practices would be likely to disrupt Bullion's contractual relationship with Customer 3, the Wholesaler, and the Listing Service because of Plaintiff's warnings. Further, B.O.A. generally knows of the harmful conduct its wrongful conduct has on its customers because had entered into consent judgments regarding the Credit Card Scam, the Garnishment Scam, and the Fraud Reporting Scam, and the Theft Scam.

124) Because of Defendant's wrongful conduct, Plaintiff was unable to conduct any business, and has lost out on approximately $ 1 million – $ 2 million of sales on 4 April 2025, and all other lost sales from March 27, 2025 until it was able to reestablish at least some of its banking connections.

~~102)~~125) Additionally, Plaintiff will lose out on continued business because Plaintiff's extended shutdown in business has ~~destroyed its goodwill~~caused it reputational and general harm amongst its key business partners, the Wholesaler and the Listing Service, as well as the customer base~~,~~ those business partners helped Bullion Standard

Build. This caused it to be delisted from various industry listings, and generally diminished Plaintiff's good will in the precious metals market. This will result in damages to Plaintiff in the form of loss or reputation, lost future profits, and other damages in a sum to be proven at trial.

103)126) The aforementioned acts of Defendant were willful, malicious, oppressive, and/or fraudulent. Plaintiff is therefore entitled to an award of punitive damages. Defendants' actions were instructed, approved, ratified, or consented to by the supervisors and other managing agents that supervised Defendant's fraud prevention unit and customer service hotlines.

## SIXTH CAUSE OF ACTION
## (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)
## (AGAINST ALL DEFENDANTS)

104)127) PLAINTIFF hereby incorporates by reference paragraphs 1-95126 of this Complaint as if fully set forth herein.

105) As outlined above, Plaintiff had built goodwill and a customer base generating approximately $ 4 million in sales during January 2024 through February 2025, and another $ 1.5 million in the first eleven days of March 2025, which were handled through Plaintiff's Account over the last year.

106)128) Defendant knew of these sales by virtue. Specific instances of the facts outlined above. Plaintiff's prospective economic opportunities include, but are not limited to:

(a) Customer 3;

(b) The Wholesaler (Upstate Coin & Gold);

(c) The Listing Service (www.findbullionprices.com).

107)129) As a result of its considerable track record of success, Plaintiff anticipated that it would generate at least another $ 4 million in sales per year for the next several years of its business. Based on the extreme growth patterns Bullion Standard saw during January through March of 2025, Bullion Standard expects that this number would have grown even larger.

108)130) In addition to above, as a result of historic events, Plaintiff expected to have an additional $ 1 million – $ 2 million in sales on the day of March 27,4 April 2025.

131) Plaintiff advised Defendant of these relationships as follows:

(a) **Customer 3**: After Defendant stole Plaintiff's money and froze the Account at the end of March 2025, Plaintiff advised Defendant of the existence, nature, and amount of Customer 3's purchase;

(b) **The Wholesaler**: Plaintiff informed Defendant of its relationship with the Wholesaler twice. The first time occurred when Defendant took the money associated with Customer 1's and Customer 2's purchases. The second

time occurred when Defendant stole Plaintiff's money and froze the Account at the end of March 2025.

(c) **The Listing Service**: After Defendant stole Plaintiff's money and froze the Account at the end of March 2025, Plaintiff advised Defendant of the existence, nature, and importance of its relationship with the Listing Service.

109)132) Additionally, Plaintiff had repeatedly advised Defendant of the nature of its business, and Defendant monitored all the wire transfers that Plaintiff's customers made into the Account. Defendant further knew that each of these transfers in was accompanied by a transfer out to Plaintiff's wholesalerthe Wholesaler.

110)133) Further, during the "investigations" into the transactions related to Customer 1 Customer 2, and Customer 2,3 Plaintiff's personnel, told Defendant knew (because Plaintiff told it) of the devastating effects Defendant's conduct would have on Plaintiff's business. – as follows:

(a) **Customer 3**: Plaintiff advised Defendant that if it did not receive Customer 3's money it would be unable to fulfill Customer 3's order. As previously alleged, B.O.A. knows that precious metals do not stay at a constant price and were likely to appreciate in the turbulent economic times of 2025. Thus, B.O.A. knew that every day it stole, concealed, and withheld the

money associated with Customer 3's purchase would make it more expensive to ultimately purchase the 5 Platinum Bars for Customer 3.

(b) **The Wholesaler**: Plaintiff advised Defendant that if its relationship with the Wholesaler was harmed it would be unable to fulfill customer orders, which were nearly $ 4 million in February 2025 and $ 1.5 million in the first eleven days of March 2025. Plaintiff further advised Defendant that its relationship with the Wholesaler is built upon mutual trust and that interference with that trust would be difficult to rebuild, at a cost to Plaintiff, including less favorable terms in future transactions once it reestablished its business.

134) **The Listing Service**: Plaintiff advised Defendant that if its relationship with the Listing Service was harmed it would lose 85-90 percent of its business, which was nearly $ 4 million in February 2025 and $ 1.5 million in the first eleven days of March 2025.

~~111)~~135) Notwithstanding the foregoing, Defendant negligently closed Plaintiff's Account and shut down its business. Defendant further knows of the extended amount of time it would take for Plaintiff to open new bank accounts because Defendant itself took time to open the Account for Plaintiff and Defendant knew that it labeled Plaintiff as a fraudulent merchant despite the fact that Plaintiff was not a fraudulent merchant.

136) Defendant knewDefendant froze Plaintiff's Account and took the funds that Customer 3 deposited into Plaintiff's Account. This left Plaintiff unable to fulfill Customer 3's order, interfered with Plaintiff's relationship with the Wholesaler, and caused Plaintiff to become delisted with the Listing Service.

137) Defendant knew or should have known that taking and not returning the funds from Plaintiff's Account, in addition to those other acts alleged herein, was certain or substantially certain to disrupt Plaintiff's economic relationships with Customer 3, the Wholesaler, and the Listing Service.

112)138) Defendant further knew or should have known of the wrongful nature of its conduct because it had already been punished and fined an amount in excess of $ 1,000,000,000.00 ($ 1 billion) by the C.F.P.B. and the O.C.C. for engaging in similar conduct in the Credit Card Scam, Garnishment Scam, and Fraud Reporting Scam outlined above. . These Scams demonstrate that B.O.A. knew of the wrongfulness of its actions as follows:

113) Because of Defendant's wrongful conduct, Plaintiff is unable to conduct any business, and has lost out on approximately $ 1 million -- $ 2million of sales from March 27, 2025.

(a) In the Credit Card Scam B.O.A. misrepresented to consumers the nature of its accounts so that it could obtain $ 459 million in fees from them. In this case, B.O.A. misrepresented to Plaintiff the nature of its

"investigation" into the Account and ultimately took approximately $ 50,000 based upon those misrepresentations knowing that Plaintiff needed those funds to fulfill Customer 3's orders.

(b) In the Garnishment Scam, B.O.A. misrepresented to consumers their rights under the law so as to relieve B.O.A. of its own obligations, resulting in losses to consumers that they otherwise would not have suffered. B.O.A. was ordered to pay a $ 10 million penalty into the C.F.P.B.'s Civil Penalty Fund. Similarly, B.O.A. failed to investigate the nature of the funds being deposited into the Account and simply kept them for itself without regard to Plaintiff's or Customer 3's rights under the law.

(a)(c) In the Fraud Reporting Scam, B.O.A. set up an automated fraud filter with unreasonably low "flags" that automatically triggered an account freeze that harmed thousands of consumers by depriving them of their unemployment benefits. This is similar to this case because B.O.A.'s fraud reporting system also proved to be faulty and failed to correct itself here, causing harm to Plaintiff and Customer 3. Because of Defendant's wrongful conduct, Plaintiff is unable to conduct any business, and has lost out on approximately $ 1 million -- $ 2million of sales from March 27, 2025.

(d) In the Theft Scam, B.O.A. stole money from its customers and set up fraudulent bank accounts under sneaky deposit agreements which were also utilized to steal money from different customers. This is similar to this case because B.O.A. has stolen money from Bullion Standard and is attempting to utilize a so-called, but unproven and unalleged, deposit agreement to "justify" its theft.

139) In all instances, B.O.A. had notice or should have known that these business practices would be likely to disrupt Bullion's contractual relationship with Customer 3, the Wholesaler, and the Listing Service because of Plaintiff's warnings. Further, B.O.A. generally knows of the harmful conduct its wrongful conduct has on its customers because had entered into consent judgments regarding the Credit Card Scam, the Garnishment Scam, the Fraud Reporting Scam, and the Theft Scam.

140) Because of Defendant's wrongful conduct, Plaintiff was unable to conduct any business, and has lost out on approximately $ 1 million – $ 2 million of sales on 4 April 2025, and all other lost sales from March 27, 2025 until it was able to reestablish at least some of its banking connections.

114)141) Additionally, Plaintiff will lose out on continued business because Plaintiff's extended shutdown in business has destroyed its goodwill amongst its customer base,caused it reputational and general harm amongst its key business partners, the Wholesaler and the Listing Service, as well as the customer base those business partners

helped Bullion Standard Build. This caused it to be delisted from various industry listings, and generally diminished Plaintiff's good will in the precious metals market. This will result in damages to Plaintiff in the form of loss or reputation, lost future profits, and other damages in a sum to be proven at trial.

115)142) The aforementioned acts of Defendant were willful, malicious, oppressive, and/or fraudulent. in that they were undertaken with a reckless disregard for the rights of the Plaintiff. Plaintiff is therefore entitled to an award of punitive damages. Defendants' actions were instructed, approved, ratified, or consented to by the supervisors and other managing agents that supervised Defendant's fraud prevention unit and customer service hotlines.

## SEVENTH CAUSE OF ACTION
## (VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200)
## (AGAINST ALL DEFENDANTS)

116)143) PLAINTIFF hereby incorporates by reference paragraphs 1-116142 of this Complaint as if fully set forth herein.

144) As an additional/alternative legal theory to those other claims alleged above, Plaintiff further alleges violations of California Business & Professions Code § 17200. Plaintiff not only seeks disgorgement, but also equitable remedies for B.O.A.'s fraudulent, deceptive, and unfair business practices.

~~117)~~145) As alleged above, B.O.A. has a troubling and disturbing history of lying to and stealing from its customers, including Bullion. *See also,* Exhibits 3.A-3.D.

146) ~~As a direct result of B.O.A.'s bad conduct~~In the **Credit Card Scam**, B.O.A. engaged in fraudulent, deceptive, and unfair conduct by misrepresenting its business practices to consumers in a manner similar to as occurred in this case. In the Credit Card Scam, B.O.A. admitted that it perpetrated the following unfair, deceptive, and fraudulent acts:

(a) B.O.A. illegally charged approximately 1.9 million consumer accounts for credit monitoring and credit reporting services that they were not receiving and was ordered to pay a $ 20 million civil money penalty to the C.F.P.B.

(b) B.O.A. led some consumers to believe that the first 30 days of coverage were free of charge when, in fact, by enrolling, consumers were "agreeing" to purchase the credit protection products. Consumers would begin incurring charges unless they cancelled within an initial 30-day review period, in which case any fees previously paid would be reimburse.

(c) B.O.A. misled some consumers about the enrollment process for these products, telling them that there were additional steps to enroll in or purchase the products after the telemarketing call or that, on the call, they were merely agreeing to receive additional information. In reality, B.O.A.

was enrolling these consumers in the products during these calls and then charging consumers for the products.

(d) B.O.A. misrepresented the benefits consumers could receive from the products, telling consumers they could receive benefits for a longer period of time than was allowed under the terms and conditions of the credit protection products. B.O.A. also led some consumers to believe they would be entitled to a "$25,000 death benefit" by enrolling in Credit Protection Plus when that was not the case. Telemarketers misled consumers by implying the benefits of these products were automatic upon notice of a qualifying event when, in fact, benefits were contingent on the successful completion of a benefit request submission and approval process.

(e) B.O.A. illegally charged customers for these products as soon as they enrolled even if they were not actually receiving the services yet.

(f) B.O.A. engaged in these unfair billing practices from at least October 2000 through September 2011. About 1.9 million consumer accounts were improperly billed product fees while not receiving the full product services, affecting roughly 1.5 million consumers.

(g) B.O.A. damaged consumers in an amount of $ 459 million.

147) In the **Garnishment Scam**, B.O.A. engaged in fraudulent, deceptive, and unfair conduct by misrepresenting its business practices to consumers in a manner similar to as occurred in this case. In the Garnishment Scam, B.O.A. admitted that it perpetrated the following unfair, deceptive, and fraudulent acts:

(a) B.O.A. falsely represented to customers that their rights to have certain funds exempted from garnishment were governed by the law of the issuing court's state. By stating to its customers that it applied the exemption law of the garnishment issuing state, B.O.A. misrepresented to customers that their rights to have certain funds exempted from garnishment orders were governed by the laws of the issuing states when, actually, in most states, customers' own state laws apply.

(b) B.O.A. required customers to "direct" it not to contest garnishment orders and to waive the company's liability for its actions regarding the out-of-state garnishment orders. This prevented customers from pursuing legal claims against B.O.A. for improperly handling garnishments. B.O.A. also represented to its customers that they waived their right to hold the company liable for improperly responding to garnishment notices; however, account holders have the right to challenge garnishments despite any language in their account agreements to the contrary.

(c) B.O.A. acted on garnishment orders without disclosing that the accounts were located out-of-state and protected from the issuing courts' garnishment orders. B.O.A. applied the consumer protections and exemption rights of the state that issued the garnishment order and not those of the state where the individual lived. As a result, it improperly held, froze, and eventually turned over its customers' funds to judgment creditors.

148) In the **Fraud Reporting Scam**, B.O.A. engaged in fraudulent, deceptive, and unfair conduct by misrepresenting its business practices to consumers in a manner similar to as occurred in this case. In the Fraud Reporting Scam, B.O.A. admitted that it perpetrated the following unfair, deceptive, and fraudulent acts:

(a) In the fall of 2020, and continuing through mid-2021, B.O.A. changed its practices for investigating prepaid debit card fraud on the unemployment insurance benefit accounts. Instead of conducting reasonable investigations, it implemented a fraud filter with a simple set of flags that automatically triggered an account freeze. This set a low bar to freeze the unemployment insurance benefits of many people, harming thousands of legitimate cardholders needing the money. The bank also retroactively applied its fraud filter to deny some notices of error submitted by prepaid debit cardholders that the bank had previously investigated and paid.

(b) B.O.A. made it very difficult for people to unfreeze their prepaid debit cards or for people to report fraudulent use of their cards. People with unemployment insurance benefit prepaid debit cards could not make reports online, or in person at bank branches. People were on hold for hours every day for weeks trying to talk to someone at the bank. Furthermore, the bank told customers they had agents available 24 hours a day, seven days a week, when, in fact, it operated a more limited schedule for its claim call center. Because Bank of America was the strongly preferred provider for California unemployment benefits, consumers were caught without any choice to switch providers.

(c) When consumers sought assistance, the bank often sent them back to the California state unemployment department for verification in order to regain access to their benefits. But the bank knew the department was stretched and unable to provide services; the bank met with the department dozens of times in the summer of 2020 and should have known it was essentially redirecting people into a black hole.

149) In the **Theft Scam**, B.O.A. engaged in fraudulent, deceptive, and unfair conduct by misrepresenting its business practices to consumers in a manner similar to as occurred in this case. In the Theft Scam, B.O.A. admitted that it perpetrated the following unfair, deceptive, and fraudulent acts:

(a) B.O.A. had a policy of charging customers $35 after the bank declined a transaction because the customer did not have enough funds in their account. The C.F.P.B.'s investigation found that B.O.A. double-dipped by allowing fees to be repeatedly charged for the same transaction. Over a period of multiple years, B.O.A. generated substantial additional revenue by illegally charging multiple $35 fees.

(b) To compete with other credit card companies, B.O.A. targeted individuals with special offers of cash and points when signing up for a credit card. B.O.A. illegally withheld promised credit card account bonuses, such as cash rewards or bonus points, to tens of thousands of consumers. B.O.A. failed to honor rewards promises for consumers who submitted in-person or over-the-phone applications. B.O.A. also denied sign-up bonuses to consumers due to the failure of B.O.A.'s business processes and systems.

(c) From at least 2012, in order to reach now disbanded sales-based incentive goals and evaluation criteria, B.O.A. employees illegally applied for and enrolled consumers in credit card accounts without consumers' knowledge or authorization. In those cases, B.O.A. illegally used or obtained consumers' credit reports, without their permission, to complete applications. Because of B.O.A.'s actions, consumers were charged

unjustified fees, suffered negative effects to their credit profiles, and had to spend time correcting errors.

(d) B.O.A. also violated the Fair Credit Reporting Act by using or obtaining consumer reports without a permissible purpose in connection with unauthorized credit cards, as well as the Truth in Lending Act and its implementing Regulation Z, by issuing credit cards to consumers without their knowledge or consent.

150) Unlawful Prong: In accordance with its prior acts under the Theft Scam and the Credit Card Scam, B.O.A. unlawfully took money out of Bullion's Account in violation of California Penal Code §§ 484, 503 and 506.

151) Unfair Prong: In accordance with its prior acts under the Theft Scam, the Credit Card Scam, the Fraud Reporting Scam, and the Garnishment Scam, B.O.A. unfairly labeled Bullion as a fraudulent merchant, closed its account, took its money, and refused to return its funds. B.O.A.'s conduct was unfair because it claims to have a "fraud investigation department" to determine whether fraud has been committed; however, B.O.A. has conducted no investigation. Rather, Bullion has provided B.O.A. with exonerating evidence, including statements from Customer 1 and Customer 2, as well as the evidence accompanying Exhibits 1 and 3, attached to this Complaint. Despite this, B.O.A. (including its fraud department) has refused to consider this evidence and has nonetheless—and unfairly—labeled Bullion as a fraudulent merchant. There is no benefit

to B.O.A., other than it has wrongfully (and illegally) retained Bullion's money. Against this, Bullion's reputation and credibility in the community was destroyed at great cost to Bullion. Thus, the harm of B.O.A.'s unfair acts have been greatly outweighed by non-existent benefit of B.O.A.'s conduct.

152) Fraudulent Prong: In accordance with its prior acts under the Theft Scam and the Credit Card Scam, B.O.A. fraudulently induced Bullion to utilize the Account when it knew full well that it was going to close it, through the use of the fraudulent statements more fully alleged in the Theft Through False Pretenses Scheme alleged above.

~~118)~~153) As a direct result of B.O.A.'s conduct as alleged herein, B.O.A. has wrongfully obtained in excess of $ 50,000 of funds from Bullion's Account, not to mention fees and other charges it has collected in an amount to be proven at trial.

~~119)~~154) By reason of the above-alleged unlawful, unfair, and fraudulent~~, deceptive, and unfair~~ conduct, Bullion seeks disgorgement of B.O.A.'s ill-gotten gains. Bullion further seeks an order from this Court enjoining B.O.A. from continuing to conduct business through the unlawful, unfair, and fraudulent~~, deceptive, and unfair~~ acts herein described.

155) As outlined above, B.O.A. has failed and refused to accede to Bullion's requests to clear its name and to refund Bullion's money. Likewise, Bullion is informed and believes, and hereon alleges, that B.O.A. treats other similarly situated merchants in similar manners. B.O.A.'s acts herein alleged are acts of unfair competition within the

meaning of California Business and Professions Code § 17203. Bullion is informed and believes that B.O.A. will continue to do those acts unless the Court orders B.O.A. to cease and desist.

156) Bullion has incurred and, during the pendency of this action, will incur, expenses for attorney's fees and costs herein. Such attorney's fees and costs are necessary for the prosecution of this action and will result in benefit affecting the public interest, or a large group of persons (consisting of merchants adversely affected by B.O.A.'s business practices) such as to make the necessity and financial burden of private enforcement of this action unfairly imposed solely upon Bullion, and it is not in the interests of justice that such fees be paid out of Bullion's recovery. Accordingly, Bullion is entitled to an award of attorney fees pursuant to § 1021.5 of the California Code of Civil Procedure.

**WHEREFORE** PLAINTIFF prays judgment against DEFENDANTS, and each of them, as follows:

~~120)~~157) On the **First Cause of Action**:

(a) For a declaration that Plaintiff did not commit fraud against Customer 1 and Customer 2;

(b) For an order requiring Defendant to correct any statements made to third parties stating, implying, or otherwise insinuating that Plaintiff committed fraud against Customer 1 and Customer 2;

~~121)~~158) On the **Second Cause of Action**:

(a) For actual damages, trebled pursuant to § 496 of the California Penal Code;

(b) For attorneys fees pursuant to § 496 of the California Penal Code;

~~122)~~159) On the ~~**Second**~~**Third Cause of Action**:

(a) For actual damages;

(b) For prejudgment interest at the legal rate from 3/27/2025;

~~123)~~160) On the **Fourth through Sixth Causes of Action**:

(a) For damages in a sum to be proven at trial;

(b) For exemplary and punitive damages;

~~124)~~161) On the **Seventh Cause of Action**:

(a) For disgorgement of all sums wrongfully retained by Defendant;

(b) For declaratory and injunctive relief restraining Defendant from engaging in the misconduct described herein, including but not limited to ordering that Defendant take each of the following corrective actions:

(i) Timely respond to merchant customers' claims that their transactions are legitimate and to validate the source of disputed funds;

(ii) Establish a timeline by which Defendant's fraud prevention unit must respond to its merchant customers' claims that their

accounts are not the subject of irregular, unauthorized, fraudulent, or illegal activity;

(iii) Establish a customer service website, email address, and telephone hotline which will be staffed by bank personnel that will be empowered to answer questions in a timely fashion that allows merchants to timely and accurately dispute the Bank's claims that their accounts are the subject of irregular, unauthorized, fraudulent, or illegal activity;

(iv) Return all disputed funds to the merchant customers within 15 days of the imposition of any "freeze" if the Bank is unable to comply with the above.

(c) For an award of attorney fees pursuant to § 1021.5 of the California Code of Civil Procedure;

~~125)~~162) On **All Causes of Action**:

(a) For cost of suit incurred herein; and

(b) For such other relief as the Court may deem proper.

SHARIF | FAUST LAWYERS, LTD.

Dated: ~~8/20/2025~~9 March 2026 BY: /S/ Matthew J. Faust

MATTHEW J. FAUST
Attorneys for Plaintiff
BULLION STANDARD, INC.